UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**FILED**

FEB 13 2015

Clerk, U.S. District and
Bankruptcy Courts

GRANT F. SMITH, *PRO SE*

4101 DAVIS PL NW #2, WASHINGTON, DC 20007

202-342-7325

Plaintiff,

v.

CENTRAL INTELLIGENCE AGENCY

Washington, D.C. 20505

703-613-1287

Defendant.

Case: 1:15-cv-00224
Assigned To : Chutkan, Tanya S.
Assign. Date : 2/13/2015
Description: FOIA/Privacy Act

## COMPLAINT FOR INJUNCTIVE RELIEF

1. This is an action under the Freedom of Information Act, 5 U.S.C. § 552, to order the production of Central Intelligence Agency (CIA) files about the unlawful diversion of U.S. government-owned weapons-grade uranium from the Nuclear Materials and Equipment Corporation (NUMEC) into the clandestine Israeli nuclear weapons program which the Defendant Central Intelligence Agency has improperly withheld from the Plaintiff.

2. This court has jurisdiction over this action pursuant to 5 U.S.C. § 552(a)(4)(B).

3. The Plaintiff has a legal right under FOIA to obtain the information he seeks, and there is no legal basis for the denial by Defendant CIA of said right.

- 1 -

4. Plaintiff, Grant F. Smith, is an author and public interest researcher and founder of the Institute for Research: Middle Eastern Policy, Inc. (IRmep) and is the requester of the records which Defendant is now withholding. Smith's FOIA, mandatory declassification review (MDR) and Interagency Security Classification Appeals Panel (ISCAP) generated releases, research and analysis have been published in *The Washington Report on Middle East Affairs*, *The Wall Street Journal*, *Antiwar.com*, *The Washington Examiner*, *Mint Press News*, *LobeLog*, the *Bulletin of the Atomic Scientists,*[1] *Military.com*, *The Jewish Daily Forward*, *Business Insider*, and *Courthouse News Service*. They have been carried on broadcast outlets such as C-SPAN, public and commercial U.S. radio stations as well as foreign outlets like the BBC and RT. Plaintiff originally requested this information for use in vital public interest research into how nuclear weapons related know-how, material and technology have been unlawfully diverted into Israeli entities conducting clandestine nuclear weapons-related research and development while undermining the Nuclear Non-Proliferation Treaty and the Symington and Glenn Amendments to the 1961 US Foreign Assistance Act. He is the author of the 2012 book *Divert! NUMEC, Zalman Shapiro and the Diversion of US. Weapons-Grade Uranium into the Israeli Nuclear Weapons Program.*

5. According to a U.S. Department of Energy year 2000 report, the Nuclear Materials and Equipment Corporation (NUMEC), though defunct, retains the highest pre-1986 "materials unaccounted for" losses of any government-contractor nuclear processing facility

---

[1] "Did Israel steal bomb-grade uranium from the United States?" Victor Gilinsky and Roger J. Mattson, Bulletin of the Atomic Scientists, April 17, 2014 http://thebulletin.org/did-israel-steal-bomb-grade-uranium-united-states7056

in the United States.[2] According to a declassified GAO report, Apollo, Pennsylvania based

NUMEC processed scarce government-supplied, unique, highly enriched uranium into fuel

for the U.S. Navy, receiving over 22 tons of weapons-grade U-235.   Through 1968 more

than 330 kilograms of highly enriched uranium disappeared from NUMEC.[3]   In 1968,

Israel's top spy Rafael Eitan visited the plant with his team of Israeli intelligence operatives

under false pretenses at the invitation of the plant's president, Zalman Shapiro. Information

about this visit became part of the FBI investigative file on NUMEC. (Exhibit 1) 1968 was

the year of highest NUMEC losses.[4]   The plant only returned to normal industry-level

losses soon after the Atomic Energy Agency engineered a buyout, termination of Israel joint-

ventures, and transfer of top executives.[5]

6. According to lengthy investigations by the Federal Bureau of Investigation, the

earliest demanded by the CIA, NUMEC was unique among U.S. government nuclear

contractors in its formal and informal ties to Israel and Israel's clandestine nuclear weapons

operatives and front organizations.   Many FBI files are now in the public domain.[6]

NUMEC President Zalman Shapiro knew Benyamin Blumberg, who formed Israel's

LAKAM (Bureau of Scientific Relations) intelligence and covert operations agency that

collected scientific and technical intelligence abroad. Avraham Hermoni, technical director

---

[2] "Highly Enriched Uranium: Striking a Balance" U.S. Department of Energy, 2001 released to the Federation of American Scientists on February 2, 2006 http://www.fas.org/sgp/othergov/doe/heu/striking.pdf
[3] "Did Israel Steal Bomb-Grade Uranium from the United States?" Bulletin of the Atomic Scientists, April 7, 2014 http://thebulletin.org/did-israel-steal-bomb-grade-uranium-united-states7056
[4] "Revisiting the NUMEC Affair" Victor Gilinsky and Roger Mattson, Bulletin of the Atomic Scientists, May 30, 2013
[5] "Divert! NUMEC, Zalman Shapiro, and the Diversion of US Weapons Grade Uranium into the Israeli Nuclear Weapons Program" Grant F. Smith, IRmep, 2012
[6] Archived at http://IRmep.org/ila/numec

of Israel's nuclear bomb project at RAFAEL was Shapiro's frequent guest both at his home in Pittsburgh and at NUMEC.   Shapiro held rushed clandestine meetings with Israeli intelligence operatives such as Jeruhem Kafkafi which took place under FBI surveillance[7]. NUMEC formed a joint venture, ISORAD, with the Israeli Atomic Energy Commission, later determined to be a front for nuclear weapons development.   This "joint venture" required shipping hollow, sealed "irradiators" under non-standard logistical arrangements prioritized to leave the United States as quickly as possible.

7. According to a 1980 NUMEC employee eyewitness (Exhibit 2) account to the FBI, Shapiro and unknown accomplices stuffed irradiators with highly enriched uranium (HEU) canisters before sealing for rush shipment to Israel.

8. High officials at the CIA went on the record claiming that Israel diverted HEU from NUMEC for use in its clandestine nuclear weapons program.   The head of the Nuclear Regulatory Commission (NRC) invited CIA Deputy Director for Science and Technology Carl Duckett to brief the NRC about safeguards issues. Duckett told a stunned NRC executive audience not only that CIA believed Israel had illegally obtained HEU from NUMEC, but that the stolen material was used to produce Israel's first atomic bombs. Duckett confirmed the CIA's finding that Israel had already assembled nuclear weapons by the mid-1960s. Israel began to practice A-4 jet bombing run maneuvers that were only warranted if the explosives being delivered were atomic rather than conventional. Such practice runs to guarantee aircraft and pilot survival "would not have made sense unless it

---

[7] "Revisiting the NUMEC Affair" Victor Gilinsky and Roger Mattson, Bulletin of the Atomic Scientists, May 30, 2013

was to deliver a nuclear bomb."[8]   A summary of the CIA briefing was released under FOIA to the Natural Resources Defense Council. (Exhibit 3)

9. John Hadden was CIA station chief in Tel Aviv from 1963 to 1967 and was tasked with collecting environmental samples outside Dimona for radiation testing. Hadden told congressional investigators, "NUMEC had been an Israeli operation from the beginning but the CIA had not been able to follow the money trail. The agency thought NUMEC had been financed by the owner of Apollo steel mill, Israeli War of Independence veteran David Lowenthal." Hadden said that any suggestion that Angleton (John Jesus Angleton, the top CIA counterintelligence official and Israel liaison) had actually helped the Israelis with the NUMEC operation was "totally without foundation."[9]

10. In a 1978 BBC interview Hadden revealed that Israeli spy Rafi Eitan, who had visited the NUMEC plant at the invitation of Zalman Shapiro, was complicit in the removal of material. "The Israelis, and they are gentlemen. Just imagine to yourself how much easier it would be to remove a pound or two of this or that at any one time, as opposed to—which is inert material—as opposed to removing all at one blow. 150 pounds of shouting and kicking Eichmann.[10] You see, they are pretty good at removing things." (Exhibit 4) In the mid-1980s Eitan became publicly known in the United States as the Israeli handler of convicted spy Jonathan Pollard, who is currently serving out a life sentence.

---

[8] "The American Connection: How Israel Got the Bomb," Jon J. Fialka, The Washington Monthly, January, 1979 p 51

[9] "Dangerous Liaison, The Inside Story of the U.S.-Israeli Covert Relationship," Andrew and Leslie Cockburn, p. 78-80, Harper-Collins, 1991

[10] Eitan and a team renditioned Nazi war criminal Eichmann from Argentina to Israel in 1960.

11. The CIA discovered traces of enriched uranium in Israel in the mid-1960s, touching off an investigation to determine which handful of countries then in possession of multi-billion dollar gaseous diffusion plants was the source.[11] Energy Department officials visiting retired former Atomic Energy Commission head Glenn Seaborg in 1978 told him the signature of the uranium picked up outside Dimona in Israel was of that of a specialized signature provided to NUMEC. (Exhibit 5)

12. The CIA was initially compelled by President Lyndon B. Johnson to suppress its findings about NUMEC and Israel's possession of nuclear weapons built with material diverted from NUMEC.   When CIA Director Richard Helms advised LBJ of CIA findings, he was ordered by LBJ to not further discuss it. (Exhibit 3)

13. In July of 1969, according to declassified files,[12] National Security Advisor Henry Kissinger noted "There is circumstantial evidence that some fissionable material available for Israel's weapons development was illegally obtained from the United States about 1965... This is one program on which the Israelis have persistently deceived us," Mr. Kissinger said, "and may even have stolen from us."[13]

14. Concerns in Congress that illegal activity had occurred and was simply covered up triggered new interest in finally determining what had happened at NUMEC during the Ford administration. Attorney General Edward Levi ordered the FBI to investigate whether criminal statutes had been violated in the diversion and whether a government cover-up had

---

[11] Transcript of the BBC News program "Panorama", June 26 1978, included as Exhibit 4

[12] Archived at http://www.irmep.org/ila/numec/07191969_Kissinger_Israeli_Nuclear_Program%20.pdf

[13] "Israel's Nuclear Arsenal Vexed Nixon," David Sout, The New York Times, November 29, 2007. http://www.nytimes.com/2007/11/29/world/middleeast/29nixon.html?_r=0

ensued.[14]   Another FBI investigation, with additional input by the CIA and General

Accounting Office (GAO) commenced and continued until the end of the Carter

administration.

15. The CIA has long taken the position that none of its "source" files about

NUMEC or derivative equity content can ever be made public.   It has issued blanket denials

of Freedom of Information Act requests from the late 1970's onward filed by such

investigative reporters as John Fialka of the Washington Star.[15]

16. On May 13, 2010 the Plaintiff requested "declassification and release of all cross

referenced CIA files related to uranium diversion from the Nuclear Materials and

Equipment Corporation (NUMEC) to Israel. This request includes, but is not limited to CIA

content provided for publication in the now declassified 1978 GAO report titled 'Nuclear

Diversion in the U.S.? 13 Years of Contradiction and Confusion.'" The request was broad.

(See Exhibit 6) It is known in the public domain that the CIA possesses thousands of

NUMEC files.

17. On September 10, 2010, months in excess of the twenty day FOIA response limit,

the CIA confirmed receipt of the Plaintiff's request and assigned it number F-2010-01210.

(See Exhibit 7)

18. On August 28, 2013, over three years after the Plaintiff's filing of the request, the

CIA issued a "final response to your 13 May 2010 Freedom of Information Act FOIA

---

[14]  FBI Airtel, special agent in charge, Washington Field Office to FBI director, [subject redacted], June 15, 1976, Benjamin Loeb papers, Library of Congress Manuscript Division

[15]  Reviewed by the Plaintiff at the Library of Congress Manuscripts Division, Benjamin Loeb Papers

request." The CIA segregated and released nothing it had generated about the diversion,[16] stating "We completed a thorough search for records responsive to your request and located material that we determined is currently and properly classified and must be denied in its entirety on the basis of FOIA exemptions(b)(I)and (b)(3)." (See Exhibit 8)

19. On September 19, 2013 the Plaintiff administratively appealed the CIA denial and also challenged the CIA on whether it was conducting the required periodic reviews of operational and related files for release. (See Exhibit 9).

20. On March 28, 2014, nearly four years after the initial FOIA, the CIA denied the plaintiff's administrative appeal, segregated and released nothing. (See Exhibit 10). Although the Plaintiff had legal standing much earlier to seek a de *novo* judicial review of the adequacy of the Defendant's search and whether it was conducting reviews of classified material that should be automatically released after fixed durations and other applications of FOIA and declassification directives, the Plaintiff instead chose to allow the Defendant as much time as it required to fully exhaust its administrative process.

21. The Defendant now bears the burden of justifying to the court its longtime blanket nondisclosure of NUMEC files under FOIA exceptions, of demonstrating that it conducted a bona fide search and that the agency has adequately segregated exempt from non-exempt information. See 5 U.S.C. § 552(a)   Part of this burden to the court may involve the production of detailed Vaughn indexes or even *in camera* review of the documents in

---

[16] The CIA did re-release internal memorandums about why it would not allow release of CIA equity in the 1978 GAO report titled "13 Years of Conflict and Confusion" due to the need for a "coordinated Executive Branch position and our desire to protect a sensitive and valuable liaison equity."

question.

22. As it conducts a de novo review of the adequacy of the Defendant's search for files, the Defendant's prior assertions that operational files and derivative products about NUMEC should not be released, and the Defendant's determinations that nothing was segregable or releasable, the court should consider that the CIA's previous release determinations on NUMEC files have already been overruled.

23. On December 18, 1978 the Government Accounting Office[17] (GAO) issued the report "Nuclear Diversion in the U.S.? 13 Years of Contradiction and Confusion." Because it contained CIA equity, in 1978 the CIA was opposed to public release of a report originally chartered to quell concerns in Congress and the American public that uranium was illegally diverted from NUMEC, and that nothing was ever done about it. The four allegations investigated by GAO were as follows. "A. The material was illegally diverted to Israel by NUMEC management for use in nuclear weapons. B. The material was diverted to Israel by NUMEC management with the assistance of the Central Intelligence Agency (CIA). C. The material was diverted to Israel with the acquiescence of the United States Government. D. There has been a cover-up of the NUMEC incident by the United States Government."

24. At the CIA's insistence in 1978, and in opposition to the will of the Congress, the entirety of the GAO report was originally classified as "secret" and not publically released.

25. In May of 2009, the GAO asked the CIA and FBI to engage in a mandatory declassification review of the secret GAO report "Nuclear Diversion in the U.S.? 13 Years

---

[17] Since renamed the "Government Accountability Office"

of Contradiction and Confusion" for public release.   The CIA redacted all of its equity

content. The FBI did not. The GAO released a CIA-redacted copy of the report to the

public on May 6, 2010.

26. On March 18, 2014 the Interagency Security Classification Appeals Panel, a

review board that issues rulings "on appeals by authorized persons who have filed

classification challenges under Section 1.8 of E.O. 13526" overturned the CIA's

determinations and released most of the equity the CIA had redacted from the GAO report

before the 2010 release.   (A page by page comparison of CIA redactions vs ISCAP reversals

of CIA may be found in Exhibit 11)

27. On March 18, 2014 the ISCAP also overruled CIA's blanket of secrecy over

NUMEC and released the April 2, 1968 appeal from then-CIA Director Richard Helms to

Attorney General Ramsey Clark urging the FBI "initiate a discreet intelligence investigation

of an all source nature of [NUMEC president] Dr. Shapiro in order to establish the nature

and extent of his relationship with the Government of Israel" in the name of counter-

proliferation.   (Exhibit 12).

28. The ISCAP also compelled partial release on March 18, 2014 of CIA Deputy

Director of Covert Operations Theodore Shackley's July 28, 1977 phone briefing on the

NUMEC diversion, including content about how then-CIA director George H.W. Bush had

briefed President-elect Jimmy Carter on the matter.   Recipient of the Shackley briefing

Jessica Tuchman Mathews, a national-security official in the Carter administration, stated "I

do not think the President has plausible deniability.   The CIA case is persuasive…" (Exhibit

13).

- 10 -

29. The Plaintiff therefore asserts on the basis of evidence that the Defendant has neither properly reviewed files in its possession nor equity held by other parties for release. The CIA has never denied that CIA files on the NUMEC matter exist.   Records in the public domain confirm that "thousands" of CIA files have been generated on the matter.

30. For example, in 2013 the National Archives released an April 25, 1979 Carter Administration Attorney General memo that their Internal Security Section "completed a detailed review of thousands of CIA documents..." on NUMEC which necessitated further FBI investigations. (Exhibit 14)   The name of the National Security Council file folder containing these documents is revealing, "NSA Staff Material: Global Issues Box 41, Folder: Proliferation: Apollo, PA 5/77-11/79."

31. Some of CIA's improperly retained records are almost certainly about internal investigations, particularly whether the agency or any of its operatives abetted the diversion of uranium from NUMEC. This is documented in an August 2, 1977 memo to President Jimmy Carter from his national Security Advisor Zbigniew Brzezinski. "So far as we know however, (and we have made serious effort to discover it) there is nothing to indicate active CIA participation in the alleged theft." (Exhibit 15).

32. A number of historical records produced by the FBI and Naval Intelligence about such conventional weapons smuggling fronts for Israel as Foundry Associates, the Sonneborn Institute, Materials and Manpower for Palestine, Mar Tech, Service Airways and other fronts that endangered Americans by shipping mislabeled explosive cargo, stealing U.S. government military property, stealing veterans lists from the U.S. chaplains, undermining

the Neutrality and Arms Export Control Act and other laws through illegal activities[18] are now available as public records.[19] Also in the public domain are records about why the U.S. Department of Justice only prosecuted a handful of lower-level operatives but not the identified kingpins of the smuggling operations due to their ability to use "war chests" to "quash" warranted prosecutions.[20]

33. However NUMEC records about similar Atomic Energy Act violations that were covered up and never prosecuted could now soon be lost to posterity under mandatory document destruction guidelines, burying a vital chapter of history forever.

34. There is a strong and growing public interest in the immediate disclosure of the requested CIA documents concerning NUMEC. Currently U.S. taxpayers are being maneuvered into position to pay for a massive clean-up of the contaminated environs caused by the severely undercapitalized, safety-scoffing NUMEC smuggling front operations in Apollo, and neighboring Parks Township in Pennsylvania.[21] In January of 2015 the U.S. Army Corps of Engineers estimated the NUMEC cleanup will cost just under half a billion dollars over the next decade.[22]

35. Further confirming that NUMEC really was as CIA officer John Hadden asserts, "an Israeli operation from the beginning," will allow concerned U.S. citizens, anti-corruption

---

[18] "Arming David: The Haganah's Illegal Arms Procurement Network in the United States, 1945-49," Ricky Dale Calhoun, Journal of Palestine Studies, Vol 36 No 4, Summer 2007

[19] FBI File regarding Foundry Associates Incorporated-Neutrality Act; file number 2-I-IQ-875, 4,000 plus pages of FBI files available at the National Archives and Records Administration in College Park, MD.

[20] File archive at http://www.irmep.org/ila/feinberg/

[21] "Americans Pay Dearly to Maintain Israel's Nuclear Secrets: CIA endangers NUMEC toxic waste cleanup," Grant F. Smith, October 20, 2011 http://original.antiwar.com/smith-grant/2011/10/19/americans-pay-dearly-to-maintain-israels-nuclear-secrets/

[22] "Nuclear-Dump Cleanup Gets Complicated," John R Emshwiller,., Wall Street Journal, January 29, 2015, http://www.wsj.com/articles/pennsylvania-nuclear-dump-cleanup-gets-more-complicated-1422558579

and taxpayer watchdog organizations to use withheld CIA and other available government files verifying these facts in litigation against the Israeli government for cleanup, health, and other NUMEC-related damages.

36. Failing that, citizens could lobby members of Congress to deduct costs of the NUMEC cleanup from the massive annual taxpayer-funded foreign aid packages delivered to Israel in the same way that U.S. loan guarantees are occasionally withdrawn when there is evidence of improper use in Israeli settlement activity.

37. It is important to note under Executive Order 13526 §3.1(a) that documents may not be classified in order to "(1) conceal violations of law, inefficiency or administrative error; (2) prevent embarrassment to a person, organization or agency; (3) restrain competition; or (4) prevent or delay the release of information that does not require protection in the interest of national security."

38. The U.S. government continually misuses its classification authority on matters concerning the Israeli nuclear weapons program, of which NUMEC is only one component. Adding insult to the original injury, FOIA exemptions are misused to delay release indefinitely.

39. It is also important to note that although most government agencies do not discuss issues touching on the Israeli nuclear arsenal under various gag regulations,[23]

---

[23] "Lawsuit Challenges U.S. Ambiguity Toward Israel's Nuclear Arsenal," Grant F. Smith, Washington Report on Middle East Affairs, January/February 2015 http://www.wrmea.org/2015-january-february/lawsuit-challenges-u.s.-ambiguity-toward-israels-nuclear-arsenal.html

Americans are not fooled. A September 2014 Google Consumer Survey revealed that 63.9 percent of American adults believe Israel has nuclear weapons.[24]        ..

40. As noted, Lyndon Baines Johnson's immediate response to news of NUMEC was to order the CIA director's silence. Evidence suggests it was domestic special interest group politics rather than national security that triggered LBJ's response. One of LBJ's longtime campaign contribution bundlers was Abraham Feinberg. At times LBJ was in possession of hundreds of thousands of dollars of Feinberg-raised cash in White House safes.[25] According to "Israel and the Bomb" author Avner Cohen (1998), Israeli Prime Minister David Ben-Gurion secretly named Feinberg his chief nuclear weapons fundraising coordinator in 1958. According to Michael Karpin's "The Bomb in the Basement" (2007) Feinberg and 25 others contributed $40 million to the Israeli nuclear weapons program in opposition to presidents Eisenhower and Kennedy non-proliferation efforts.

41. Recently declassified Nixon administration files reveal the president agreed to comply with Israel's policy of not confirming or denying the existence of its arsenal under special interest pressure to avoid a "Zionist campaign to try to undermine" him rather than any legitimate national interest.[26]

42. The GAO was right to investigate the NUMEC matter in 1978 as a government cover-up. When problems with materials diversion became overwhelming, at great taxpayer expense AEC chairman Glenn Seaborg engineered NUMEC's buyout and a management

---

[24] Google Consumer Survey, "Do you believe Israel Has Nuclear Weapons?"
http://www.google.com/insights/consumersurveys/view?survey=7gfftskexqbf4&question=1&filter=&rw=1
[25] "The Samson Option" Seymour M. Hersh, Chapter 14, Random House, 1991
[26] Israel's Nuclear Weapons Program, ISCAP declassification, March 18, 2014,
http://www.archives.gov/declassification/iscap/pdf/2009-076-doc1.pdf

transition by an oilfield services company Atlantic Richfield in 1967 by dangling a $30 million per year Hanford facilities management contract.[27]

43. Zbigniew Brzezinski was eager in 1977 to divert public attention away from NUMEC diversion questions raised by CIA information and toward general "safeguards" findings by one of the AEC's successor organizations, the Energy Research and Development Administration (ERDA). "There is a tremendous amount of interest in this issue in Congress...We face tough sledding in the next few weeks in trying to keep attention focused on ERDA's technical [overall U.S. nuclear material loss and safeguard remedy] arguments. On the FBI investigations, and away from the CIA's information." (Exhibit 15) In 2014 Brzezinski told the *Wall Street Journal* the evidence suggested that "something did transpire" but that if theft was proven, "What are we going to say to the Israelis, 'give it back?'"[28]

44. Most Americans, if asked such a simple question, would probably say, "yes," be appalled by the real reasons for the wall of secrecy, and wonder whether such deference to domestic special interests—not national security—continues to generate similar abuses.

45. There currently is no FOIA exemption enabling "deference to special interests." Existing FOIA exemptions cannot lawfully be used for such purposes.

46. Quashing warranted public disclosure and informed debate through spurious claims of secrecy undermines governance in the United States and the spirit of FOIA as

---

[27] AEC Operating Contract No. AT (45-1)-2130 between USA and Atlantic Richfield Hanford Company. http://www.irmep.org/ila/numec/contract.pdf
[28] "The U.S. Suspected Israeli Involvement in 1960s Missing Uranium" John R Emshwiller, The Wall Street Journal, August 5, 2014. http://www.wsj.com/articles/u-s-suspected-israeli-involvement-in-1960s-uranium-theft-1407352852

reiterated by President Obama upon entering office, "The Freedom of Information Act should be administered with a clear presumption: In the face of doubt, openness prevails. The Government should not keep information confidential merely because public officials might be embarrassed by disclosure, because errors and failures might be revealed, or because of speculative or abstract fears. Nondisclosure should never be based on an effort to protect the personal interests of Government officials at the expense of those they are supposed to serve. In responding to requests under the FOIA, executive branch agencies (agencies) should act promptly and in a spirit of cooperation, recognizing that such agencies are servants of the public."[29]

47. Defendant CIA is an agency of the United States and has possession of and authority to release the document that Plaintiff seeks.

48. Plaintiff believes he and the public have a compelling right of access to CIA's NUMEC files. The Plaintiff believes their publication will reveal important insights into the functions of government. Enabling these insights to produce oversight and better governance is the reason FOIA exists.

49. The basic question is, as former Nuclear Regulatory Commissioner Victor Gilinsky formulated it in a 2014 *Wall Street Journal* article, "We know the CIA thought the material was stolen. We want to know why they thought that."[30]

50. The D.C. Circuit applied the general federal statute of limitations, which is found

---

[29]  White House Memorandum on FOIA, January 21, 2009,
http://www.whitehouse.gov/the_press_office/Freedom_of_Information_Act
[30]  "The U.S. Suspected Israeli Involvement in 1960s Missing Uranium" John R Emshwiller, The Wall Street Journal, August 5, 2014. http://www.wsj.com/articles/u-s-suspected-israeli-involvement-in-1960s-uranium-theft-1407352852

at 28 U.S.C. § 2401(a), to FOIA actions in Spannaus v. Department of Justice.

In the relevant portion Section 2401(a) states, that "every action commenced against the

United States shall be barred unless the complaint is filed within six years after the right of

action first accrues." It was held that the FOIA cause of action accrued— and, therefore,

that the statute of limitations began to run— once the plaintiff had "constructively"

exhausted administrative remedies in Spannaus.

51. The Plaintiff's administrative remedies were exhausted by the CIA's March 28,

2014 denial of his appeal.

52. This complaint is filed well within the six year limit.

WHEREFORE, Plaintiff requests this Court:

(1) Declare the Defendant's failure to comply with FOIA to be unlawful;

(2) Order the Central Intelligence Agency to disclose the requested records in their entirety and make copies promptly available to him;

(3) Award Plaintiff costs in this action, as provided in 5 U.S.C. § 552(a)(4)(E);

(4) Award attorney's fees if such assistance is later engaged in this action as provided in 5 U.S.C. §552(a)(4)(E) and

(5) Grant such other and further relief as may deem just and proper.

Respectfully submitted,

Grant F. Smith, *Pro Se*
4101 Davis PL NW #2, Washington, DC 20007
gsmith@IRmep.org
(202) 640-3709

Dated:   February 13, 2015

Exhibit List

Exhibit 1: NUMEC letter advising of Israeli spy Rafi Eitan's team plant visit—September 27, 1968, FBI memo about visit—October 17, 1968

Exhibit 2: FBI FD-302 Report – Eyewitness to nuclear diversion at NUMEC—September 21, 1980

Exhibit 3: Inquiry into the Testimony of the Executive Director for Operations, Unclassified, Office of the General Counsel, Office of Inspector & Auditor, U.S. Nuclear Regulatory Commission—February 1978

Exhibit 4: Transcript of the BBC News program "Panorama", excerpt 6 pages of 17 — June 26 1978

Exhibit 5: Glenn T. Seaborg Papers, Library of Congress, Manuscript Division - Glenn Seaborg office diary: DOE claims Shippingport U-235 picked up in Israel — June 21, 1987

Exhibit 6: Freedom of Information Act Request to CIA for NUMEC files — May 13, 2010

Exhibit 7: Freedom of Information Act confirmation from CIA — September 10, 2010

Exhibit 8: Freedom of Information Act final response from CIA — August 28, 2013

Exhibit 9: Freedom of Information Act administrative Appeal to CIA — September 19, 2013

Exhibit 10: Freedom of Information Act appeal denial from CIA—March 28, 2014

Exhibit 11: Nuclear Diversion in the U.S.? 13 Years of Contradiction and Confusion. Report by the Comptroller General of the United States, December 18, 1978. —May 6, 2010 release with CIA redactions (Right side) March 18, 2014 release with ISCAP overrulings of CIA redactions (Left side).

Exhibit 12: Director of Central Intelligence Agency memo to Attorney General Ramsey Clark—April 2, 1968

Exhibit 13: Memorandum for Jessica Tuchman from John Marcum on Israel and MUF—July 28, 1977

Exhibit 14: Memorandum to the Attorney General from Frederick D. Baron RE: NUMEC Investigation—April 25, 1979

Exhibit 15: Memorandum to the President from Zbigniew Brzezinski, Subject Nuclear MUF Frederick D. Baron RE: NUMEC Investigation—August 2, 1977

# Exhibit 1

**Nuclear Materials and Equipment Corporation**     Apollo, Pennsylvania 15613     Telephone 412-842-8111     Cable NUMEC

September 27, 1968

Mr. Harry R. Walsh, Director
Security & Property Management Division
New York Operations Office
U. S. Atomic Energy Commission
376 Hudson Street
New York, New York     10014

Dear Mr. Walsh:

Reference your telephone call concerning the September 10 visit of Messrs. Hermoni, Bendor, Eitan and Biegun, Israeli citizens. Please be advised of the following.

The above mentioned gentlemen met with Dr. Shapiro, D. Purdy, T. Hursen, J. Williams, and S. Kolenik. With the exception of Dr. Shapiro, all of the NUMEC personnel are in our Energy Conversion Department and are thermo-electric generator specialists.

Discussion with the Israeli nationals concerned the possibility of developing plutonium fueled thermo-electric generator systems in the 5 and 50 milliwatt power level. Specifically, they were interested in 10 generators in the 5 milliwatt range. Each of which would be fueled with about 2 grams of plutonium. The 50 milliwatt generator is considered a remote possibility, but would use approximately 20 grams of plutonium. The generators are of the terrestrial type.

We are proceeding to make a proposal to these gentlemen for this work using, of course, only unclassified information which is already in the public domain. It is also our understanding that these same gentlemen have visited several of the major nuclear organizations in the United States to develop proposals from them on these items.

I trust this satisfies your needs.

Very truly yours,

Bruce D. Nifong
Manager, Security

ALL INFORMATION CONTAINED
HEREIN IS UNCLASSIFIED
DATE 6-17-15 BY ___

A Subsidiary of Atlantic Richfield Company     DOCUMENT 149

EXEMPTED FROM AUTOMATIC
DECLASSIFICATION
AUTHORITY DERIVED FROM:
FBI AUTOMATIC DECLASSIFICATION GUIDE
EXEMPTION CODE 25X(1,6)
09-26-2008

SECRET

# UNITED STATES DEPARTMENT OF JUSTICE
## FEDERAL BUREAU OF INVESTIGATION

### Pittsburgh, Pennsylvania

In Reply, Please Refer to
File No.

October 17, 1968

### DR. ZALMAN MORDECAI SHAPIRO

Investigation was instituted at the request of
the Attorney General to establish the nature and extent
of Zalman Mordecai Shapiro's relationship with the
(U) Government of Israel. This could be connected with, or in
addition to, or as a result of, his association with
Israeli officials and sympathizers in the United States.

On September 6, 1968, Clem Palazzolo, Security
Office, Atomic Energy Commission (AEC), Germantown,
Maryland, advised that AEC, New York City, had recently
been requested by the following individuals to visit
Nuclear Materials Equipment Corporation (NUMEC), Apollo,
Pa.:

Avraham Hermoni, Scientific Counselor,
Israeli Embassy, Washington, D. C.;

Dr. Ephraim Biegun, Department of Electronics,
Israel, born

Avraham Bendor, Department of Electronics,
Israel, born

Raphael Eitan, Chemist, Ministry of Defense,
Israel, born                , in

On September 26, 1968, Clem Palazzolo, supra,
made available a copy of a letter dated September 12,
1968, from                Manager, Security, NUMEC,
Apollo, Pa., to Harry R. Walsh, Director, Security &

b6
b7C

This document contains neither recommendations
nor conclusions of the FBI. It is the property
of the FBI and is loaned to your agency; it and
its contents are not to be distributed outside
your agency.

SECRET
GROUP 1
Excluded from automatic
downgrading and
declassification

ALL INFORMATION CONTAINED
HEREIN IS UNCLASSIFIED
EXCEPT WHERE SHOWN
OTHERWISE

SECRET

# Exhibit 2



# UNITED STATES DEPARTMENT OF JUSTICE

### FEDERAL BUREAU OF INVESTIGATION

Pittsburgh, Pennsylvania

March 25, 1980

*In Reply, Please Refer to
File No.*

b6
b7C

FORMER EMPLOYEE OF NUCLEAR
MATERIALS AND EQUIPMENT CORPORATION,
APOLLO, PENNSYLVANIA;
ATOMIC ENERGY ACT

    On March 21, 1980, [                    ] was interviewed
at his residence and provided the following information:



    This document contains neither recommenda-
tions nor conclusions of the FBI.  It is
the property of the FBI and is loaned to your
agency; it and its contents are not to be
distributed outside your agency.

Classified by



FD-302 (REV. 3-8-77)



**FEDERAL BUREAU OF INVESTIGATION**

~~CONFIDENTIAL~~                         3/24/80

Date of transcription _____

b6
b7C

[_____] telephone [_____]
was interviewed at his residence.  After being advised of
the identities of the interviewing Agents and the nature
of the interview, [_____] provided the following informa-
tion:

[_____] advised that he was employed by Nuclear
Materials and Equipment Corp. (NUMEC) in February, 1965,
(exact date unknown) and was continuously employed
at the Apollo, Pa., facility through two ownership changes
until October, 1978.  [_____] advised that he was fired
in October, 1978, by the present owner, Babcock and Wilcox,
Inc., for job abandonment following an alleged job related
illness.

[_____] advised that upon being hired at NUMEC,
he was given three days of schooling on the equipment he
was to operate and briefed by the Personnel Manager and
Low Enrichment Facility Foreman concerning the security
measures at the Apollo facility nuclear plant.  He then
commenced his production line job upon completion of this
brief schooling.  [_____] related that his exact position
was Senior Ammonator Operator in the Low Enriched Operations
area, which was immediately adjacent to the loading dock
area of the Apollo nuclear facility.  [_____] further
described the NUMEC Apollo plant as being broken down into
four areas:  the Low Enriched area, the High Enriched area,
the Sphere area, and the Peletizer area.  He advised that
although his full-time job was on the Low Enriched Area
Ammonator, he worked overtime in the High Enriched area
on several occasions.

[_____] advised in late March or early April,
1965 (exact date unknown) while working on a swing shift
from 3:30 p.m. until 12:00 a.m., his Ammonator was shut
down between approximately 9:00 and 10:00 p.m. in the evening.
He stated that because of the negative air pressure within
the plant area, conditions were usually very warm so he
walked out to the loading dock for a breath of air.  The
loading dock was located approximately 20 feet from his
equipment through a single door.  [_____] advised that

Investigation on __3/21/80__ at __Apollo, Pa.__          File # __Pittsburgh 117-108__

by __SAs [_____]__                    Date dictated __3/24/80__

b6
b7C

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency;
it and its contents are not to be distributed outside your agency.

PG 117-108                    2

employees often went to the loading dock to get a breath
of air and further said he thought he remembered an employees'
eating area on the dock.

b6
b7C

[          ] related that when he entered the loading
dock area on this particular evening, he noticed a flatbed
truck backed up to the loading dock with some strange equip-
ment on it.  He described the equipment as several steel
cabinets with some kind of gauges on the front of them and
other equipment which looked like a lathes.  [          ]
opined the equipment may have come from the Peletizer area
of which he was not familiar.  [          ] advised he then
noticed the NUMEC owner, Dr. Zalman Shapiro, pacing around
the loading dock while [          ] (Shipping and Receiving
Foreman) and [          ] truckdriver for NUMEC) were
loading "stove pipes" into the steel cabinet type equip-
ment that he observed on the truck.  [          ] recalled
that there were four or five of the steel cabinets on the
flatbed truck.  [          ] stated that [          ] and [          ]
never loaded trucks themselves, always employing other workers.

[          ] stated that the "stove pipes" are cylindrical
storage containers used to store canisters of high enriched
materials in the vaults located at the Apollo nuclear facility.
[          ] stated that the "stove pipes" contained three
or four canisters which were described as highly polished
aluminum with standard printed square yellow labels, approxi-
mately three inches in diameter by six inches tall, that
normally were used to store high enriched uranium products
which [          ] defined as 95 percent uranium.

[          ] stated that he observed two workmen,
whose names he could not recall, bringing the "stove pipes"
from the High Enriched vault area located approximately
150 feet from the docks to the dock area where [          ] and
[          ] opened the "stove pipes" and withdrew the canisters
located in the "stove pipes".  He then said [          ] checked
the label on each canister for information and checked it
off on a shipping order he had attached to a clipboard.
[          ] advised that the canisters were then replaced
in the "stove pipe" and then the "stove pipe" itself was
loaded into the cabinet type equipment after being wrapped
with a brown paper type insulation.  [          ] advised that
he observed one cabinet being loaded and that the "stove
pipes" were placed one in each back corner of the cabinet
and one in the front center of the cabinet directly behind
the door.

[          ] described the canisters found in the
"stove pipes" as approximately three inches by six inches,
bright polished aluminum canisters with yellow labels con-
taining typewritten information and nuclear "fan" symbols
in the upper corners of the label. [          ] said he had

PG 117-108                    3

never observed typewritten information on the labels that
he had previously seen on the dock.

~~CONFIDENTIAL~~

b6
b7C

[blank] advised he was sure this was High En-
riched uranium products due to the size and shape of the
container and the labeling.  He stated that the containers
he used in the Low Enriched area were much larger than the
canisters he observed and used a different label

[blank] stated he had never seen "stove pipes"
used as shipping containers but whenever High Enriched
uranium products were shipped, the canisters were unloaded
from the "stove pipes" and loaded into cement lined steel
drums.  [blank] further advised that the route the workmen
transporting the "stove pipes" used took them away from
the Low Enriched area and brought them onto the dock through
a different door.  The Low Enriched materials vaults were
located approximately 50 feet from the dock area down an
angled corridor.  [blank] said the normal route for High
Enriched materials from the High Enriched vaults was down
the same corridor where the Low Enriched vaults were lo-
cated.

[blank] citing his natural curiosity, stated
he observed [blank] lay his clipboard down on an empty
drum located on the dock, whereupon [blank] proceeded
to read the information contained on the shipping order.
He said he noticed that the destination for the equipment
on the truck was Israel, and that it was to be transported
by ship.  He recalled that the ship had a long foreign name
which he believed to be Greek, and its location at the time
was in New York City.

(U)

[blank] advised that he believed the ship's
name was Greek because when he was in the U.S. Navy (1956-60),
he was a radio man third class stationed at the Naval Radio
Facility, Londonderry, Northern Ireland, and had handled
messages from Greek shipping among others

(U)

[blank] stated that after he had quickly read
the information contained on the shipping order, [blank]
grabbed the clipboard away from him, telling him in words
to the effect that the material contained in the shipping
order was confidential and not for his eyes.  [blank]
advised that shortly thereafter, an armed guard ordered
him off the loading dock.  [blank] stated he did not ob-
serve anybody call the armed guard nor did he see the guard
on the dock, but that he believed the guard came from one
of the hallways adjoining the dock.  [blank] stated that
he was on the loading dock for approximately 15 minutes
and that at no time did Dr. Shapiro, [blank] or
[blank] or anybody else ask him to leave.

4

~~CONFIDENTIAL~~

PG 117-108 . 4 . ~~CONFIDENTIAL~~

b6
b7C

[            ] further advised that it was highly unusual
to see Dr. Shapiro in the manufacturing section of the Apollo
nuclear facility; it was unusual to see Dr. Shapiro there
at night; and very unusual to see Dr. Shapiro so nervous
as to pace around. [            ] described Dr. Shapiro as a
very calm, cool and collected man who never got upset.

[            ] advised that the only records and docu-
mentation he had access to were the shift productions records
for the Low Enrichment Area and then only during the specific
shift on which he was working.  He stated that at the comple-
tion of each shift, the records were removed from the manu-
facturing area and taken across the street to the administrative
offices.

[            ] advised that most of the shipping was
normally done at daytime but did state that occasionally
there was some shipping activity in the early evenings.
He stated it was highly unusual though that any equipment
would be shipped at night.

[            ] advised that he had not seen previously
the equipment he noted on the loading dock and flatbed trailer
and that he had not seen the equipment subsequent to that
incident or any equipment like it in the NUMEC Apollo nuclear
facility.

[            ] stated he became aware of the alleged
diversion of nuclear materials through newspaper articles
which caused him to think.  He said that "everyone" at the
plant knew there were losses of materials from the High
Enriched area but nobody seemed to care during the time
the facility was owned by NUMEC.  He stated when Atlantic
Richfield Company purchased NUMEC, the losses stopped.
[            ] further stated that newspaper accounts of the
alleged diversion mentioned Doctor Shapiro, and he recalled
that just prior to the previously mentioned incident, it
was an open plant rumor that Doctor Shapiro had just re-
turned from an extensive vacation in Israel.

[            ] advised he had not come forward before
because he had a large family to support and the day following
the incident, the plant Personnel Manager (name unrecalled)
of NUMEC threatened to fire [            ] if he "did not keep
his mouth shut" concerning what he had seen on the loading

PG 117-108                     <u>5</u>                    ~~CONFIDENTIAL~~

dock the night before. [               ] further advised he men-
tioned the threat he received from the Personnel Manager
to his union steward, whereupon [          ] claims he was
visited by "sone union goons" from Kittanning, Pa., and
again told to keep his mouth shut.

        [               ] stated the prevailing attitude at the
plant in 1965 by management, union and the employees was
that the Atomic Energy Commission was the enemy looking
for a reason to shut the facility down with the resultant
job losses.  In addition, he stated he did not know how
or who to contact in authority who would take action.

        [               ] advised that he could recall no other
information concerning this incident which occurred in late
March or early April, 1965.

b6
b7C

~~CONFIDENTIAL~~

# Exhibit 3



UNCLASSIFIED



Thomas
B Cochran
[ ]

Please
return to

# INQUIRY INTO
# THE TESTIMONY OF
# THE EXECUTIVE DIRECTOR
# FOR OPERATIONS

## VOLUME III

## INTERVIEWS

UNCLASSIFIED

### FEBRUARY 1978

### OFFICE OF THE GENERAL COUNSEL
### OFFICE OF INSPECTOR & AUDITOR
## U.S. NUCLEAR REGULATORY COMMISSION

## UNCLASSIFIED

## INQUIRY INTO THE TESTIMONY OF THE EXECUTIVE DIRECTOR FOR OPERATIONS

### VOLUME III - INTERVIEWS

### TABLE OF CONTENTS

| Name | Page |
|------|------|
| Clifford V. Smith, Jr. | 1 |
| Robert F. Burnett | 7 |
| Gerald Page | 11 |
| Roger J. Mattson | 17 |
| John G. Davis | 27 |
| William A. Anders, former Chairman | 29 |
| Kenneth R. Chapman | 40 |
| Peter L. Strauss | 43 |
| Bryan Eagle | 48 |
| C. W. Reamer | 53 |
| Marcus A. Rowden, former Chairman | 60 |
| Hugh L. Thompson, Jr. | 65 |
| George W. McCorkle | 70 |
| Robert A. Erickson | 72 |
| Paul F. Goldberg | 75 |
| Ben Huberman | 78 |
| L. D. Y. Ong | 82 |
| Kenneth S. Pedersen | 106 |
| Bernard J. Snyder | 109 |
| Joseph M. Hendrie, Chairman | 113 |
| Frederick L. Crane | 117 |
| Thomas F. Carter, Jr./Thomas C. Thayer | 121 |
| Joseph J. Fouchard | 122 |
| William J. Dircks | 135 |
| Richard T. Kennedy, Commissioner | 137 |
| Lee V. Gossick | 145 |
| Carl Builder | 159 |
| Edward Mason, former Commissioner | 164 |
|  | 176 |
| Victor Gilinsky, Commissioner | 180 |
| James H. Conran | 199 |

## UNCLASSIFIED

3

information. They had other information such as a type of bombing practice done with A-4 aircraft that would not have made sense unless it was to deliver a nuclear bomb.

By the time of the NRC briefing the question of whether U-235 had been diverted from NUMEC was academic for the CIA because plutonium from the Dimona reactor was believed to be available. Therefore, from the CIA's intelligence point of view the diversion did not matter. The last inspection of Dimona was in 1969. In his view it was less than an adequate investigation to determine whether plutonium was there. Afterwards Israel refused to permit inspections. Furthermore, a shipment of 200 tons of non-enriched uranium from Argentina had been diverted to Israel through a West German cut out.

Mr. Duckett raised the question of whether the U.S. had intentionally allowed material to go to Israel. He said that if any such scheme was under consideration, he would have known about it and he never heard so much as a rumor about this. He, therefore, does not believe there is any substance to this allegation. In support of this view, he related that CIA had drafted a National Intelligence Estimate on Israel's nuclear capability in 1968. In it was the conclusion that the Israelis had nuclear weapons. He showed it to Mr. Helms. Helms told him not to publish it and he would take it up with President Johnson. Mr. Helms later related that he had spoken to the President, that the President was concerned, and that he had said "Don't tell anyone else, even Dean Rusk and Robert McNamara."

Mr. Duckett was asked about the reactions of NRC officials who were present at his briefing. He said that Mr. Anders was very concerned and felt that already too many people had been exposed to the information. After the briefing Mr. Duckett went to Mr. Kennedy's office. Mr. Kennedy wanted to talk about more frequent interchange of information between the NRC and the CIA. Mr. Anders came in and wanted to apologize for having so many people present. He said he did not realize how sensitive the information was and if he had he would have restricted the attendance even more. Mr. Anders said that, in the future, he should deal only with Mr. Kennedy and him, and that in light of the sensitive nature of the information he was going to go to the White House. During this session, Mr. Duckett recalls that one Commissioner, probably Mr. Mason, commented with mock jocularity "My God, I almost went to work for Zal Shapiro. I came close to taking a job with him." By the end of the meeting it was a pretty somber group. Mr. Duckett does not recall that the staff actively participated in the briefing. He pointed out that it was not a formal briefing. It was more of a discussion for the whole session.

# Exhibit 4

NOTE:  THIS TRANSCRIPT HAS BEEN TYPED FROM A TELEDIPHONE RECORDING
AND NOT COPIED FROM AN ORIGINAL SCRIPT.  BECAUSE OF THE RISK OF
MISHEARING AND THE DIFFICULTY, IN SOME CASES, IN IDENTIFYING
INDIVIDUAL SPEAKERS, THE BBC CANNOT VOUCH FOR ITS ACCURACY,

## P A N O R A M A

Recorded from transmission 2010 (BBC-1)           26th June, 1978
---------------------------------------------------------------

CHARLES WHEELER:              Good evening.  It is now seven
months since President Sadat of Egypt went to Israel in search of
peace.  His journey split the Arab world and threatened his own
position as an Arab leader.  As for peace, it seems no nearer,
if anything the reverse.  So why did Sadat launch such a mission
without the preparation that might have told him it would fail ?
Various reasons have been put forward, ranging from Egypt's dire
economic need for a settlement, to Sadat's own belief that a touch
of drama would create the climate for a breakthrough.

One other factor has been suggested:  there is speculation that
Sadat was at least partly moved by the belief that Israel possesses
the ultimate deterrent, the atom bomb.  The rumour that she has it
has been around for years, but recently information has come to
light that shows how Israel may have acquired the means to make the
bomb.   In a parallel investigation with the Insight team of the
SUNDAY TIMES, whose book "The Plumbat Affair" came out today,
PANORAMA now traces two of the ways by which Mossad, the Israeli
Secret Service, apparently obtained the ingredients for the atom bomb.
Tom Bower reports.

TOM BOWER:                In 1958, this part of the Negev Desert
in Israel was declared a restricted area and closed to all traffic.
It was the beginning of Israel's worldwide strategy to get the material
and technology to build an atomic bomb.   Dimona was accessible only
to the holders of special permits.   Covered lorries passed through the
security checks bringing the materials and equipment for what is
simultaneously one of Israel's most closely guarded secrets, and a
deliberately cultivated ambiguity.

It is the strength of the security screen that has created the firm
belief that Israel has introduced the atomic bomb into the Middle East.
Israel has answered all requests for information with the bland reply
that the area was scheduled as the centre for Israel's textile industry.
The colour of the Israeli textiles, a spokesman said, would be cobalt
blue.    In fact under a secret agreement signed in 1958, France had
provided Israel with the technical details for building a nuclear
reactor.  Still protected by complete security blackout, it is believed
to be able to produce enough plutonium for just over one Hiroshima type
atomic bomb per year.  It was completed around 1960, and in operation
four years later.  Since then Israel has refused to share its nuclear
secrets, even with the United States.
AM

- 2 -

PANORAMA 26.6.78.

Throughout Israel has insisted that it would never be the first to introduce nuclear weapons into the Middle East, and that Dimona would only be used for peaceful purposes.

When Dimona's secret was discovered by the Americans in 1960, the CIA in Tel Aviv was ordered to investigate the extent of Israel's programme. A sensitive intelligence operation in an allied country. Officially listed as the Political Officer, John Haddon claims there are eight main factors that convinced him that Israel had embarked on an atomic bomb programme.

Firstly, the construction of facilities to produce and handle nuclear materials like Dimona.

Secondly, the development of weapons technology, especially the type which can carry tactical nuclear warheads for use in conventional wars.

Thirdly, the flow of key personnel, the numbers specialising in nuclear physics and who were being trained in the many areas necessary for a nuclear programme.

Fourthly, the attitude of the leadership to the nuclear question. General Dayan had hinted that Israel should declare it has the bomb.

Fifth, the armed forces had bought and developed a vehicle, the Jericho missle, which can deliver an atomic bomb.

Sixth, existing planes had been specially adapted to carry atomic bombs.

Seventh, the delivery pattern of bombers on training runs. The plane's fight on a nuclear attack is different from a conventional attack.

Eighth, analysis of the aerial water near nuclear installations for traces of bomb grade uranium.  Few doubted that Israeli scientists had the knowledge to design and build an atomic bomb.

What remained unknown was whether the political decision had been taken to use that expertise and build one.

Combining his intelligence discoveries with the earlier public resignation of all but one of Israel's Atomic Energy Commission, Haddon was convinced that the pro-bomb lobby had won the argument.

JOHN HADDON:                    My judgment would be that the pros
have probably won most of the arguments.  That would be my feeling.

BOWER:                          The pros - you mean the Israeli pros
for having the bomb ?

HADDON:                         Yes, I think that, because if I were an
Israeli I would want the bomb.  I think the Israelis would want to take
out an insurance policy, so that if the Arabs got it and if the Arabs
used it, they would have something in their sling.

PANORAMA. 26.6.78.

BOWER:                          But they have also stated that
although they can't go in for a limitless arms race, that they also
would not be the first to introduce nuclear weapons into the area.
How do you see those two statements as compatible ?

HADDON:                         Well, I think that the second one is
very easily handled in that in that area you have the Soviet Fleet
and the U.S.Sixth Fleet, both of which as I understand it, have
introduced atomic weapons into the area.

HADDON:                         So you mean that if Israel get the
bomb they will be the third ?  (Yes)   Which therefore is consistent
with not being the first ?

HADDON:                         Yes.  And you can go on, you can
- I think the Americans use this term 'scenario' , there's another
one.  Let us suppose that you have a weapon and that it is in a
vehicle, that everything is all set to go, and only the last screw
remains to be in place, to complete it.   Well you haven't introduced
then have you, until you put that last screw in.

BOWER:                          It was another agent that supplied the
CIA in Washington with what was considered to be conclusive evidence
that Israel had built the bomb.  The agent reported the discovery of
traces of bomb grade enriched uranium near a security zone.  The CIA's
conclusions were taken straight to President Johnson, by the ten director
Richard Helms. .  Their conversation was reported in 1977 by James
Duckett, No. 3 in the Agency.  It was Duckett who had told Helms of the
discovery.  Duckett's report of that conversation was mistakenly
released under the Freedom of Information Act.

VOICE OVER:                     In it was the conclusion that the Israelis
had nuclear weapons.  He showed it to Mr. Helms.  Helms told him not to
publish it, that he would take it up with President Johnson.  Mr. Helms
later related that he had spoken to the President, that the President was
concerned, and that he had said 'Don't ell anyone else, even Dean Rusk
and Robert Macnamara'.

BOWER:                          In another CIA Secret Report on
Further Proliferation of Nuclear Weapons, written in 1974, and again
mistakenly released, the Agency drew on more intelligence reports to
conclude that Israel had the bomb.

VOICE OVER:                     We believe that Israel has already
produced nuclear weapons.  Our judgment is based on Israeli acquisition
of large quantities of uranium, partly by clandestine means, the
ambiguous  nature of Israeli efforts in the field of uranium enrichment,
and Israel's large investment in a costly missile system designed to
accommodate nuclear warheads.

HADDON:                         I think that the publication of highly
classified documents was a mistake.

AM

PANORAMA 26.6.78.

BOWER:                          There is absolutely no doubt that this
is a highly classified document ?

HADDON:                          I was told that it was.

BOWER:                          There are two sources of material to
make an atomic bomb;  enriched uranium and plutonium processed from
uranium ore.   It is now believed that during the '60s, Israel
launched at least two clandestine operations to obtain both materials.
In both operations Israel relied on reputable businessmen, on inadequate
controls, and on a series of coverups.

The NUMEC diversion is suspected to be the first of Israel's succesful
operations.      NUMEC, the Nuclear Materials and Equipment Corporation,
was founded in 1957 to build enriched uranium units for America's
growing nuclear fleet.   Security was the management's responsibility,
although allegedly supervised by the U.S.Atomic Energy Commission.
The management was accountable for each gram of enriched uranium
delivered, not only because of its monetary value - it's worth two
thousand five hundred pounds a pound, but more importantly its strategic
potential.   Just twenty pounds-of-enriched uranium is sufficient for a
Hiroshima type A-bomb.   Yet in 1960, AEC inspectors discovered that at
least two hundred pounds of enriched uranium delivered to NUMEC was
missing.

In the investigation which followed, the AEC discovered that in contrast
to surveyed security, NUMEC had delegated the task to a receptionist at
the front door.   Worse still, many of the vital records which
accounted for each gram of the uranium's unit was either lost or had been
accidentally destroyed in a fire.

NUMEC Management's explanations for the loss all proved to be bogus or
misleading.   The missing two hundred pounds were never found.
Frustrated, the AEC decided nevertheless to drop their investigations
and cover up the loss.

Only in the mid-'60s when the CIA discovered the traces of enriched
uranium in Israel were the investigations reopened.   A massive
three-pronged investigation revealed that NUMEC's management with
access to top secret nuclear information had very close links with
Israeli nuclear scientists and had allowed them to visit the plant.

In particular NUMEC's founder and president, Zalman Shapiro, an ardent
Zionist, but a frequent and privileged visitor to Israel, jointly owned
a company with an Israeli Group which dealt in nuclear materials, and
had a scrambler telephone direct from the factory to an Israeli
Government office in New York.

Yet eighteen months of CIA and FBI telephone taps and round the clock
surveillance, failed to prove that Shapiro was either a foreign agent
or that he knew of a deliberate plan to divert the two hundred pounds
to Israel.

AM

- 5 -

PANORAMA 26.6.78.

Shapiro refused to be interviewed on film, but during a three hour conversation he insisted that the two hundred pounds worth over one million dollars, was simply lost during the industrial process. An excuse dismissed by one expert saying that NUMEC would have had to have been in operation since the American revolution in 1776 to have lost that amount.

The Government, sensitive to the implications of stability in the Middle East, ordered the AEC to keep the loss and the investigation secret. The coverup lasted until 1974, when an Inquiry was ordered into the security of nuclear materials.

The investigator, James Conran, discovered the coverup, that the NUMEC uranium had probably gone to Israel. He insisted that the Commission take action.

JAMES CONRAN:                    I told the Commission that I had discovered information, that there likely had been a theft of nuclear material, from at least one facility, for the purposes of a foreign Power.

BOWER:                           And what was their reaction to your information ?

CONRAN:                          Fear, panic, an attempt to scramble and cover up, ignore this information.

BOWER:                           When the Commission refused to act, Conran reported his discovery to the U.S.Congress. Now three different committees are investigating the NUMEC loss. All three have been warned that a public statement that the uranium did go to Israel inevitably means Israel has the atomic bomb.

JOHN STOCKTON:                   I think the argument would go that it would be seriously distabilising if indeed a United States official, someone in the Congress, stated positively that the Israelis had a bomb, because of the potential impact on the Arabs. And their potential reaction to that, of course that whole issue has been mooted now, we have been seriously worried about this, that however the CIA by mistake released the documents saying just that.

BOWER:                           Had the CIA warned you as well, that it would be a mistake.

STOCKTON:                        Yes, they had.

BOWER:                           What's your reaction been to those warnings ?

STOCKTON:                        We've been very careful not to say anything, and of course as soon as they released their document, the National Intelligence esatimate which made it very clear that in their estimation Israel had a bomb, and that potentially their material for that bomb had been obtained clandestinely, I don't see any particular need to keep that secret any longer, the fact that they warned us on numerous occasions not to make it explicit.

BOWER:                              At what level had they warned you ?

STOCKTON:                           At very high levels.

BOW'R:                              Representative Morris Udall chaired
one of the Inquiries into the NUMEC loss.

REP. MORRIS UDALL:                  It seems generally conceded in the
Intelligence community that – and generally accepted in the Mid-East –
that the Israelis have the bomb, and had it for a number of years.
It appears that they achieved this capability at about the time
that some od the uranium was missing in the United States, so there's
a temptation to draw conclusions from this.   There always seemed
to be a feeling among the investigators that I hope we don't find
something and maybe this will all go away, and it was pursued in the
days when the trail was a little more warm, with the kind of vigour
that I would liked to have seen.

BOWER:                              What do you think happened ?

UDALL:                              If someone had to have me write in an
envelope whether a diversion occurred or didn't occur, and I were
going to be put to death if I answered wrong, I suspect I'd have to
put in the envelope that I believe there is a diversion.

HADDON:                             These gentlemen have been extraordinarily
adept at removing things at long distance.

BOWER:                              Which gentlemen are we talking about ?

HADDON:                             The Israelis, and they are gentlemen.
Just imagine to yourself how much easier it would be to remove a pound
or two of this or that at any one time, as opposed to – which is inert
material – as opposed to removing all at one blow 150 lbs of shouting
and kicking Eichmann.   You see, they are pretty good at removing
things.   So I would have no argument with that kind of a judgment
without knowing anything about it.

BOWER:                              You mean it would be quite consistent
with Israeli practice to clandestinely go about getting any materials
they needed?

HADDON:                             Well, there were those ships out of
Cherbourg, and there was that – there was that garage full of Mirage
plans, I don't think it's unusual for them to have removed things or
acquired things.

BOWER:                              The other operation by which Israel
is now known to have clandestinely obtained uranium ore suitable to
convert into bomb grade plutonium, is the so-called Plumbat Affair.

At 2 p.m. on November 16th, 1968, a special train carrying two hundred
tons of uranium ore was shunted onto Berth No. 42 in the Antwerp Docks.
AM

# Exhibit 5

June 21, 1978
2:15 p.m.

INTERVIEW: Bill Knauf
Jim Anderson
Department of Energy
Division of Inspection

I met from 2:15 to 3:15 p.m. with Bill Knauf and Jim Anderson
of the Division of Inspection of the Department of Energy. Their
purpose was to interview me on the allegation that Salman Shapiro of
the Nuclear Materials and Equipment Corporation of Apollo, Pennsylvania
diverted large amounts of highly enriched Uranium-235 to Israel in the
1960's.

They questioned me about the degree of surveilance of the Atomic
Energy Commission commissioners on the NUMEC and the actions of the
Commission when the loss of material was reported. I described the
manner in which the commission operated and the responsibility of the
staff in this connection.

They focussed a good deal on the dispute which the commissioners
had with John Mitchell in 1970 when he wanted to deny the upgrading
of Shapiro's clearance without granting him due process.

In response to this questioning I said that the commissioners
were motivated by the desire to give Shapiro a proper hearing as well
as by their concern that the scientific and legal community would
disapprove of any denial of due process.

They were interested in how the matter was finally settled. They
told me that they had already discussed this with Ramey and I agreed
with them that Ramey served as the means by which a position was found
for Shapiro with the Westinghouse Corporation, hence rendering the
question of clearance upgrading moot. They told me that as late
as 1971 the CIA wanted to pursue this further but Mitchell declined to
do so.

They asked about any discussions I have had with Helms about this
matter and I described the luncheon meeting I had with him in 1967 or
1968 during which I asked Helms whether he had any evidence beyond that which
I had and Helms replied that he did not. They are going to interview
Helms. They are probably going to interview Hardian but not John
Mitchell.

They have interviewed Howard Brown and the BPC has also inter-
viewed Howard Brown, giving him a hard time. They indicated that BPC
may try to interview me. They said that Shapiro has now engaged the
law firm of Arnold and Porter and this law firm may get in touch with
me.

I asked them if any responsible persons feel that Shapiro actually
diverted material to Israel. They replied that nobody with a scientific
background believes this but that it is difficult to convince some members



Transcription

I met from 2:15 to 3:15 p.m. with Bill Knauf and Jim Anderson of the Division of Inspection of the Department of Energy.  Their purpose was to interview me on the allegation that Zalman Shapiro of the Nuclear Materials and Equipment Corporation of Apollo, Pennsylvania diverted large amounts of highly enriched Uranium-235 to Israel in the 1960's.

They questioned me about the degree of surveillance [surveillance] of the Atomic Energy Commission commissioners on the NUMEC and the actions of the Commission when the loss of material was reported.  I described the manner in which the commission operated and the responsibility of the staff in this connection.

They focused a good deal on the dispute which the commissioners had with John Mitchell in 1970 when he wanted to deny the upgrading of Shapiro's clearance without granting him due process.

In response to this questioning I said that the commissioners were motivated by the desire to give Shapiro a proper hearing as well as by their concern that the scientific and legal community would disapprove of any denial of due process.

They were interested in how the matter was finally settled.  They told me that they had already discussed this with Ramey and I agreed with them that Ramey served as the means by which a position was found for Shapiro with the Westinghouse Corporation, hence rendering the question of clearance upgrading as moot.  They told me that as late as 1971 the CIA wanted to pursue this further but Mitchell declined to do so.

They asked about any discussions I have had with Helms about this matter and I described the luncheon meeting I had with him in 1967 or 1968 during which I asked Helms if he had any evidence beyond that which I had and Helms replied that he did not.  They are going to interview Helms.  They are probably going to interview Mardian but not John Mitchell.

They have interviewed Howard Brown and the BBC has also interviewed Howard Brown, giving him a hard time.  They indicated that BBC may try to interview me.  They said that Shapiro has now engaged the law firm of Arnold and Porter and this law firm may get in touch with me.

I asked them if any responsible persons feel that Shapiro actually diverted material to Israel.  They replied that nobody with a scientific background believes this but that it is difficult to convince some members of Congress.  They said that some enriched Uranium-235 which can be identified as coming from the Portsmouth, Ohio plant has been picked up in Israel which, of course, has exited some members of Congress. However, such enriched material has been sold on an official basis to Israel and this could be the source of the clandestine sample.

They indicated that they would let me read the draft of their summary of our conversation today in order that I might make any necessary corrections.

# Exhibit 6

**IRmep**
**Calvert Station**
**P.O. Box 32041**
**Washington, DC 20007**

http://www.irmep.org
info@irmep.org
Phone: 202-342-7325
Fax: 202-318-8009



Institute for Research: Middle Eastern Policy

Delores M. Nelson
Information and Privacy Coordinator
Central Intelligence Agency
Washington, D.C. 20505

Fax: (703) 613-3007

RE: FOIA Request

Dear Coordinator,

Under the Freedom of Information Act, 5 U.S.C. subsection 552, I am requesting declassification and release of all cross referenced CIA files related to uranium diversion from the Nuclear Materials and Equipment Corporation (NUMEC) to Israel. This request includes, but is not limited to CIA content provided for publication in the now declassified 1978 GAO report titled "Nuclear Diversion in the U.S.? 13 Years of Contradiction and Confusion."

We request a waiver of all fees for this request as a nonprofit, tax exempt research organization. Disclosure of the requested information to IRmep is in the public interest because it is likely to contribute significantly to public understanding of the operations or activities of the government and is not primarily in our commercial interest.

If you have any questions about handling this request, please call me at 202-342-7325.

Sincerely,

Grant F. Smith
Director of Research

Cc:     Cover "Nuclear Diversion in the U.S.? 13 Years of Contradiction and Confusion."

# Exhibit 7

Central Intelligence Agency



Washington, D.C. 20505

10 September 2010

Mr. Grant F. Smith
Director of Research
Institute for Research: Middle Eastern Policy
Calvert Station
P.O. Box 32041
Washington, D.C. 20007

Reference: F-2010-01210

Dear Mr. Smith:

On 18 May 2010, the office of the Information and Privacy Coordinator received your 13 May 2010 Freedom of Information Act (FOIA) request for records "relating to uranium diversion from the Nuclear Materials and Equipment Corporation (NUMEC) to Israel." We have assigned your request the reference number above. Please use this number when corresponding so that we can identify it easily.

The CIA Information Act, 50 U.S.C. § 431, as amended, exempts CIA operational files from the search, review, publication, and disclosure requirements of the FOIA. To the extent your request seeks information that is subject to the FOIA, we accept your request and will process it in accordance with the FOIA, 5 U.S.C. § 552, as amended, and the CIA Information Act. Unless you object, we will limit our search to CIA-originated records existing through the date of this acceptance letter. As a matter of administrative discretion, and in accordance with our regulations, the Agency has waived the fees for this request.

The large number of FOIA requests CIA receives has created unavoidable delays making it unlikely that we can respond within the 20 working days the FOIA requires. You have the right to consider our honest appraisal as a denial of your request and you may appeal to the Agency Release Panel. A more practical approach would permit us to continue processing your request and respond to you as soon as we can. You will retain your appeal rights and, once you receive the results of our search, can appeal at that time if you wish. We will proceed on that basis unless you object.

Sincerely,

Scott Koch
Acting Information and Privacy Coordinator

# Exhibit 8

Central Intelligence Agency



Washington DC 20505

28 August 2013

Mr. Grant F. Smith
Director of Research
Institute for Research: Middle Eastern Policy
Calvert Station
P.O. Box 32041
Washington, DC 20007

Reference: F-2010-01210

Dear Mr Smith:

This is a final response to your 13 May 2010 Freedom of Information Act (FOIA) request for records "relating to uranium diversion from the Nuclear Materials and Equipment Corporation (NUMEC) to Israel." We processed your request in accordance with the FOIA, 5 U.S.C. § 552, as amended, and the CIA Information Act, 50 U.S.C. § 431, as amended. Our processing included a search for records as described in our 0 September 2010 acceptance letter.

We completed a thorough search for records responsive to your request and located material that we determined is currently and properly classified and must be denied in its entirety on the basis of FOIA exemptions (b)(1) and (b)(3). An explanation of exemptions is enclosed. Exemption (b)(3) pertains to information exempt from disclosure by statute. The relevant statute is the Central Intelligence Agency Act of 1949, 50 U.S.C. § 403g, as amended, Section 6, which exempts from the disclosure requirement information pertaining to the organization and functions, including those related to the protection of intelligence sources and methods. As the CIA Information and Privacy Coordinator, I am the CIA official responsible for this determination. You have the right to appeal this response to the Agency Release Panel, in my care, within 45 days from the date of this letter. Please include the basis of your appeal.

We conducted a search of our previously released database and located the enclosed four documents, totaling 11 pages, which we believe may be responsive to your request. Please be advised that these documents were released as part of another release program.

Sincerely,

Michele Meeks
Information and Privacy Coordinator

Enclosures

## Explanation of Exemptions

### Freedom of Information Act:

(b)(1) exempts from disclosure information currently and properly classified, pursuant to an Executive Order;

(b)(2) exempts from disclosure information, which pertains solely to the internal personnel rules and practices of the Agency;

(b)(3) exempts from disclosure information that another federal statute protects, provided that the other federal statute either requires that the matters be withheld, or establishes particular criteria for withholding or refers to particular types of matters to be withheld. The (b)(3) statutes upon which the CIA relies include, but are not limited to, the CIA Act of 1949;

(b)(4) exempts from disclosure trade secrets and commercial or financial information that is obtained from a person and that is privileged or confidential;

(b)(5) exempts from disclosure inter-and intra-agency memoranda or letters that would not be available by law to a party other than an agency in litigation with the agency;

(b)(6) exempts from disclosure information from personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of privacy;

(b)(7) exempts from disclosure information compiled for law enforcement purposes to the extent that the production of the information (A) could reasonably be expected to interfere with enforcement proceedings; (B) would deprive a person of a right to a fair trial or an impartial adjudication; (C) could reasonably be expected to constitute an unwarranted invasion of personal privacy; (D) could reasonably be expected to disclose the identity of a confidential source or, in the case of information compiled by a criminal law enforcement authority in the course of a criminal investigation or by an agency conducting a lawful national security intelligence investigation, information furnished by a confidential source ; (E) would disclose techniques and procedures for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law; or (F) could reasonably be expected to endanger any individual's life or physical safety;

(b)(8) exempts from disclosure information contained in reports or related to examination, operating, or condition reports prepared by, or on behalf of, or for use of an agency responsible for regulating or supervising financial institutions; and

(b)(9) exempts from disclosure geological and geophysical information and data, including maps, concerning wells.

April 2012

Approved For Release 2006/12/04 : CIA-RDP81M00980R001500050015-5

SECRET 

S OCI 1978

*GAO*

MEMORANDUM FOR: Director of Central Intelligence

VIA          :  Deputy Director of Central Intelligence

FROM         :  John H. Stein
                Acting Deputy Director for Operations

SUBJECT      :  GAO Report on Alleged Nuclear Diversion

REFERENCE    :  Our memorandum on the same subject,
                dated 30 August 1978


    1.  <u>Action Requested</u>.  Review options outlined
in paragraph 3 and note recommendations.

    2.  <u>Background</u>.  Since forwarding Reference to
GAO, there has been no response to our letter.  We
assume the report, as previously drafted, will stand.
GAO has asked us to declassify our contributions to
this report.  We have worked on sanitization of the
report, and this version is attached.  The FBI also
has been asked to sanitize their contribution and is
taking the position that they will not declassify.
The Department of Energy's position also is that
they do not want to declassify their portion.

    3.  <u>Staff Position</u>.  This leaves us with two
options:

        a.  Clear the sanitized report for passage
    to GAO:

            (1)  Pro - This is responsive to GAO's        25X1
        request.


SECRET



Approved For Release 2006/12/04 : CIA-RDP81M00980R001500050015-5

C03250307

S E C R E T
-2-

(2)  Con - In our sanitized report,
every effort was made to protect intelligence
sources and methods                          however, the
sanitized report still would reveal sensitive
information when considered together with the
unclassified collateral material            which
has appeared in the press and which the House
Committee on Interior and Insular Affairs has
published in a booklet.

25X1

25X1

b.  Advise GAO that we cannot declassify our
report because of the need to have a coordinated
Executive Branch position and our desire to protect
a sensitive and valuable liaison equity.

(1)  Pro - (Our reasons are identical
to those stated in paragraph 3a(2) above.)

(2)  Con - This is unresponsive to GAO's
desires.

4.  Coordination.  This has been coordinated with
OLC, OGC, NE Division and CTS.

5.  Recommendation.  Option B.  If you concur,
GAO will be advised orally by OLC.

John H. Stein

John H. Stein

Attachments:
A.  GAO report
B.  Booklet,

S E C R E T

Approved For Release 2006/12/04   CIA-RDP81M00980R001500050015-5

C03250307

25X1

Approved For Release 2006/12/04 : CIA-RDP81M00980R001500050015-5

25X1

25X1

25X1



Approved For Release 2006/12/04 : CIA-RDP81M00980R001500050015-5

3250308

Approved For Release 2004/10/12 : CIA-RDP81M00980R001500050016-4

OHC 78-1667/7

78-5638/2

S E C R E T

78- 1819/3

6 OCT 1978

*SAO*

MEMORANDUM FOR:  Director of Central Intelligence

VIA            :  Deputy Director of Central Intelligence

FROM           :  John H. Stein
                  Acting Deputy Director for Operations

SUBJECT        :  GAO Report on Alleged Nuclear Diversion

REFERENCE      :  Our memorandum on the same subject,
                  dated 30 August 1978


    1.  Action Requested.  Review options outlined
in paragraph 3 and note recommendations.

    2.  Background.  Since forwarding Reference to
GAO, there has been no response to our letter.  We
assume the report, as previously drafted, will stand.
GAO has asked us to declassify our contributions to
this report.  We have worked on sanitization of the
report, and this version is attached.  The FBI also
has been asked to sanitize their contribution and is
taking the position that they will not declassify.
The Department of Energy's position also is that
they do not want to declassify their portion.

    3.  Staff Position.  This leaves us with two
options:

        a.  Clear the sanitized report for passage
    to GAO:

            (1)  Pro – This is responsive to GAO's
        request.


S E C R E T

25X

C03250308

Approved For Release 2004/10/12 : CIA-RDP81M00980R001500050016-4

S E C R E T
- 2 -

(2) Con - In our sanitized report,
every effort was made to protect intelligence
sources and methods ⬚ 25X
however, the
sanitized report still would reveal sensitive
information when considered together with the
unclassified collateral material ⬚ which 25X
has appeared in the press and which the House
Committee on Interior and Insular Affairs has
published in a booklet, ⬚ 25X
25X

*DCI concurs* ↓
*(RECOMMENDED)* →

b. Advise GAO that we cannot declassify our
report because of the need to have a coordinated
Executive Branch position and our desire to protect
a sensitive and valuable liaison equity.

(1) Pro - (Our reasons are identical
to those stated in paragraph 3a(2) above.)

(2) Con - This is unresponsive to GAO's
desires.

4. Coordination. This has been coordinated with
OLC, OGC, NE Division and CTS.

5. Recommendation. Option B. If you concur,
GAO will be advised orally by OLC.

*Yes* / *No* 25X

*DCI comments* →

John H. Stein

Attachments:
A. GAO report
B. Booklet, ⬚

S E C R E T

Approved For Release 2004/10/12 : CIA-RDP81M00980R001500050016-4

C03242743

Approved For Release 2004/07/16 : CIA-RDP81M00980R000800090051-9

S E C R E T

DD/O 78-5538/1

DDC 73-1667/7

6 OCT 1978

Rpts

MEMORANDUM FOR:   Director of Central Intelligence

VIA          :   Deputy Director of Central Intelligence

FROM         :   John H. Stein
                 Acting Deputy Director for Operations

SUBJECT      :   GAO Report on Alleged Nuclear Diversion

REFERENCE    :   Our memorandum on the same subject,
                 dated 30 August 1978

    1.  Action Requested.  Review options outlined
in paragraph 3 and note recommendations.

    2.  Background.  Since forwarding Reference to
GAO, there has been no response to our letter.  We
assume the report, as previously drafted, will stand.
GAO has asked us to declassify our contributions to
this report.  We have worked on sanitization of the
report, and this version is attached.  The FBI also
has been asked to sanitize their contribution and is
taking the position that they will not declassify.
The Department of Energy's position also is that
they do not want to declassify their portion.

    3.  Staff Position.  This leaves us with two
options:

        a.  Clear the sanitized report for passage
    to GAO:

            (1)  Pro - This is responsive to GAO's
        request.

ILLEGIB                    S E C R E T                              25X1

Approved For Release 2004/07/16 : CIA-RDP81M00980R000800090051-9

C03242743

Approved For Release 2004/07/16 : CIA-RDP81M00980R000800090051-9

S E C R E T
- 2 -

(2)  Con -

25X1

    b.  Advise GAO that we cannot declassify our
report because of the need to have a coordinated
Executive Branch position and our desire to protect
a sensitive and valuable liaison equity.

        (1)  Pro - (Our reasons are identical
to those stated in paragraph 3a(2) above.)

        (2)  Con - This is unresponsive to GAO's
desires.

    4.  Coordination.  This has been coordinated with
OLC, OGC, NE Division and CTS.

    5.  Recommendation.  Option B.  If you concur,
GAO will be advised orally by OLC.


                        John H. Stein

                        John H. Stein

Attachments:
    A.  GAO report
25X1     B.

                    S E C R E T
Approved For Release 2004/07/16 : CIA-RDP81M00980R000800090051-9

C03242743

Approved For Release 2004/07/16 : CIA-RDP81M00980R000800090051-9

S E C R E T
-3-

Distribution:
  Orig - Addressee w/atts
     1 - DDCI w/atts
     2 - Executive Registry w/o atts
     1 - ADDO w/atts
     2 - DDO Registry w/o atts
     1 - C/NE w/o atts
     1 - C/NE hold w/o atts
     1 - OLC w/o atts
     1 - OGC w/atts
     1 - CTS w/o atts
     1 - NE/ISR w/atts
     1 - NE/ISR w/o atts
     1 - NE/ISR hold w/o atts

25X1

Orig: [          ] C/NE/[    ]:rmw:6C18[    ] 3 Oct 78

25X1

Approved For Release 2004/07/16 : CIA-RDP81M00980R000800090051-9

C03240476

Approved For Release 2006/11/27 : CIA-RDP81M00980R001800060024-1
18-5538/2

S E C R E T



C DC1 1978

**DDO**

MEMORANDUM FOR:  Director of Central Intelligence

VIA          :  Deputy Director of Central Intelligence

FROM         :  John H. Stein
                Acting Deputy Director for Operations

SUBJECT      :  GAO Report on Alleged Nuclear Diversion

REFERENCE    :  Our memorandum on the same subject,
                dated 30 August 1978


   1.  Action Requested.  Review options outlined
in paragraph 3 and note recommendations.

   2.  Background.  Since forwarding Reference to
GAO, there has been no response to our letter.  We
assume the report, as previously drafted, will stand.
GAO has asked us to declassify our contributions to
this report.  We have worked on sanitization of the
report, and this version is attached.  The FBI also
has been asked to sanitize their contribution and is
taking the position that they will not declassify.
The Department of Energy's position also is that
they do not want to declassify their portion.

   3.  Staff Position.  This leaves us with two
options:

        a.  Clear the sanitized report for passage
   to GAO:

            (1)  Pro - This is responsive to GAO's
        request.

                                              25X1

S E C R E T

MORI/CDF

C03240476

Approved For Release 2006/11/27 : CIA-RDP81M00980R001800060024-1

S E C R E T
- 2 -

    (2)  Con - In our sanitized report,      25X1
every effort was made to protect intelligence
sources and methods ☐
☐ however, the      25X1
sanitized report still would reveal sensitive
information when considered together with the
unclassified collateral material ☐ which
has appeared in the press and which the House
Committee on Interior and Insular Affairs has
published in a booklet. ☐

    b.  Advise GAO that we cannot declassify our
report because of the need to have a coordinated
Executive Branch position and our desire to protect
a sensitive and valuable liaison equity.

    (1)  Pro - (Our reasons are identical
to those stated in paragraph 3a(2) above.)

    (2)  Con - This is unresponsive to GAO's
desires.

    4.  Coordination.  This has been coordinated with
OLC, OGC, NE Division and CTS.

    5.  Recommendation.  Option B.  If you concur,
GAO will be advised orally by OLC.

               John H. Stein

               John H. Stein

Attachments:
  A.  GAO report
  B.  Booklet,

S E C R E T

Approved For Release 2006/11/27 : CIA-RDP81M00980R001800060024-1

C03240476

Approved For Release 2006/11/27 · CIA-RDP81M00980R001800060024-1

S E C R E T
- 3 -

Distribution:
Orig - Addressee w/atts
   1 - DDCI w/atts
   2 - Executive Registry w/o atts
   1 - ADDO w/atts
   2 - DDO Registry w/o atts
   1 - C/NE w/o atts
   1 - C/NE hold w/o atts
   1 - OLC w/o atts
   1 - OGC w/atts
   1 - CTS w/o atts
   1 - NE/ISR w/atts
   1 - NE/ISR w/o atts
   1 - NE/ISR hold w/o atts

25X1

Orig: [          ] :C/NE/[    ] rmw:6C18[    ] 3 Oct 78

25X1

25X1

S E C R E T

# Exhibit 9

IRmep
Calvert Station
P.O. Box 32041
Washington, DC 20007

http://www.irmep.org
info@irmep.org
Phone: 202-342-7325
Fax: 202-318-8009



Institute for Research: Middle Eastern Policy

Thursday, September 19, 2013

Agency Release Panel
Michele Meeks, Information and Privacy Coordinator
Central Intelligence Agency
Washington, D.C. 20505

Reference: F-2010-01210 CIA records "relating to uranium diversion from the Nuclear Materials and Equipment Corporation (NUMEC) to Israel."

Dear Michele Meeks,

On August 28, 2013 the CIA denied in entirety the release of material on the above-referenced FOIA request of May 13, 2010. (Attached)  We appeal to the Agency Release Panel to reconsider this denial and release in full all requested records, including the Carter administration Nuclear Materials and Equipment Corporation (NUMEC) files.

The CIA Information Act of 1984, cited in the Agency's September 10, 2010 FOIA confirmation letter (Attached), provided guidance over the review for release of relevant CIA files.  As an outside public-interest nonprofit, it is impossible for us to know whether the majority of the CIA's thousands of files about NUMEC are considered to be "operational" or not. We believe they probably should not be since the diversion was not a CIA operation, according to officials who spoke publicly about the matter.

Carl Duckett, the executive director for CIA operations, revealed that CIA Director Richard Helms wrote a classified letter to Attorney General Ramsey Clark telling him that highly enriched uranium  "processed at Apollo might have ended up at Dimona" and requested that the FBI investigate NUMEC and its officials, many who had strong ties to Israel. Helms also informed President Lyndon Johnson about Israel's nuclear weapons program, to which LBJ famously responded, "Don't tell anyone else, even [Secretary of State] Dean Rusk and [Defense Secretary] Robert McNamara."[1] CIA Tel Aviv Station Chief John Hadden called the NUMEC incident an "Israeli operation from the beginning."  These and other comments by CIA officials imply that while the diversion of weapons-grade uranium from Apollo to Dimona was indeed an operation, it was not a clandestine CIA operation authorized by a presidential finding, and is therefore probably unworthy of the decades of agency refusals to researchers seeking file release.

However, even if CIA considers NUMEC files to be "operational files," under Sec. 702 "Decennial review of exempted operational files" the CIA would have had to have conducted ten-year reviews for removal of exemptions for release of NUMEC files.  In particular, under subsection (b) CIA would have had to consider the historical value and ongoing heavy public interest in the subject matter.

The NUMEC affair has been of intense public interest since the first press accounts of massive NUMEC uranium losses were reported by the New York Times on September 17, 1966.  A lingering question is whether the ramshackle NUMEC facilities and operations that polluted the Kiski Valley, currently requiring a U.S. Army

---

[1]  McTiernan, Tom "Inquiry into the Testimony of the Executive Director for Operations" Volume III, Interviews, February 1978. The CIA's Carl Duckett briefed NRC commissioners in 1976  In 1978, Tom McTiernan of NRC investigated the 1977 Congressional testimony of NRC's Executive Director for Operations Lee Gossick to see if Gossick lied to Congress about whether officials thought there was evidence of a diversion. The 1978 report of McTiernan's investigation contains recollections by NRC people who attended the Duckett briefing in 1976. There is also a four page summary of an interview with Duckett. Nearly all of what Duckett said or what others recalled he said was redacted from the public version of McTiernan's report that was eventually released to the public. However, one page (number 3) of the four pages summarizing Duckett's interview summary was inadvertently released to the Natural Resources Defense Council when the report was first made public.

Corps of Engineers cleanup costing up to half a billion taxpayer dollars, were the result of its core mission as a budget smuggling operation. Many such operations were established across the United States in the 1940s to illegally obtain and smuggle conventional weapons. One key figure in the NUMEC scheme, David Lowenthal, was just such a smuggler for Israel. Even in 2013, civil suits over accidental death and injury compensation continue to be filed in Pennsylvania district courts by victims of NUMEC. However, aside from the public remarks of Carl Duckett and John Hadden affirming an illegal diversion, the CIA has never fully divulged its findings about NUMEC to the American public.

It is now known that the CIA generated a vast amount of data about NUMEC which could reveal a great deal about the functions of government and fill important gaps in the historical record—which is the primary purpose of the Freedom of Information Act. According to a Carter Administration memo obtained from the National Archives this year dated April 25, 1979, the Internal Security Section of the Justice Department completed a review of "thousands of CIA documents" about the NUMEC diversion. (Attached). Although Congress was to have received the review to take warranted action, apparently such an accountability moment never occurred.

According to a previously released October 6, 1978 memo from John H. Stein, Acting Deputy Director for Operations which accompanied the August 28, 2013 FOIA denial to us, the CIA believed intelligence sources and methods might have been compromised if CIA material submitted for a 1978 GAO report[2] were combined with information already in the public domain. Further, the CIA felt it could not declassify their report "because of the need to have a coordinated Executive Branch position and our desire to protect a sensitive and valuable liaison equity."

The Executive branch is demonstrably reticent to release classified files about Israel's nuclear weapons arsenal in observance of the Nixon-Kissinger Meir policy of "strategic ambiguity." However, no educated person inside or outside the Middle East any longer believes Israel doesn't have a nuclear arsenal. There is an abundance of public domain information about clandestine nuclear weapons funding through nonprofit corporations, yellowcake and technology transfers that helped build the arsenal—often against the wishes of the countries from which such resources were extracted. Perhaps the Stein memo is saying that the U.S. was once so reliant on Israel as an intelligence liaison it would have been counter-productive to let the public know that Israel's agents stole sensitive military material. However, the Cold War is now over. Furthermore, the Obama administration's 2009 executive order on Freedom of Information calls for a new "presumption" of openness, and prohibits retaining material for decades that is "embarrassing" or casts a harsh light on decisions made under such circumstances. Exempting 30+ year-old records under (b)(1) contradicts Obama guidelines that "nothing should remain classified forever" and new automatic 25-year declassification targets.

As you may know, the ISCAP panel, which has an established record declassifying tightly held intelligence files, is currently reviewing a number of NUMEC-related files for release, including the 1978 GAO report. CIA is no longer the sole decision point for release of sensitive records about NUMEC. We believe it would be best for compliance with the spirit of FOIA, the reputation of the CIA, and the benefit of the American public, if all of the CIA's NUMEC-related material were released immediately.

Sincerely,

Grant F. Smith
Director of Research

Attachments.

---

[2] *Nuclear Diversion in the US? 13 Years of Contradiction and Confusion*, GAO, partially declassified and released in 2010

# Exhibit 10



Central Intelligence Agency

Washington, DC 20505

28 March 2014

Mr. Grant F. Smith
Director of Research
Institute for Research: Middle Eastern Policy
Calvert Station
P.O. Box 32041
Washington, DC 20007

Reference: F-2010-01210

Dear Mr. Smith,

This responds to your 19 September 2013 letter appealing our 28 August 2013 final response to your Freedom of Information Act request for records relating to uranium diversion from the Nuclear Materials and Equipment Corporation (NUMEC) to Israel.

The Agency Release Panel (ARP) considered your appeal and determined the material denied in its entirety is currently and properly classified and must continue to be protected from release on the basis of FOIA exemptions (b)(1) and (b)(3). Exemption (b)(3) pertains to information exempt from disclosure by statute. The relevant statute is the Central Intelligence Agency Act of 1949, 50 U.S.C. § 403g, as amended, Section 6, which exempts from the disclosure requirement information pertaining to the organization and functions, including those related to the protection of intelligence sources and methods.

Therefore, in accordance with Agency regulations set forth in part 1900 of title 32 of the Code of Federal Regulations, the ARP denied your appeal on the basis of FOIA exemptions (b)(1) and (b)(3). In accordance with the provisions of the FOIA, you have the right to seek judicial review of this determination in a United States district court. Alternatively, the Office of Government Information Services (OGIS) offers mediation services to resolve disputes between FOIA requesters and federal agencies. Using services offered by OGIS does not affect your right to pursue litigation. For more information, including how to contact OGIS, please consult its website, http://ogis/archives.gov.

Sincerely,

Michele Meeks
Executive Secretary
Agency Release Panel

# Exhibit 11

To see where the changes are, scroll down.



SECRET

EO 12958 3.3(b)(1)>25Yrs
EO 12958 3.3(b)(6)>25Yrs

UNCLASSIFIED

REPORT BY THE

# Comptroller General
OF THE UNITED STATES

## Nuclear Diversion In The U.S.?
## 13 Years Of Contradiction
## And Confusion

"NATIONAL SECURITY INFORMATION"
UNAUTHORIZED DISCLOSURE SUBJECT
TO CRIMINAL SANCTIONS

CLASSIFIED BY: SEE INSIDE FRONT COVER.
EXEMPT FROM GENERAL DECLASSIFICATION SCHEDULE
OF EXECUTIVE ORDER 11652.
EXEMPTION CATEGORY 2 #

WARNING NOTICE—Sensitive
Intelligence Sources and
Methods Involved

UNITED STATES
GENERAL ACCOUNTING OFFICE

UNCLASSIFIED

SECRET

B-157767
EMD-79-8
DECEMBER 18, 1978

C01162251

---

SECRET

REPORT BY THE

# Comptroller General
OF THE UNITED STATES

## Nuclear Diversion In The U.S.?
## 13 Years Of Contradiction
## And Confusion

"NATIONAL SECURITY INFORMATION"
UNAUTHORIZED DISCLOSURE SUBJECT
TO CRIMINAL SANCTIONS

CLASSIFIED BY: SEE INSIDE FRONT COVER.
EXEMPT FROM GENERAL DECLASSIFICATION SCHEDULE
OF EXECUTIVE ORDER 11652.
EXEMPTION CATEGORY 2 #

WARNING NOTICE—Sensitive
Intelligence Sources and
Methods Involved

DECLASSIFIED UNDER AUTHORITY OF THE
INTERAGENCY SECURITY CLASSIFICATION APPEALS PANEL,
E.O. 13526, SECTION 5.3(b)(3)
ISCAP APPEAL NO. 2013-078, document no.1
DECLASSIFICATION DATE: March 18, 2014

UNITED STATES
GENERAL ACCOUNTING OFFICE

SECRET

B-157767
EMD-79-8
DECEMBER 18, 1978

C01162251

Classified by letter from FBI to GAO dated October 25, 1978 and a letter
from CIA to GAO also dated October 25, 1978.

C01162251

---

Classified by letter from FBI to GAO dated October 25, 1978 and a letter
from CIA to GAO also dated October 25, 1978.

C01162251

C01162251

COMPTROLLER GENERAL OF THE UNITED STATES
WASHINGTON D.C. 20548

B-157767

The Honorable John D. Dingell
Chairman, Subcommittee on
 Energy and Power
Committee on Interstate and
 Foreign Commerce
House of Representatives

Dear Mr. Chairman:

On August 12, 1977, you requested that we initiate an investigation to determine the extent and contents of intelligence and related nuclear safeguards information regarding a possible diversion of nuclear material from a U.S. facility and the extent to which this information was disseminated among those agencies having responsibilities in this area.

In response to your request, this report primarily discusses two questions

--what information has been developed about the alleged diversion? and

--were the investigations done by the Federal Government adequate?

As agreed with your office we plan to distribute the report to certain other parties having an interest in it. Specifically, we plan to provide the report to the Chairman of the House Committee on Interior and Insular Affairs and the Chairman of the Subcommittee on Energy, Nuclear Proliferation and Federal Services, Senate Committee on Governmental

CLASSIFIED BY (see inside front cover).
EXEMPT FROM GENERAL DECLASSIFICATION
SCHEDULE OF EXECUTIVE ORDER 11652
EXEMPTION CATEGORY 2

(This page is UNCLASSIFIED.)

UNCLASSIFIED

C01162251

COMPTROLLER GENERAL OF THE UNITED STATES
WASHINGTON D.C. 20548

B-157767

The Honorable John D. Dingell
Chairman, Subcommittee on
 Energy and Power
Committee on Interstate and
 Foreign Commerce
House of Representatives

Dear Mr. Chairman:

On August 12, 1977, you requested that we initiate an investigation to determine the extent and contents of intelligence and related nuclear safeguards information regarding a possible diversion of nuclear material from a U.S. facility and the extent to which this information was disseminated among those agencies having responsibilities in this area.

In response to your request, this report primarily discusses two questions

--what information has been developed about the alleged diversion? and

--were the investigations done by the Federal Government adequate?

As agreed with your office we plan to distribute the report to certain other parties having an interest in it. Specifically, we plan to provide the report to the Chairman of the House Committee on Interior and Insular Affairs and the Chairman of the Subcommittee on Energy, Nuclear Proliferation and Federal Services, Senate Committee on Governmental

CLASSIFIED BY (see inside front cover).
EXEMPT FROM GENERAL DECLASSIFICATION
SCHEDULE OF EXECUTIVE ORDER 11652
EXEMPTION CATEGORY 2

(This page is UNCLASSIFIED.)

C01162251

B-157767

UNCLASSIFIED

Affairs.  Further, we will also be providing the report to
the House and Senate Select Intelligence Committees and the
Federal agencies included in our review.

The report has been classified as SECRET/National Secu-
rity Information by the Federal Bureau of Investigation and
the Central Intelligence Agency. We made every attempt to
issue an unclassified report on this matter. However, neither
the Federal Bureau of Investigation nor the Central Intelli-
gence Agency was able to provide us with a declassified version
of the report.

Sincerely yours,

Comptroller General
of the United States

2
UNCLASSIFIED

C01162251

B-157767

UNCLASSIFIED

Affairs.  Further, we will also be providing the report to
the House and Senate Select Intelligence Committees and the
Federal agencies included in our review.

The report has been classified as SECRET/National Secu-
rity Information by the Federal Bureau of Investigation and
the Central Intelligence Agency. We made every attempt to
issue an unclassified report on this matter. However, neither
the Federal Bureau of Investigation nor the Central Intelli-
gence Agency was able to provide us with a declassified version
of the report.

Sincerely yours,

Comptroller General
of the United States

2
UNCLASSIFIED

C01162251

SECRET

REPORT OF THE COMPTROLLER
GENERAL OF THE UNITED STATES

NUCLEAR DIVERSION IN THE
UNITED STATES? 13 YEARS OF
CONTRADICTION AND CONFUSION

D I G E S T

PREFACE

It is not GAO's function to conduct criminal
investigations and this review should not be
construed as one. This report is simply a
presentation of facts as we have examined
them regarding the alleged diversion and its
accompanying 13 years of contradiction and
confusion. GAO's efforts focused on the im-
plications such an alleged incident would
have for improving the effectiveness of the
Nation's current nuclear safeguards program.
Investigations of the alleged incident by
the FBI and the Department of Energy's (DOE)
Office of Inspector General are still under-
way.

WHY GAO'S REVIEW WAS MADE

Chairman John Dingell of the House Subcom-
mittee on Energy and Power requested GAO
to examine an alleged incident involving
over 200 pounds of unaccounted for uranium-
235, the material used in the fabrication
of nuclear weapons, from a nuclear plant in
western Pennsylvania. Also, Chairman John
Glenn of the Subcommittee on Energy, Nuclear
Proliferation and Federal Services, Senate
Committee on Governmental Affairs, and Chair-
man Morris K. Udall of the Subcommittee on
Energy and Environment, House Committee on
Interior and Insular Affairs, expressed in-
terest in the review.

Chairman Dingell specifically asked GAO to
examine the extent and content of intelli-
gence and safeguards information regarding
the alleged incident, and the extent to
which this information was provided to DOE
and the Nuclear Regulatory Commission (NRC)
for their use in assuring that nuclear ma-
terials were being adequately protected in
this country. Chairman Dingell requested
that GAO review * * * all necessary files

EMD-79-8

SECRET

REPORT OF THE COMPTROLLER
GENERAL OF THE UNITED STATES

NUCLEAR DIVERSION IN THE
UNITED STATES? 13 YEARS OF
CONTRADICTION AND CONFUSION

D I G E S T

PREFACE

It is not GAO's function to conduct criminal
investigations and this review should not be
construed as one. This report is simply a
presentation of facts as we have examined
them regarding the alleged diversion and its
accompanying 13 years of contradiction and
confusion. GAO's efforts focused on the im-
plications such an alleged incident would
have for improving the effectiveness of the
Nation's current nuclear safeguards program.
Investigations of the alleged incident by
the FBI and the Department of Energy's (DOE)
Office of Inspector General are still under-
way.

WHY GAO'S REVIEW WAS MADE

Chairman John Dingell of the House Subcom-
mittee on Energy and Power requested GAO
to examine an alleged incident involving
over 200 pounds of unaccounted for uranium-
235, the material used in the fabrication
of nuclear weapons, from a nuclear plant in
western Pennsylvania. Also, Chairman John
Glenn of the Subcommittee on Energy, Nuclear
Proliferation and Federal Services, Senate
Committee on Governmental Affairs, and Chair-
man Morris K. Udall of the Subcommittee on
Energy and Environment, House Committee on
Interior and Insular Affairs, expressed in-
terest in the review.

Chairman Dingell specifically asked GAO to
examine the extent and content of intelli-
gence and safeguards information regarding
the alleged incident, and the extent to
which this information was provided to DOE
and the Nuclear Regulatory Commission (NRC)
for their use in assuring that nuclear ma-
terials were being adequately protected in
this country. Chairman Dingell requested
that GAO review * * * all necessary files

EMD-79-8

C01162251

SECRET

and reports including those of ERDA, NRC, CIA, and the FBI * * *."

## CONSTRAINTS ON GAO'S REVIEW

GAO attempted to satisfy the Chairman's request by interviewing responsible Federal and private individuals and by examining pertinent reports and documentation. While DOE 1/ and NRC provided full access to all their records and documents, GAO was continually denied necessary reports and documentation on the alleged incident by the Central Intelligence Agency (CIA) and the Federal Bureau of Investigation (FBI).

CIA provided GAO a written chronology of contacts with other Federal agencies, however, the CIA denied GAO access to any source documents on the case. According to agency officials, this decision made by the Director of the CIA. The CIA did subsequently allow selected staff of Chairman Dingell's Subcommittee access to CIA documents, however, access to the documents was not extended to include GAO.

> Withheld under statutory authority of the Central Intelligence Agency Act of 1949 (50 U.S.C. section 403g)

1/The Atomic Energy Commission (AEC) was formerly responsible for both regulating and promoting all nuclear activities in the United States. In January 19, 1975, it was split into the Nuclear Regulatory Commission and the Energy Research and Development Administration (ERDA). NRC became responsible for nuclear regulation and ERDA became responsible for nuclear development and promotion. Under Public Law 95-91, ERDA's functions were placed in the Department of Energy effective October 1, 1977. NRC remained intact. Throughout the report, DOE is used to refer to the Department of Energy, ERDA, and AEC.

ii
SECRET

SECRET

and reports including those of ERDA, NRC, CIA, and the FBI * * *."

## CONSTRAINTS ON GAO'S REVIEW

GAO attempted to satisfy the Chairman's request by interviewing responsible Federal and private individuals and by examining pertinent reports and documentation. While DOE 1/ and NRC provided full access to all their records and documents, GAO was continually denied necessary reports and documentation on the alleged incident by the Central Intelligence Agency (CIA) and the Federal Bureau of Investigation (FBI).

CIA provided GAO a written chronology of contacts with other Federal agencies, however, the CIA denied GAO access to any on the case. The CIA did subsequently allow selected staff of Chairman Dingell's Subcommittee access to CIA documents, however, access to the documents was not extended to include GAO.

1/The Atomic Energy Commission (AEC) was formerly responsible for both regulating and promoting all nuclear activities in the United States. In January 19, 1975, it was split into the Nuclear Regulatory Commission and the Energy Research and Development Administration (ERDA). NRC became responsible for nuclear regulation and ERDA became responsible for nuclear development and promotion. Under Public Law 95-91, ERDA's functions were placed in the Department of Energy effective October 1, 1977. NRC remained intact. Throughout the report, DOE is used to refer to the Department of Energy, ERDA, and AEC.

ii
SECRET

C01162251

The FBI's rationale for denying access was that it did not want to jeopardize an ongoing investigation of the alleged diversion incident.

Because GAO was denied access to documentation, it had to rely, for the most part, on oral evidence obtained in interviews with knowledgeable individuals and staff. The lack of access to CIA and FBI documents made it impossible for GAO to corroborate or check all information it obtained. Whenever possible, GAO attempted to corroborate the information with other knowledgeable individuals. One must keep in mind, however, that the alleged incident occurred more than 13 years ago. These limitations impeded GAO's efforts to fully collect and evaluate any facts of possible relevance to the alleged diversion incident.

While GAO normally would not continue work where it was continually denied access to pertinent and important documentation, it did continue in this case because of the significant nuclear safeguards implications and the congressional interest. This report is focused on the implications the alleged incident has for improving the effectiveness of the Nation's current nuclear safeguards program.

BACKGROUND

The alleged incident surfaced in 1965 at the Nuclear Materials and Equipment Corporation (NUMEC). Since that time, many allegations concerning the incident have been made in newspaper and magazine articles and at congressional hearings. These allegations include:

--The material was illegally diverted to Israel by NUMEC's management for use in nuclear weapons.

--The material was diverted to Israel by NUMEC's management with the assistance of the CIA.

iii
SECRET

IC01162251

The FBI's rationale for denying access was that it did not want to jeopardize an ongoing investigation of the alleged diversion incident.

Because GAO was denied access to documentation, it had to rely, for the most part, on oral evidence obtained in interviews with knowledgeable individuals and staff. The lack of access to CIA and FBI documents made it impossible for GAO to corroborate or check all information it obtained. Whenever possible, GAO attempted to corroborate the information with other knowledgeable individuals. One must keep in mind, however, that the alleged incident occurred more than 13 years ago. These limitations impeded GAO's efforts to fully collect and evaluate any facts of possible relevance to the alleged diversion incident.

While GAO normally would not continue work where it was continually denied access to pertinent and important documentation, it did continue in this case because of the significant nuclear safeguards implications and the congressional interest. This report is focused on the implications the alleged incident has for improving the effectiveness of the Nation's current nuclear safeguards program.

BACKGROUND

The alleged incident surfaced in 1965 at the Nuclear Materials and Equipment Corporation (NUMEC). Since that time, many allegations concerning the incident have been made in newspaper and magazine articles and at congressional hearings. These allegations include:

--The material was illegally diverted to Israel by NUMEC's management for use in nuclear weapons.

--The material was diverted to Israel by NUMEC's management with the assistance of the CIA.

iii
SECRET

IC01162251

C01162251

SECRET

--The material was diverted to Israel with the acquiescence of the United States Government.

--There has been a cover-up of the NUMEC incident by the United States Government.

CIA officials provided us with their views on the first allegation and stated that they had no information to substantiate any of the others. Based on the totality of GAO's inquiry, we believe that the allegations have not been fully or adequately answered.

Investigations of the incident were conducted by DOE and the FBI. The CIA, NRC, and the Joint Committee on Atomic Energy also have some knowledge of the facts surrounding the incident. All investigations 1/ of the alleged incident ended with no definitive answer and GAO found no evidence that the 200 pounds of nuclear material has been located. However, as a result of the NUMEC incident the safeguards programs in the United States have undergone substantial changes and have improved significantly.

This report addresses the two major questions still surrounding the incident and their implications for this country's continuing responsibilities for safeguarding strategic nuclear materials. These are:

--What information has been developed about the alleged NUMEC diversion?

--Were the investigations conducted by the Federal Government into the alleged incident adequate?

---

1/CIA officials informed GAO that they have no authority to conduct "investigations" of unaccounted for nuclear materials in the United States. As used in this report the term investigation is used in the context of the entire Federal effort to resolve the incident.

iv
SECRET

SECRET

--The material was diverted to Israel with the acquiescence of the United States Government.

--There has been a cover-up of the NUMEC incident by the United States Government.

CIA officials provided us with their views on the first allegation and stated that they had no information to substantiate any of the others. Based on the totality of GAO's inquiry, we believe that the allegations have not been fully or adequately answered.

Investigations of the incident were conducted by DOE and the FBI. The CIA, NRC, and the Joint Committee on Atomic Energy also have some knowledge of the facts surrounding the incident. All investigations 1/ of the alleged incident ended with no definitive answer and GAO found no evidence that the 200 pounds of nuclear material has been located. However, as a result of the NUMEC incident the safeguards programs in the United States have undergone substantial changes and have improved significantly.

This report addresses the two major questions still surrounding the incident and their implications for this country's continuing responsibilities for safeguarding strategic nuclear materials. These are:

--What information has been developed about the alleged NUMEC diversion?

--Were the investigations conducted by the Federal Government into the alleged incident adequate?

---

1/CIA officials informed GAO that they have no authority to conduct "investigations" of unaccounted for nuclear materials in the United States. As used in this report the term investigation is used in the context of the entire Federal effort to resolve the incident.

iv
SECRET

C01162251

C01162251

SECRET

## WHAT INFORMATION HAS BEEN DEVELOPED ABOUT THE ALLEGED NUMEC DIVERSION?

Based on its review of available documents held by DOE and discussions with those involved in and knowledgeable about the NUMEC incident, GAO cannot say whether or not there was a diversion of material from the NUMEC facility. DOE has taken the position that it is aware of no conclusive evidence that a diversion of nuclear material ever occurred at the NUMEC facility, although it recognizes that the possibility cannot be eliminated. Agents from the FBI involved in the current investigation told GAO that while there exists circumstantial information which could lead an individual to conclude that a diversion occurred, there is no substantive proof of a diversion.

Currently the FBI is continuing its investigation into the alleged NUMEC incident.

SECRET

---

C01162251

SECRET

## WHAT INFORMATION HAS BEEN DEVELOPED ABOUT THE ALLEGED NUMEC DIVERSION?

Based on its review of available documents held by DOE and discussions with those involved in and knowledgeable about the NUMEC incident, GAO cannot say whether or not there was a diversion of material from the NUMEC facility. DOE has taken the position that it is aware of no conclusive evidence that a diversion of nuclear material ever occurred at the NUMEC facility, although it recognizes that the possibility cannot be eliminated. Agents from the FBI involved in the current investigation told GAO that while there exists circumstantial information which could lead an individual to conclude that a diversion occurred, there is no substantive proof of a diversion.

Currently the FBI is continuing its investigation into the alleged NUMEC incident.

In an August 1977 meeting a former high ranking CIA official informed GAO in the presence of several current CIA officials, that information was developed by the CIA that made it appear that the NUMEC facility was the "most likely" source of the material.

understanding of the information that was presented at this meeting was subsequently provided to CIA in a memorandum of conversation. A knowledgeable CIA official who reviewed the memorandum expressed no opposition to GAO's use of the term "most likely."

Later, in a November 1977 meeting with CIA officials, GAO was informed that there was no data to specifically support such a conclusion. Further, GAO was informed by CIA officials that characterizing NUMEC as the "most likely" source for the uranium-235 held by Israel was not the official position of the Agency but of perhaps one or two former Agency officials. The CIA officials GAO contacted informed us that the position on expressed in the August 1977 briefing should

25X1,E.O.13526

SECRET

C01162251

C01162251

SECRET

have been changed to reflect a less conclusive position. The CIA officials suggested that NUMEC be recognized as only one of many possible sources of enriched uranium going to Israel. Subsequently, however, two former senior CIA officials responsible for collecting and analyzing such data told GAO that information does exist within the CIA linking the unaccounted for NUMEC material to Israel. One of these former officials was one of the five highest ranking employees of the CIA and reported directly to the Director of the CIA on this matter.

Current CIA officials told GAO that these two former officials were drawing on memory as they recalled past events. The CIA officials having current access to the files advised GAO that a search of the available data reveals a "semantic" problem concerning the use of the term "evidence." In short, CIA states there is no hard evidence on a diversion from NUMEC to Israel. At the same time, current CIA officials recognize that the available data, when coupled with past recollections of events, could lead former officials to speak in terms of "linking" the unaccounted material from NUMEC to nuclear developments in Israel. GAO was unable to determine whether the CIA changed its opinions about any NUMEC/Israel link or whether the CIA inadvertently failed to comment on the inaccuracy of the "most likely" position conveyed to GAO in the August 1977 briefing. The FBI agent currently in charge of the investigation told GAO that the FBI also received conflicting stories from the CIA. Initially, when the FBI began investigators they had information supporting the possibility that the material missing from the NUMEC facility went to Israel. The CIA later reversed itself and told the FBI it did not have this type of information.

In 1975, the entire regulatory function of DOE was taken over by the newly created NRC, which was made responsible for the regulatory oversight of commercial nuclear facilities like NUMEC, and consequently has become involved in the incident. In a February 1978 report related to the NUMEC incident,

vi

SECRET

SECRET

In 1975, the entire regulatory function of DOE was taken over by the newly created NRC, which was made responsible for the regulatory oversight of commercial nuclear facilities like NUMEC, and consequently has become involved in the incident. In a February 1978 report related to the NUMEC incident,

vi

SECRET

C01162251

SECRET

NRC concluded that their previous official position of "no evidence" to support a diversion may need to be reconsidered in light of the many uncertainties surrounding the incident.

## WERE THE INVESTIGATIONS CONDUCTED BY THE FEDERAL GOVERNMENT INTO THE ALLEGED INCIDENT ADEQUATE?

If a diversion or theft of nuclear material is suspected or actually occurs in this country, the Federal Government must be able to quickly and definitively determine how and why it happened so that the public can be protected against the potential hazards from such an occurrence. To do this, agencies of the Government with capabilities for investigating and responding to such incidents must work together to assure that all relevant information is obtained and is timely. This did not happen with the alleged NUMEC incident. Federal investigations of the alleged NUMEC incident were uncoordinated, limited in scope and timeliness and, in GAO's opinion, less than adequate. There was not a unified and coordinated investigation of the incident by those agencies having the capabilities to fully resolve the matter --DOE, the FBI, and the CIA.

During 1965 and 1966 DOE investigated NUMEC's accountability and safeguards system focusing on the diversion possibility. Prior to the alleged 1965 incident, DOE conducted six accountability inspections at NUMEC in order to assure that nuclear materials were being adequately protected. The inspections were directed solely at the material accounting requirements of the time which were less rigorous than those in existence at nuclear facilities today. Each inspection revealed significant deficiencies, but DOE allowed the facility to continue nuclear operations even though a key field investigator at one point recommended that DOE stop providing nuclear material to the facility.

The FBI, which had the responsibility and authority to investigate the alleged incident, did not focus on the question of a

SECRET

SECRET

C01162251

NRC concluded that their previous official position of "no evidence" to support a diversion may need to be reconsidered in light of the many uncertainties surrounding the incident.

WERE THE INVESTIGATIONS CONDUCTED BY THE FEDERAL GOVERNMENT INTO THE ALLEGED INCIDENT ADEQUATE?

If a diversion or theft of nuclear material is suspected or actually occurs in this country, the Federal Government must be able to quickly and definitively determine how and why it happened so that the public can be protected against the potential hazards from such an occurrence. To do this, agencies of the Government with capabilities for investigating and responding to such incidents must work together to assure that all relevant information is obtained and is timely. This did not happen with the alleged NUMEC incident. Federal investigations of the alleged NUMEC incident were uncoordinated, limited in scope and timeliness and, in GAO's opinion, less than adequate. There was not a unified and coordinated investigation of the incident by those agencies having the capabilities to fully resolve the matter --DOE, the FBI, and the CIA.

During 1965 and 1966 DOE investigated NUMEC's accountability and safeguards system focusing on the diversion possibility. Prior to the alleged 1965 incident, DOE conducted six accountability inspections at NUMEC in order to assure that nuclear materials were being adequately protected. The inspections were directed solely at the material accounting requirements of the time which were less rigorous than those in existence at nuclear facilities today. Each inspection revealed significant deficiencies, but DOE allowed the facility to continue nuclear operations even though a key field investigator at one point recommended that DOE stop providing nuclear material to the facility.

The FBI, which had the responsibility and authority to investigate the alleged incident, did not focus on the question of a

vii
SECRET

C01162251

25X1, E.O.13526

SECRET

possible nuclear diversion until May 1976 --nearly 11 years later. Initially, the FBI declined DOE's request to conduct an investigation of the diversion possibility even though they are required to conduct such investigations under the Atomic Energy Act. Two sources familiar with the matter gave GAO differing views on why the FBI declined to undertake the investigation. Between 1965 and 1976 the FBI's efforts were directed at investigating the actions and associations of NUMEC's president. FBI and Department of Justice staff told GAO that after a request by President Ford in April 1976 the FBI did begin to address the diversion aspect. GAO was not furnished any documents regarding President Ford's request and thus could not specifically determine its nature and scope. This investigation, which is currently ongoing, is obviously hampered by the 11-year gap since the alleged incident occurred. Also, although it may not affect the investigative outcome, GAO found that certain key individuals had not been contacted by the FBI almost 2 years into the FBI's current investigation.

According to the CIA, it did not conduct a domestic investigation of the incident because it had no authority to do so.

Several current and former FBI and DOE officials indicated that the CIA withheld this information from them, at a time when it could have affected the scope and direction of FBI investigations. However, current CIA officials [redacted] stated that the full range of information [redacted] was not available during the FBI investigation in 1968. Current CIA officials told us that during the FBI's investigation beginning in 1976 the FBI was briefed by CIA in full and the FBI agent-in-charge told

viii



possible nuclear diversion until May 1976 --nearly 11 years later. Initially, the FBI declined DOE's request to conduct an investigation of the diversion possibility even though they are required to conduct such investigations under the Atomic Energy Act. Two sources familiar with the matter gave GAO differing views on why the FBI declined to undertake the investigation. Between 1965 and 1976 the FBI's efforts were directed at investigating the actions and associations of NUMEC's president. FBI and Department of Justice staff told GAO that after a request by President Ford in April 1976 the FBI did begin to address the diversion aspect. GAO was not furnished any documents regarding President Ford's request and thus could not specifically determine its nature and scope. This investigation, which is currently ongoing, is obviously hampered by the 11-year gap since the alleged incident occurred. Also, although it may not affect the investigative outcome, GAO found that certain key individuals had not been contacted by the FBI almost 2 years into the FBI's current investigation.

iii

C01162251

SECRET

C01162251

SECRET

the CIA that he did not see any new information in the presentation which was germane to the FBI investigation. CIA officials also told us that at about the same time

DOE officials, also briefed by CIA, said that the information was consistent with what had been known previously. GAO does not know the extent to which the CIA revealed to the FBI or DOE the information it possessed. While the CIA may have alerted these agencies, it does not appear to us that it provided them with all the information it had on this subject in an adequate or timely manner. It appears to GAO that the CIA may have been reluctant to aid the domestic investigation of the alleged diversion because of its concern about protecting its own "sources and methods" of obtaining information.

The failure of DOE, the FBI, and the CIA to coordinate their efforts on the suspected diversion when it occurred and as new information developed and the limitation in the scope and timeliness of the FBI efforts, lead GAO to conclude that the Federal efforts to resolve the matter were less than adequate.

Currently, there exists no coordinated inter-agency agreed upon plan which focuses on (1) an adequate detection and investigative system and (2) a reporting system to the appropriate congressional committees and to the President. As a result, if a similar incident were to occur today, this country may not be assured of any better investigation. The United States needs to improve its efforts for effectively responding to and investigating incidents involving missing or unaccounted for weapons-grade nuclear materials. In view of increasing terrorist activities throughout the world, the ability to respond and investigate such incidents should be of concern to national security and the public health and safety.

SECRET

The failure of DOE, the FBI, and the CIA to coordinate their efforts on the suspected diversion when it occurred and as new information developed and the limitation in the scope and timeliness of the FBI efforts, lead GAO to conclude that the Federal efforts to resolve the matter were less than adequate.

Currently, there exists no coordinated inter-agency agreed upon plan which focuses on (1) an adequate detection and investigative system and (2) a reporting system to the appropriate congressional committees and to the President. As a result, if a similar incident were to occur today, this country may not be assured of any better investigation. The United States needs to improve its efforts for effectively responding to and investigating incidents involving missing or unaccounted for weapons-grade nuclear materials. In view of increasing terrorist activities throughout the world, the ability to respond and investigate such incidents should be of concern to national security and the public health and safety.

C01162251

C01162251

**SECRET**

## RECOMMENDATIONS TO THE HEADS OF AGENCIES

GAO recommends that the heads of DOE, NRC, the Department of Justice, and the CIA, as part of their responsibilities for the national security of the country, establish a plan for coordinated interagency action which focuses on a nuclear safeguards system that adequately detects, investigates, and reports to the Congress and the President on thefts or diversions of nuclear materials. The plan which should be submitted to the Congress within 90 days or less of the issuance of this report, should include

--a formal means for a timely determination of whether a loss has occurred; --

--a clear and direct channel of communications between the agencies;

--a formal means for rapidly focusing the abilities of these agencies on the resolution of a diversion incident; and

--a means for allowing any incident involving the theft or diversion of nuclear material to be definitely resolved to the satisfaction of the Congress and the President.

GAO also recommends that the Attorney General, working with the FBI, take the lead in establishing the interagency plan since the FBI, under the Atomic Energy Act of 1954, is responsible for investigating incidents involving the diversion or theft of nuclear materials.

## RECOMMENDATION TO THE CONGRESS

The committees of Congress having jurisdiction for domestic nuclear safeguards should

--review the nuclear safeguards plan to be submitted by the Executive Branch to assure that an adequate system is developed which deters and investigates thefts or diversions of nuclear materials.

**SECRET**

**SECRET**

## RECOMMENDATIONS TO THE HEADS OF AGENCIES

GAO recommends that the heads of DOE, NRC, the Department of Justice, and the CIA, as part of their responsibilities for the national security of the country, establish a plan for coordinated interagency action which focuses on a nuclear safeguards system that adequately detects, investigates, and reports to the Congress and the President on thefts or diversions of nuclear materials. The plan which should be submitted to the Congress within 90 days or less of the issuance of this report, should include

--a formal means for a timely determination of whether a loss has occurred; --

--a clear and direct channel of communications between the agencies;

--a formal means for rapidly focusing the abilities of these agencies on the resolution of a diversion incident; and

--a means for allowing any incident involving the theft or diversion of nuclear material to be definitely resolved to the satisfaction of the Congress and the President.

GAO also recommends that the Attorney General, working with the FBI, take the lead in establishing the interagency plan since the FBI, under the Atomic Energy Act of 1954, is responsible for investigating incidents involving the diversion or theft of nuclear materials.

## RECOMMENDATION TO THE CONGRESS

The committees of Congress having jurisdiction for domestic nuclear safeguards should

--review the nuclear safeguards plan to be submitted by the Executive Branch to assure that an adequate system is developed which deters and investigates thefts or diversions of nuclear materials.

**SECRET**

C01162251

C01162251

--request that the FBI and DOE's Office of Inspector General complete their investigations of the NUMEC incident as soon as possible and submit their reports to the committees.

These reports should be reviewed to determine the adequacy of the investigations and their implications for developing a more effective future system.

Even with complete information on all Government investigations, given the passage of time, it may be difficult to conclusively determine what specifically happened at NUMEC. GAO believes the important thing is to use the lessons learned from the NUMEC experience to make certain that the Nation develops an adequate detection and follow-up system to deter future nuclear thefts or diversions.

## AGENCY COMMENTS

DOE's comments on the report are contained in a letter dated July 25, 1978. (See appendix II). DOE agreed with the thrust of the report. However, it disagreed with our recommendation concerning the need to enter into a formal interagency agreement with NRC, the FBI, and the CIA for more timely and effective action in investigating incidents of suspected theft and diversions of nuclear material. DOE stated in its letter that a comprehensive plan and a memorandum of understanding with the FBI already existed for joint responses to nuclear threat situations. Further, DOE stated that it had open channels of communication to other agencies, including the CIA, for the exchange of information pertinent to nuclear threat situations.

These factors were known to GAO and are commendable. The current memorandum of understanding between DOE and the FBI is the beginning of an effective response plan to incidents of nuclear diversion, but is inadequate since it does not include CIA participation and cooperation. Without a formal interagency agreement placing positive reporting and investigative responsibilities on DOE, NRC, the FBI, and the CIA along the lines recommended by GAO, we believe the

SECRET

C01162251

sibility exists for a repetition of the 16-year NUMEC investigation.

The comments received from the CIA are contained in a letter dated September 1, 1978. (See appendix III.) The letter takes no issue with the facts or recommendations included in the report. It does, however, point out some concerns about certain information in the report.

GAO believes that the concerns expressed by the CIA have been adequately addressed in the text of the report. However, we did not specifically address the CIA's concerns regarding its degree of cooperation with DOE and the FBI on the alleged NUMEC incident. In its letter the CIA disagreed with the statement in the report indicating that they failed to cooperate with DOE and the FBI. The CIA bases the disagreement on the fact that its officials briefed a large number of officials in the executive and legislative branches of Government on the NUMEC matter in 1976 and 1977.

GAO was aware that such briefings were provided. However, GAO believes that since the briefings were provided 4 to 6 years after some of the key information was developed their utility in helping to resolve the NUMEC matter was greatly diminished.

The Department of Justice and the FBI did not furnish formal written comments. GAO provided them more than 3 months to do so, a time period longer than that provided DOE, the CIA, and NRC. While GAO did not have the benefit of official written comments from the Department of Justice and

SECRET

---

C01162251

sibility exists for a repetition of the 16-year NUMEC investigation.

The comments received from the CIA are contained in a letter dated September 1, 1978. (See appendix III.) The letter takes no issue with the facts or recommendations included in the report. It does, however, point out some concerns about certain information in the report.

GAO believes that the concerns expressed by the CIA have been adequately addressed in the text of the report. However, we did not specifically address the CIA's concerns regarding its degree of cooperation with DOE and the FBI on the alleged NUMEC incident. In its letter the CIA disagreed with the statement in the report indicating that they failed to cooperate with DOE and the FBI. The CIA bases the disagreement on the fact that its officials briefed a large number of officials in the executive and legislative branches of Government on the NUMEC matter in 1976 and 1977.

GAO was aware that such briefings were provided. However, GAO believes that since the briefings were provided 4 to 6 years after some of the key information was developed their utility in helping to resolve the NUMEC matter was greatly diminished. Further, according to two former CIA officials familiar with the case, documents were prepared within the CIA linking the uncounted-for NUMEC material to Israel. This information was not passed on to DOE or the FBI according to the officials we contacted in those agencies. However, we believe it must be pointed out that the current CIA officials GAO interviewed said that such documents were not known to exist within the CIA.

The Department of Justice and the FBI did not furnish formal written comments. GAO provided them more than 3 months to do so, a time period longer than that provided DOE, the CIA, and NRC. While GAO did not have the benefit of official written comments from the Department of Justice and

SECRET

C01162251

the FBI in preparing the final report, GAO did consider the views and comments of the FBI staff familiar with the alleged NUMEC incident during the course of the review.

NRC had no comment on the content of the report. However, NRC did state that the recommendations to the Heads of Agencies appears reasonable. (See appendix IV.)

SECRET

C01162251

the FBI in preparing the final report, GAO did consider the views and comments of the FBI staff familiar with the alleged NUMEC incident during the course of the review.

NRC had no comment on the content of the report. However, NRC did state that the recommendations to the Heads of Agencies appears reasonable. (See appendix IV.)

SECRET

IC01162251

SECRET

# C o n t e n t s

|  |  | Page |
|---|---|---|
| **DIGEST** |  | 1 |
| **CHAPTER** |  |  |
| 1 | INTRODUCTION | 1 |
|  | Agencies involved in investigating NUMEC | 3 |
|  | Access to records difficulties | 3 |
| 2 | WHAT INFORMATION HAS BEEN DEVELOPED ABOUT THE ALLEGED NUMEC DIVERSION? | 5 |
|  | Department of Energy's involvement with NUMEC incident | 5 |
|  | Federal Bureau of Investigation's involvement with NUMEC incident | 10 |
|  | Central Intelligence Agency's involvement with NUMEC incident | 15 |
| 3 | WERE THE INVESTIGATIONS BY THE FEDERAL GOVERNMENT INTO THE ALLEGED INCIDENT ADEQUATE? | 19 |
|  | Department of Energy | 19 |
|  | Federal Bureau of Investigation | 22 |
|  | Central Intelligence Agency | 23 |
| 4 | OBSERVATIONS, CONCLUSIONS, AND RECOMMENDATIONS | 25 |
|  | Whether a diversion occurred at NUMEC remains to be answered | 25 |
|  | Federal mechanisms to coordinate investigations of missing nuclear material are lacking | 26 |
|  | Recommendations to the heads of agencies | 27 |
|  | Recommendation to the Congress | 28 |
|  | Agency comments | 28 |
| 5 | SCOPE OF REVIEW | 31 |
| **APPENDIX** |  |  |
| I | Summary list of individuals contacted in preparing report | 32 |
| II | Letter dated July 25, 1978, containing DOE comments on this report | 34 |
| III | Letter dated September 1, 1978, containing CIA comments on this report | 36 |

SECRET

IC01162251

SECRET

# C o n t e n t s

|  |  | Page |
|---|---|---|
| **DIGEST** |  | 1 |
| **CHAPTER** |  |  |
| 1 | INTRODUCTION | 1 |
|  | Agencies involved in investigating NUMEC | 3 |
|  | Access to records difficulties | 3 |
| 2 | WHAT INFORMATION HAS BEEN DEVELOPED ABOUT THE ALLEGED NUMEC DIVERSION? | 5 |
|  | Department of Energy's involvement with NUMEC incident | 5 |
|  | Federal Bureau of Investigation's involvement with NUMEC incident | 10 |
|  | Central Intelligence Agency's involvement with NUMEC incident | 15 |
| 3 | WERE THE INVESTIGATIONS BY THE FEDERAL GOVERNMENT INTO THE ALLEGED INCIDENT ADEQUATE? | 19 |
|  | Department of Energy | 19 |
|  | Federal Bureau of Investigation | 22 |
|  | Central Intelligence Agency | 23 |
| 4 | OBSERVATIONS, CONCLUSIONS, AND RECOMMENDATIONS | 25 |
|  | Whether a diversion occurred at NUMEC remains to be answered | 25 |
|  | Federal mechanisms to coordinate investigations of missing nuclear material are lacking | 26 |
|  | Recommendations to the heads of agencies | 27 |
|  | Recommendation to the Congress | 28 |
|  | Agency comments | 28 |
| 5 | SCOPE OF REVIEW | 31 |
| **APPENDIX** |  |  |
| I | Summary list of individuals contacted in preparing report | 32 |
| II | Letter dated July 25, 1978, containing DOE comments on this report | 34 |
| III | Letter dated September 1, 1978, containing CIA comments on this report | 36 |

SECRET

C01162251

SECRET

| APPENDIX | | Page |
|---|---|---|
| IV | Letter dated July 13, 1978, containing NRC comments on this report | 40 |
| V | Letter dated February 8, 1978, from Attorney General to GAO denying access to Department of Justice records | 41 |

ABBREVIATIONS

AEC    Atomic Energy Commission
CIA    Central Intelligence Agency
DOE    Department of Energy
ERDA   Energy Research and Development Administration
FBI    Federal Bureau of Investigation
GAO    General Accounting Office
JCAE   Joint Committee on Atomic Energy
NRC    Nuclear Regulatory Commission
NUMEC  Nuclear Materials and Equipment Commission

SECRET

C01162251

SECRET

| APPENDIX | | Page |
|---|---|---|
| IV | Letter dated July 13, 1978, containing NRC comments on this report | 40 |
| V | Letter dated February 8, 1978, from Attorney General to GAO denying access to Department of Justice records | 41 |

ABBREVIATIONS

AEC    Atomic Energy Commission
CIA    Central Intelligence Agency
DOE    Department of Energy
ERDA   Energy Research and Development Administration
FBI    Federal Bureau of Investigation
GAO    General Accounting Office
JCAE   Joint Committee on Atomic Energy
NRC    Nuclear Regulatory Commission
NUMEC  Nuclear Materials and Equipment Commission

SECRET

# CHAPTER 1

## INTRODUCTION:

In 1965 the Department of Energy (DOE) 1/ found during an inspection that about 206 pounds of uranium-235 could not be accounted for at the Nuclear Materials and Equipment Corporation (NUMEC), a nuclear facility located in Apollo, Pennsylvania. DOE estimated that this much uranium could make at least four or five nuclear weapons. Although investigations were conducted, the uranium was never accounted for.

The Federal Government has generally remained silent about the incident. Information that has become known over the years has been vague and inconsistent. With the current high interest in assuring adequate safeguards over nuclear materials, speculation about the incident has surfaced again. Many allegations concerning the unaccounted for material and the NUMEC facility have been made in newspaper and magazine articles and at congressional hearings. These allegations include:

--The material was illegally diverted to Israel by NUMEC management for use in nuclear weapons.

--The material was diverted to Israel by NUMEC management with the assistance of the Central Intelligence Agency (CIA).

--The material was diverted to Israel with the acquiescence of the United States Government.

--There has been a cover-up of the NUMEC incident by the United States Government.

---

1/The Atomic Energy Commission (AEC) was formerly responsible for both regulating and promoting all nuclear activities in the United States. On January 19, 1975, it was split into the Nuclear Regulatory Commission (NRC) and the Energy Research and Development Administration (ERDA). NRC became responsible for nuclear regulation and ERDA became responsible for nuclear development and promotion. Under Public Law 95-91, ERDA's functions were placed in the Department of Energy effective October 1, 1977. NRC remained intact. Throughout the report, DOE is used to refer to the Department of Energy, ERDA, and AEC.

SECRET

C01162251

# CHAPTER 1

## INTRODUCTION:

In 1965 the Department of Energy (DOE) 1/ found during an inspection that about 206 pounds of uranium-235 could not be accounted for at the Nuclear Materials and Equipment Corporation (NUMEC), a nuclear facility located in Apollo, Pennsylvania. DOE estimated that this much uranium could make at least four or five nuclear weapons. Although investigations were conducted, the uranium was never accounted for.

The Federal Government has generally remained silent about the incident. Information that has become known over the years has been vague and inconsistent. With the current high interest in assuring adequate safeguards over nuclear materials, speculation about the incident has surfaced again. Many allegations concerning the unaccounted for material and the NUMEC facility have been made in newspaper and magazine articles and at congressional hearings. These allegations include:

--The material was illegally diverted to Israel by NUMEC management for use in nuclear weapons.

--The material was diverted to Israel by NUMEC management with the assistance of the Central Intelligence Agency (CIA).

--The material was diverted to Israel with the acquiescence of the United States Government.

--There has been a cover-up of the NUMEC incident by the United States Government.

---

1/The Atomic Energy Commission (AEC) was formerly responsible for both regulating and promoting all nuclear activities in the United States. On January 19, 1975, it was split into the Nuclear Regulatory Commission (NRC) and the Energy Research and Development Administration (ERDA). NRC became responsible for nuclear regulation and ERDA became responsible for nuclear development and promotion. Under Public Law 95-91, ERDA's functions were placed in the Department of Energy effective October 1, 1977. NRC remained intact. Throughout the report, DOE is used to refer to the Department of Energy, ERDA, and AEC.

SECRET

C01162251

C01162251

Based on the totality of our inquiry, we believe that the allegations have not been fully or adequately answered.

Overall the nuclear safeguards systems in this country have been greatly improved as a result of the alleged NUMEC incident. Since the alleged incident occurred AEC and its succeeding agencies have placed much greater levels of control requirements on private nuclear facilities like NUMEC. There are many new requirements which include such measures as bimonthly inventory accounting, armed guards to protect unauthorized access to nuclear material and alarm systems designed to detect unauthorized movement of nuclear material. Nevertheless, two reports GAO recently issued 1/ cited major deficiencies in our domestic nuclear safeguards systems. These reports point out that there are thousands of pounds of weapons-grade material unaccounted for in this country today. This being the case, it is critical that the Government be prepared to quickly and effectively respond to allegations of loss of nuclear material to determine whether, when, where, and how it occurred.

The unresolved NUMEC incident raises questions on the U.S. capability to deal with unaccounted for nuclear materials. This report discusses, within the constraints of the data available to us, the scope and effectiveness of U.S. efforts to locate the unaccounted for uranium, and the implications the incident has for our current nuclear safeguards programs.

This report addresses two basic questions arising from the NUMEC incident.

--What information has been developed about the alleged NUMEC diversion?

--Were the investigations by the Federal Government into the alleged incident adequate?

With the amount of nuclear materials in this country increasing rapidly, the opportunities for diversion without

1/EMD-76-3, "Shortcomings in the Systems Used to Protect and Control Highly Dangerous Nuclear Materials," dated July 22, 1976, and EMD-77-40, "Commercial Nuclear Fuel Facilities Need Better Security," dated May 2, 1977.

2

SECRET

CIA officials provided us with their views on the first allegation and stated that they had no information to substantiate any of the others. Based on the totality of our inquiry, we believe that the allegations have not been fully or adequately answered.

Overall the nuclear safeguards systems in this country have been greatly improved as a result of the alleged NUMEC incident. Since the alleged incident occurred AEC and its succeeding agencies have placed much greater levels of control requirements on private nuclear facilities like NUMEC. There are many new requirements which include such measures as bimonthly inventory accounting, armed guards to protect unauthorized access to nuclear material and alarm systems designed to detect unauthorized movement of nuclear material. Nevertheless, two reports GAO recently issued 1/ cited major deficiencies in our domestic nuclear safeguards systems. These reports point out that there are thousands of pounds of weapons-grade material unaccounted for in this country today. This being the case, it is critical that the Government be prepared to quickly and effectively respond to allegations of loss of nuclear material to determine whether, when, where, and how it occurred.

The unresolved NUMEC incident raises questions on the U.S. capability to deal with unaccounted for nuclear materials. This report discusses, within the constraints of the data available to us, the scope and effectiveness of U.S. efforts to locate the unaccounted for uranium, and the implications the incident has for our current nuclear safeguards programs.

This report addresses two basic questions arising from the NUMEC incident.

--What information has been developed about the alleged NUMEC diversion?

--Were the investigations by the Federal Government into the alleged incident adequate?

With the amount of nuclear materials in this country increasing rapidly, the opportunities for diversion without

1/EMD-76-3, "Shortcomings in the Systems Used to Protect and Control Highly Dangerous Nuclear Materials," dated July 22, 1976, and EMD-77-40, "Commercial Nuclear Fuel Facilities Need Better Security," dated May 2, 1977.

2

SECRET

C01162251

C01162251

adequate safeguards can also improve. Consequently, answers to these questions are important in order to insure that current Federal capabilities exist to respond to real or suspected incidents of nuclear material diversion.

## AGENCIES INVOLVED IN
## INVESTIGATING 1/ NUMEC

Originally, there were three agencies involved in gathering information on the incident. These were DOE, the Federal Bureau of Investigation (FBI), and the CIA. However, DOE and the FBI have begun new investigations of the incident. In February 1978 DOE began an investigation to determine what officials in the agency knew about the alleged diversion incident. In April of 1976, at the oral request of President Ford, the FBI opened an investigation of the NUMEC incident aimed at determining whether a diversion of nuclear material ever occurred at the facility. Both of these later investigations are still ongoing and we have not reviewed these reports.

There are also other Federal bodies that have developed a substantial amount of information on the incident. These are the former Joint Committee on Atomic Energy (JCAE), NRC and GAO. A staff member of the former JCAE compiled a lengthy record of the events and incidents surrounding the alleged diversion and wrote a report which was inconclusive about whether a diversion ever occurred at the NUMEC facility. The report was written in about 1967 or 1968. NRC issued a report on certain aspects of the NUMEC incident in March 1978. The NRC report, however, did not focus on the diversion question. It was aimed at what specific NRC officials knew about the alleged diversion incident. GAO issued a report on the former JCAE in June 1967 which focused primarily on NUMEC's accountability controls over nuclear material. In that report GAO said it found no evidence of diversion and after considering information available had no reason to question ABC's conclusion that while it could not be stated with certainty that diversion didn't take place, the survey team found no evidence to support the possibility.

GAO's current report focuses on the allegations and information developed since that time in attempting to answer the



1/CIA officials informed GAO that they have no authority to conduct "investigations" of unaccounted for nuclear materials in the United States. As used in this report the term "investigation(s)" is used in the context of the entire Federal effort to resolve the incident.

adequate safeguards can also improve. Consequently, answers to these questions are important in order to insure that current Federal capabilities exist to respond to real or suspected incidents of nuclear material diversion.

## AGENCIES INVOLVED IN
## INVESTIGATING 1/ NUMEC

Originally, there were three agencies involved in gathering information on the incident. These were DOE, the Federal Bureau of Investigation (FBI), and the CIA. However, DOE and the FBI have begun new investigations of the incident. In February 1978 DOE began an investigation to determine what officials in the agency knew about the alleged diversion incident. In April of 1976, at the oral request of President Ford, the FBI opened an investigation of the NUMEC incident aimed at determining whether a diversion of nuclear material ever occurred at the facility. Both of these later investigations are still ongoing and we have not reviewed these reports.

There are also other Federal bodies that have developed a substantial amount of information on the incident. These are the former Joint Committee on Atomic Energy (JCAE), NRC and GAO. A staff member of the former JCAE compiled a lengthy record of the events and incidents surrounding the alleged diversion and wrote a report which was inconclusive about whether a diversion ever occurred at the NUMEC facility. The report was written in about 1967 or 1968. NRC issued a report on certain aspects of the NUMEC incident in March 1978. The NRC report, however, did not focus on the diversion question. It was aimed at what specific NRC officials knew about the alleged diversion incident. GAO issued a report on the former JCAE in June 1967 which focused primarily on NUMEC's accountability controls over nuclear material. In that report GAO said it found no evidence of diversion and after considering information available had no reason to question ABC's conclusion that while it could not be stated with certainty that diversion didn't take place, the survey team found no evidence to support the possibility.

GAO's current report focuses on the allegations and information developed since that time in attempting to answer the

1/CIA officials informed GAO that they have no authority to conduct "investigations" of unaccounted for nuclear materials in the United States. As used in this report the term "investigation(s)" is used in the context of the entire Federal effort to resolve the incident.

SECRET

C01162251

SECRET

SECRET

C01162251

questions of what information has been developed about the alleged diversion, and were the investigations done by the Federal Government adequate.

ACCESS TO RECORDS DIFFICULTIES

During our review, we were denied documents pertinent to the NUMEC incident by the FBI and the CIA. We repeatedly tried to obtain documents from these groups, but with no success. A written chronology of contacts with other Federal agencies was provided by the CIA.

CIA did subsequently allow selected staff of Chairman Dingell's Subcommittee to review some CIA documents at CIA Headquarters. Access to these or any other CIA documents was not extended to include GAO. Further, the CIA did not cooperate with GAO in arranging some interviews with knowledgeable current and former CIA officials. This was significant since former CIA officials, although not required, can be expected to inform CIA before discussing their former activities with others. The FBI's rationale for denying GAO access to their documents was that the Bureau did not want to jeopardize its ongoing investigation of the alleged diversion incident.

These constraints made it impossible to obtain corroborating evidence for some of the report's contents. Nonetheless, we made every attempt to do so and, where it was not possible, we have so noted it in the report.

The

SECRET

SECRET

C01162251

Withheld under statutory authority of the Central Intelligence Agency Act of 1949 (50 U.S.C. section 403g)

questions of what information has been developed about the alleged diversion, and were the investigations done by the Federal Government adequate.

ACCESS TO RECORDS DIFFICULTIES

During our review, we were denied documents pertinent to the NUMEC incident by the FBI and the CIA. We repeatedly tried to obtain documents from these groups, but with no success. A written chronology of contacts with other Federal agencies was provided by the CIA, however, the CIA denied GAO access to any source documents on the case. According to Agency officials, this was a decision made by the Director of the CIA.

CIA did subsequently allow selected staff of Chairman Dingell's Subcommittee to review some CIA documents at CIA Headquarters. Access to these or any other CIA documents was not extended to include GAO. Further, the CIA did not cooperate with GAO in arranging some interviews with knowledgeable current and former CIA officials. This was significant since former CIA officials, although not required, can be expected to inform CIA before discussing their former activities with others. The FBI's rationale for denying GAO access to their documents was that the Bureau did not want to jeopardize its ongoing investigation of the alleged diversion incident.

These constraints made it impossible to obtain corroborating evidence for some of the report's contents. Nonetheless, we made every attempt to do so and, where it was not possible, we have so noted it in the report.

The

SECRET

C01162251

SECRET

## CHAPTER 2

### WHAT INFORMATION HAS BEEN DEVELOPED

#### ABOUT THE ALLEGED NUMEC DIVERSION?

Until the summer of 1977, the only publicized Government view on the NUMEC incident was that there was no evidence to indicate that a diversion of nuclear material had occurred.

We attempted to obtain all the information developed by the Government on this matter. We reviewed documents, reports, and studies made available to us. We also interviewed those individuals most involved with the incident and the subsequent investigations of it.

Based on our work, we cannot say whether or not there was a diversion of material from the NUMEC facility. Following is the information and views which we obtained from the three principal agencies involved in the alleged incident --DOE, FBI, and CIA.

#### DEPARTMENT OF ENERGY'S INVOLVEMENT WITH NUMEC INCIDENT

DOE records show that in December 1957, the NUMEC facility located in Apollo, Pennsylvania was licensed to possess enriched uranium for manufacturing nuclear fuel, recovering scrap, and conducting nuclear research and development. NUMEC obtained various forms of enriched uranium and other nuclear material from the United States Government and commercial sources. During the period 1957 through 1967, NUMEC received over 22 tons of uranium-235--the material used in the fabrication of nuclear weapons.

Until 1975 DOE was responsible for insuring that licensed commercial nuclear facilities such as NUMEC provided adequate safeguards and material control. DOE's predecessors, however, until June 1967, the policy for safeguarding nuclear materials relied primarily on the monetary value of the material. DOE believed that the financial penalties imposed upon licensees for the loss of or damage to nuclear material, and the criminal penalties provided by the Atomic Energy Act of 1954, would be sufficient to motivate licensees to adequately protect the material from loss, theft, or diversion. Material

SECRET

C01162251

SECRET

## CHAPTER 2

### WHAT INFORMATION HAS BEEN DEVELOPED

#### ABOUT THE ALLEGED NUMEC DIVERSION?

Until the summer of 1977, the only publicized Government view on the NUMEC incident was that there was no evidence to indicate that a diversion of nuclear material had occurred. However, in Congressional hearings before the House Subcommittee on Energy and Environment and the House Subcommittee on Energy and Power in July and August 1977, respectively, it was revealed that the FBI might possess information which did not support this conclusion and, in fact, that a totally opposite position could be taken.

We attempted to obtain all the information developed by the Government on this matter. We reviewed documents, reports, and studies made available to us. We also interviewed those individuals most involved with the incident and the subsequent investigations of it.

Based on our work, we cannot say whether or not there was a diversion of material from the NUMEC facility. Following is the information and views which we obtained from the three principal agencies involved in the alleged incident --DOE, FBI, and CIA.

#### DEPARTMENT OF ENERGY'S INVOLVEMENT WITH NUMEC INCIDENT

DOE records show that in December 1957, the NUMEC facility located in Apollo, Pennsylvania was licensed to possess enriched uranium for manufacturing nuclear fuel, recovering scrap, and conducting nuclear research and development. NUMEC obtained various forms of enriched uranium and other nuclear material from the United States Government and commercial sources. During the period 1957 through 1967, NUMEC received over 22 tons of uranium-235--the material used in the fabrication of nuclear weapons.

Until 1975 DOE was responsible for insuring that licensed commercial nuclear facilities such as NUMEC provided adequate safeguards and material control. DOE's predecessors, however, until June 1967, the policy for safeguarding nuclear material. DOE believed that the financial penalties imposed upon licensees for the loss of or damage to nuclear material, and the criminal penalties provided by the Atomic Energy Act of 1954, would be sufficient to motivate licensees to adequately protect the material from loss, theft, or diversion. Material

5

SECRET



accountability requirements, while written into licensee contracts and the Code of Federal Regulations, were more directed to health and safety concerns than in protecting nuclear material from theft or diversion. Our review of DOE records showed that at the time (1) there were no limits placed on the amount of unaccounted for nuclear materials, (2) facilities were required to inventory their nuclear materials only once a year, and (3) estimating inventories was a widespread practice at all nuclear facilities at that time. The elaborate material control and physical security measures in place at commercial nuclear facilities today were developed since 1967. Such measures were not present before then.

DOE officials told us that in the mid-1960s material accountability capabilities and methods were just being developed around nuclear. Much uncertainty existed on the part of both the agency and the industry about nuclear material control standards and criteria. DOE officials and NUMEC's president told us that the situation at NUMEC was further complicated by the fact that NUMEC was involved in many unique first-of-a-kind nuclear projects.

DOE, pursuant to its regulatory responsibilities, conducted six accountability inspections at NUMEC--prior to the alleged 1965 accountability issue that nuclear materials were being adequately protected. Each inspection revealed major deficiencies.

In April 1961 DOE conducted its first material control inspection and found "significant" deficiencies in the material accounting systems. During its second inspection in May 1962, DOE found that, although NUMEC had corrected some accounting deficiencies, it still did not follow practices necessary for the maintenance of adequate material control. During this inspection, the agency discovered that NUMEC was mixing nuclear material among various contracts--a practice that was expressly prohibited. According to DOE inspectors, such commingling made it difficult, if not impossible, to trace discrete batches of material through the plant and to determine how the material was being used.

DOE's next inspection in July and August of 1963 did not show much improvement, and revealed additional problems with the material accounting systems. In early 1964 another inspection was undertaken and more inadequacies were identified. DOE's records show that at this point, the agency became so concerned with the condition of NUMEC's facilities that it began considering whether to prevent NUMEC from receiving any additional nuclear materials. Later, in September of 1964, DOE attempted to take a physical inventory of the material held by NUMEC but could not do so since, in

accountability requirements, while written into licensee contracts and the Code of Federal Regulations, were more directed to health and safety concerns than in protecting nuclear material from theft or diversion. Our review of DOE records showed that at the time (1) there were no limits placed on the amount of unaccounted for nuclear materials, (2) facilities were required to inventory their nuclear materials only once a year, and (3) estimating inventories was a widespread practice at all nuclear facilities at that time. The elaborate material control and physical security measures in place at commercial nuclear facilities today were developed since 1967. Such measures were not present before then.

DOE officials told us that in the mid-1960s material accountability capabilities and methods were just being developed around nuclear. Much uncertainty existed on the part of both the agency and the industry about nuclear material control standards and criteria. DOE officials and NUMEC's president told us that the situation at NUMEC was further complicated by the fact that NUMEC was involved in many unique first-of-a-kind nuclear projects.

DOE, pursuant to its regulatory responsibilities, conducted six accountability inspections at NUMEC--prior to the alleged 1965 accountability issue that nuclear materials were being adequately protected. Each inspection revealed major deficiencies.

In April 1961 DOE conducted its first material control inspection and found "significant" deficiencies in the material accounting systems. During its second inspection in May 1962, DOE found that, although NUMEC had corrected some accounting deficiencies, it still did not follow practices necessary for the maintenance of adequate material control. During this inspection, the agency discovered that NUMEC was mixing nuclear material among various contracts--a practice that was expressly prohibited. According to DOE inspectors, such commingling made it difficult, if not impossible, to trace discrete batches of material through the plant and to determine how the material was being used.

DOE's next inspection in July and August of 1963 did not show much improvement, and revealed additional problems with the material accounting systems. In early 1964 another inspection was undertaken and more inadequacies were identified. DOE's records show that at this point, the agency became so concerned with the condition of NUMEC's facilities that it began considering whether to prevent NUMEC from receiving any additional nuclear materials. Later, in September of 1964, DOE attempted to take a physical inventory of the material held by NUMEC but could not do so since, in

6
SECRET

C01162251

C01162251

the opinion of DOE investigators, NUMEC's records were so poor that they were unauditable. As a result, the inventory check was canceled.

In April of 1965, DOE began another inspection and, for the sixth consecutive time, found fundamental problems with NUMEC's ability to control material. The inspection report concluded that "safeguards control of [nuclear material] at NUMEC was inadequate." It was during this inspection that a large amount of highly enriched uranium was unaccounted for. The loss, initially identified as 53 kilograms (117 pounds) was later adjusted to 61 kilograms (134 pounds). This was about 2 to 3 times higher than was experienced by other similar facilities operating at that time.

Although DOE had made financial arrangements with NUMEC to insure payment for the loss, the highly significant safeguards implications of the loss, the highly significant safeguards implications of the loss triggered a lengthy investigation. The investigation which began in early November 1965 was aimed at (1) determining the exact total cumulative loss of highly enriched uranium at NUMEC since its startup in 1957 and (2) explaining the 134 pound loss under its most recent contract involving 93 percent enriched—weapons-grade—uranium.

The investigation lasted until mid-November 1965 and revealed a cumulative loss of 178 kilograms (392 pounds) of material. DOE was able to trace 186 pounds to waste and gas filters leading from the plant, but the remaining 206 pounds could not be accounted for.

The November 1965 investigation did not provide DOE with a conclusive answer as to what happened to the unaccounted for material. However, according to the "theory" developed through information existing to develop a "theory" on the probable cause of the missing material. The "theory" developed by the DOE staff and accepted by top DOE officials was that through April 1965 NUMEC consistently underestimated its material losses from contract to contract. As each job was completed and NUMEC had to pay DOE for the actual losses sustained, the differences between the estimated and actual losses were passed on from completed jobs to new jobs. The theory concluded that these actions continued over the 8 years of the company's operations until April 1965 when, strictly by chance, only one contract was being processed at the facility, and it was possible for DOE to isolate the total cumulative material unaccounted for.

DOE documents showed that because of the poor condition of NUMEC's material accounting records, it was not possible to establish when the losses occurred, or even whether the material was used to offset losses on previously completed

7
SECRET

C01162251

C01162251

contracts. NUMEC's president contended that the nuclear material was not stolen or diverted but undoubtedly "lost" in the processing system itself through adherence to the equip-ment and piping and amounts discarded as waste. Consequently, the DOE investigators concluded that DOE could not say, une-quivocally, that the material was not stolen or diverted from the facility.

We learned from a discussion with a former DOE official, that in February 1966, DOE asked the FBI to determine whether a theft or diversion of the material had occurred. The DOE files contain a memorandum of discussion with the FBI. The memorandum stated that the area decided not to they were required to investigate such incidents under the Atomic Energy Act of 1954. Consequently, DOE continued its own. After examining the facility records, cleaning out proc-essing equipment, searching some of the company's nuclear waste burial ground, and interviewing many key NUMEC employees, DOE was still unable to conclusively determine what happened to the material.

In 1966 NUMEC paid DOE $1.1 million for the missing 206 pounds of enriched uranium as required by NUMEC's contract, and the DOE investigation of the incident was, for all prac-tical purposes, closed unresolved. The $1.1 million was paid partly from a $2,500,000 revolving credit note account that NUMEC arranged with the Mellon Bank; the balance was paid through the return to DOE of some nuclear material for which NUMEC was credited. Atlantic Richfield Corporation later purchased the facility in April 1967 and it is now owned by the Babcock and Wilcox Corporation who bought the facility in 1972.

### Other information relevant to the NUMEC incident

We identified several occurrences from our review of DOE files and interviews with DOE officials, which impact on the NUMEC incident. We learned that:

--After the November 1965 investigation, NUMEC management hired one of DOE's on-site investigators who was an ex-pert in material control and accountability. The in-vestigator had responsibility for conducting a major part of the material control review at the facility.

--During a period of rising concern with unaccounted for material at NUMEC, some material accounting records were reported to DOE as being inadvertently destroyed

C01162251

contracts. NUMEC's president contended that the nuclear material was not stolen or diverted but undoubtedly "lost" in the processing system itself through adherence to the equip-ment and piping and amounts discarded as waste. Consequently, the DOE investigators concluded that DOE could not say, une-quivocally, that the material was not stolen or diverted from the facility.

We learned from a discussion with a former DOE official, that in February 1966, DOE asked the FBI to determine whether a theft or diversion of the material had occurred. The DOE files contain a memorandum of discussion with the FBI. The memorandum stated that the area decided not to they were required to investigate such incidents under the Atomic Energy Act of 1954. Consequently, DOE continued its own. After examining the facility records, cleaning out proc-essing equipment, searching some of the company's nuclear waste burial ground, and interviewing many key NUMEC employees, DOE was still unable to conclusively determine what happened to the material.

In 1966 NUMEC paid DOE $1.1 million for the missing 206 pounds of enriched uranium as required by NUMEC's contract, and the DOE investigation of the incident was, for all prac-tical purposes, closed unresolved. The $1.1 million was paid partly from a $2,500,000 revolving credit note account that NUMEC arranged with the Mellon Bank; the balance was paid through the return to DOE of some nuclear material for which NUMEC was credited. Atlantic Richfield Corporation later purchased the facility in April 1967 and it is now owned by the Babcock and Wilcox Corporation who bought the facility in 1972.

### Other information relevant to the NUMEC incident

We identified several occurrences from our review of DOE files and interviews with DOE officials, which impact on the NUMEC incident. We learned that:

--After the November 1965 investigation, NUMEC management hired one of DOE's on-site investigators who was an ex-pert in material control and accountability. The in-vestigator had responsibility for conducting a major part of the material control review at the facility.

--During a period of rising concern with unaccounted for material at NUMEC, some material accounting records were reported to DOE as being inadvertently destroyed

8

SECRET

C01162251

during a labor dispute at the facility in January-February 1964. According to 3 former head of DOE's nuclear material management group, and investigators

from the FBI, the records might have affected DOE's ability to trace the material held by the facility.

--NUMEC mixed material among various contracts--a practice that was explicitly prohibited by DOE. According to DOE investigators, this practice made it very difficult, if not impossible, to track the material through the facility.

Further, DOE was concerned with the foreign interests and contacts maintained by NUMEC's president. DOE's records show that, while president, this individual had various high-level contacts with officials of the Government of Israel, both in that country and in the United States. DOE records also show that, for a time, he acted as sales agent for the United States for the Defense Ministry of Israel. Also, while president of NUMEC, he had a 50-percent interest in a nuclear facility in Israel established for the purpose of radiation experimentation on various perishable commodities.

Several current and former officials we interviewed at DOE and the FBI, and a former CIA official told us that, in view of the poor nuclear material control at NUMEC and the general sloppiness of the operation, NUMEC management could have diverted material from the facility, if they wanted to. A principal field investigator for DOE at the time, told us that the sloppiness of NUMEC operations made it very conducive to a diversion. This investigator noted that on a visit to the facility in 1963 or 1964 he saw nuclear material deposited in the crevices of the stairwells and on the floor. However, of all DOE officials we interviewed, including a former Chairman and two former members of the Atomic Energy Commission, only one, a former DOE security expert, actually believed that a diversion of material occurred. According to this individual, who was not familiar with the material accounting practices established by DOE, his conclusion was based on inspections he conducted as NUMEC. He told us he visited NUMEC several times between 1962 and 1967 to conduct physical security inspections for DOE. He said that in an inspection report dated February 10 and 11, 1966, he noted that a large shipment of highly enriched uranium was made to France. However, according to the material identified as missing in DOE's November 1965 inspection--100 kilograms. According to him, the circumstances at the facility were such that it would have been relatively easy to ship highly enriched (weapons-grade) uranium to another country instead of low-enriched uranium since the enriched uranium storage system at NUMEC did

9
SECRET

C01162251

during a labor dispute at the facility in January-February 1964. According to 3 former head of DOE's nuclear material management group, and investigators

from the FBI, the records might have affected DOE's ability to trace the material held by the facility.

--NUMEC mixed material among various contracts--a practice that was explicitly prohibited by DOE. According to DOE investigators, this practice made it very difficult, if not impossible, to track the material through the facility.

Further, DOE was concerned with the foreign interests and contacts maintained by NUMEC's president. DOE's records show that, while president, this individual had various high-level contacts with officials of the Government of Israel, both in that country and in the United States. DOE records also show that, for a time, he acted as sales agent for the United States for the Defense Ministry of Israel. Also, while president of NUMEC, he had a 50-percent interest in a nuclear facility in Israel established for the purpose of radiation experimentation on various perishable commodities.

Several current and former officials we interviewed at DOE and the FBI, and a former CIA official told us that, in view of the poor nuclear material control at NUMEC and the general sloppiness of the operation, NUMEC management could have diverted material from the facility, if they wanted to. A principal field investigator for DOE at the time, told us that the sloppiness of NUMEC operations made it very conducive to a diversion. This investigator noted that on a visit to the facility in 1963 or 1964 he saw nuclear material deposited in the crevices of the stairwells and on the floor. However, of all DOE officials we interviewed, including a former Chairman and two former members of the Atomic Energy Commission, only one, a former DOE security expert, actually believed that a diversion of material occurred. According to this individual, who was not familiar with the material accounting practices established by DOE, his conclusion was based on inspections he conducted as NUMEC. He told us he visited NUMEC several times between 1962 and 1967 to conduct physical security inspections for DOE. He said that in an inspection report dated February 10 and 11, 1966, he noted that a large shipment of highly enriched uranium was made to France. However, according to the material identified as missing in DOE's November 1965 inspection--100 kilograms. According to him, the circumstances at the facility were such that it would have been relatively easy to ship highly enriched (weapons-grade) uranium to another country instead of low-enriched uranium since the enriched uranium storage system at NUMEC did

9
SECRET

C01162251

not clearly distinguish between weapons-grade and nonweapons-grade material.

Current DOE officials informed us, however, that while the United States did not make independent verification of the shipments being dispatched to a foreign country, at the time of the NUMEC incident, it did conduct safeguards inspections as provided in bilateral agreements for cooperation with various countries. According to DOE, inspections in this particular foreign country were conducted to account for enriched uranium shipped from the United States. DOE officials told us that two of these inspections would have identified material in the form, enrichment level, and approximate quantity shown in the U.S. (NUMEC) transfer documents.

The former DOE security inspector also said that the entire security program at NUMEC was very bad and that, to a large extent, contributed to his concern that the missing material at NUMEC had been diverted. Two other security officials at DOE concurred in this latter point. These three individuals agreed that, based on their knowledge and experience with the NUMEC facility, it was very possible that the material unaccounted for from NUMEC could have been diverted. One of these security officials told us that NUMEC's security program was widely "disrespected" among the DOE investigative staff. However, none of these individuals were able to provide us with any direct evidence that would support the view that a diversion of material had occurred. Further, DOE records show that of the 37 NUMEC employees interviewed by DOE in 1969, none believed that a diversion of nuclear material had occurred.

In 1975 NRC was made responsible for the regulatory oversight of commercial nuclear facilities like NUMEC and consequently has become involved in the incident. In a February 1978 report related to the NUMEC incident, NRC concluded that their previous official position of "no evidence" to support a diversion may need to be reconsidered, in light of the many uncertainties surrounding the incident. This conclusion included the following statement from the Chairman of NRC to the Chairman of the Committee on Interior and Insular Affairs, concluding that "* * * for regulatory purposes we must assume the circumstances (surrounding NUMEC) were such that a diversion could have occurred, and we must construct our safeguards requirements accordingly."

FEDERAL BUREAU OF INVESTIGATIONS
INVOLVEMENT WITH NUMEC INCIDENT

The FBI is responsible for gathering domestic intelligence on activities affecting the national security of the



C01162251

not clearly distinguish between weapons-grade and nonweapons-grade material.

Current DOE officials informed us, however, that while the United States did not make independent verification of the shipments being dispatched to a foreign country, at the time of the NUMEC incident, it did conduct safeguards inspections as provided in bilateral agreements for cooperation with various countries. According to DOE, inspections in this particular foreign country were conducted to account for enriched uranium shipped from the United States. DOE officials told us that two of these inspections would have identified material in the form, enrichment level, and approximate quantity shown in the U.S. (NUMEC) transfer documents.

The former DOE security inspector also said that the entire security program at NUMEC was very bad and that, to a large extent, contributed to his concern that the missing material at NUMEC had been diverted. Two other security officials at DOE concurred in this latter point. These three individuals agreed that, based on their knowledge and experience with the NUMEC facility, it was very possible that the material unaccounted for from NUMEC could have been diverted. One of these security officials told us that NUMEC's security program was widely "disrespected" among the DOE investigative staff. However, none of these individuals were able to provide us with any direct evidence that would support the view that a diversion of material had occurred. Further, DOE records show that of the 37 NUMEC employees interviewed by DOE in 1969, none believed that a diversion of nuclear material had occurred.

In 1975 NRC was made responsible for the regulatory oversight of commercial nuclear facilities like NUMEC and consequently has become involved in the incident. In a February 1978 report related to the NUMEC incident, NRC concluded that their previous official position of "no evidence" to support a diversion may need to be reconsidered, in light of the many uncertainties surrounding the incident. This conclusion included the following statement from the Chairman of NRC to the Chairman of the Committee on Interior and Insular Affairs, concluding that "* * * for regulatory purposes we must assume the circumstances (surrounding NUMEC) were such that a diversion could have occurred, and we must construct our safeguards requirements accordingly."

FEDERAL BUREAU OF INVESTIGATIONS
INVOLVEMENT WITH NUMEC INCIDENT

The FBI is responsible for gathering domestic intelligence on activities affecting the national security of the



SECRET

United States. It is also responsible for investigating all
alleged or suspected criminal violations of the Atomic Energy
Act of 1954 including the theft or diversion of nuclear ma-
terial. In this role the Bureau has initiated three investi-
gations involving NUMEC with one still ongoing.

Our efforts to obtain and evaluate the information col-
lected by the FBI on the NUMEC matter were repeatedly denied
by the Department of Justice. The Department of Justice told
us that since their latest investigation was still underway,
they could not give us any documentation developed as part
incident. The denial included information related to the NUMEC
of Justice's prior two investigations. This position was for-
mally communicated to the Comptroller General of the United
States from the Attorney General in a letter dated February 8,
1978. (See Appendix V for a copy of this letter.)

The FBI did, however, brief us twice and responded to
several follow-up inquiries. We also contacted 12 former and
current officials of the Department of Justice and the Bureau
including the current Attorney General and two former Attorneys
General (Appendix I contains a summary of the individuals we
contacted during our review.)

Our first briefing by the FBI was provided by the agent-
in-charge and two other FBI representatives on October 6, 1977.
The briefing centered on investigations related to NUMEC.
We received a follow-up briefing on December 14, 1977, in order
to clarify some of the information we had obtained earlier.
This briefing was provided by a new FBI agent-in-charge since
the former one was transferred off the case shortly after our
October 1977 briefing.

We were informed at these briefings that in June of 1965,
the FBI was asked by DOE to investigate the possibility that
NUMEC's president might need to register his activities under
the United States under the Foreign Agent Registration Act.
DOE's specific concern stemmed from the individual's associa-
tions with Israeli officials. According to information we
received at the October 1977 briefing, NUMEC's president's
capacity as sales agent for the Ministry of Defense of Israel
was of particular concern to DOE.

At the October 1977 briefing, we were told that the FBI
began the investigation in August of 1965. In October of 1966,
after 14 months of effort, it reported that NUMEC's president
did not have to register as a foreign agent since NUMEC's ac-
tivities with Israel were conducted under applicable U.S. laws
and regulations. Further, according to the Department of Jus-
tice, the business activities established between Israel and
NUMEC were all found to be legitimate.

SECRET

C01162251

SECRET

United States. It is also responsible for investigating all
alleged or suspected criminal violations of the Atomic Energy
Act of 1954 including the theft or diversion of nuclear ma-
terial. In this role the Bureau has initiated three investi-
gations involving NUMEC with one still ongoing.

Our efforts to obtain and evaluate the information col-
lected by the FBI on the NUMEC matter were repeatedly denied
by the Department of Justice. The Department of Justice told
us that since their latest investigation was still underway,
they could not give us any documentation developed as part
incident. The denial included information related to the NUMEC
of Justice's prior two investigations. This position was for-
mally communicated to the Comptroller General of the United
States from the Attorney General in a letter dated February 8,
1978. (See Appendix V for a copy of this letter.)

The FBI did, however, brief us twice and responded to
several follow-up inquiries. We also contacted 12 former and
current officials of the Department of Justice and the Bureau
including the current Attorney General and two former Attorneys
General (Appendix I contains a summary of the individuals we
contacted during our review.)

Our first briefing by the FBI was provided by the agent-
in-charge and two other FBI representatives on October 6, 1977.
The briefing centered on investigations related to NUMEC.
We received a follow-up briefing on December 14, 1977, in order
to clarify some of the information we had obtained earlier.
This briefing was provided by a new FBI agent-in-charge since
the former one was transferred off the case shortly after our
October 1977 briefing.

We were informed at these briefings that in June of 1965,
the FBI was asked by DOE to investigate the possibility that
NUMEC's president might need to register his activities under
the United States under the Foreign Agent Registration Act.
DOE's specific concern stemmed from the individual's associa-
tions with Israeli officials. According to information we
received at the October 1977 briefing, NUMEC's president's
capacity as sales agent for the Ministry of Defense of Israel
was of particular concern to DOE.

At the October 1977 briefing, we were told that the FBI
began the investigation in August of 1965. In October of 1966,
after 14 months of effort, it reported that NUMEC's president
did not have to register as a foreign agent since NUMEC's ac-
tivities with Israel were conducted under applicable U.S. laws
and regulations. Further, according to the Department of Jus-
tice, the business activities established between Israel and
NUMEC were all found to be legitimate.

SECRET

C01162251

C01162251

25X1, E.O.13526

In a letter to the Director of the FBI dated February 17, 1966, DOD asked the Bureau to investigate the suspected diversion of nuclear material from the NUMEC plant. FBI responded on February 25, 1966, stating that it "decided not to undertake this investigation at this time." According to the former FBI agent in charge of the current investigation, the reason for the decision was that in DOE's discussions with the Bureau, DOE presented a convincing case that there was no diversion at the facility. However, we were informed by a former Executive Director of the Joint Committee on Atomic Energy, that the reason the Bureau did not want to get involved was twofold: (1) the Bureau did not think that a diversion occurred based on the presentation provided by DOD, and (2) it simply did not like conducting investigations involving unaccounted for nuclear materials.

C01162251

25X1, E.O.13526

In a letter to the Director of the FBI dated February 17, 1966, DOD asked the Bureau to investigate the suspected diversion of nuclear material from the NUMEC plant. FBI responded on February 25, 1966, stating that it "decided not to undertake this investigation at this time." According to the former FBI agent in charge of the current investigation, the reason for the decision was that in DOE's discussions with the Bureau, DOE presented a convincing case that there was no diversion at the facility. However, we were informed by a former Executive Director of the Joint Committee on Atomic Energy, that the reason the Bureau did not want to get involved was twofold: (1) the Bureau did not think that a diversion occurred based on the presentation provided by DOD, and (2) it simply did not like conducting investigations involving unaccounted for nuclear materials.

We were informed at the October 1977 briefing that the FBI's next involvement in the NUMEC matter occurred as a result of an April 1968 letter from the Director of CIA to the Attorney General. The FBI was asked to "initiate a discreet intelligence investigation of the relationship of NUMEC's president with the Government of Israel."

The former FBI agent in charge of the investigation told us that in September 1969, the FBI Director advised the CIA Director that the surveillance of NUMEC's president had been terminated because the FBI did not believe further investigation would develop any new information. The Associate Deputy Director for Operations at the CIA told us the CIA was not satisfied with the FBI's termination of the case and requested the Bureau to reinstitute its surveillance in a letter to the Director of the FBI dated October 31, 1969. However, according to this CIA official, no formal request was ever made to the Attorney General and no investigation was initiated as far as the CIA could determine. The former FBI agent in charge of the investigation, on the other hand, was unable to corroborate this information. CIA officials advised us that they have file copies of correspondence to the FBI which support its position that requests were made to the FBI to continue a counterintelligence investigation of NUMEC's president. We, however, did not see this correspondence.

The CIA provided us with a chronology of their contacts with the FBI. It indicated that in September 1970 the CIA again asked the FBI to reinstitute the investigation based on information that NUMEC's president was planning to ____. But, again, the CIA official said no further work was undertaken by the FBI.

25X1, E.O.13526

C01162251

At the two FBI briefings . . . were provided with information in the FBI had developed on the background, associations, and business activities of NUMEC's president with Israeli government officials, agents, and citizens. According to the FBI agents giving the briefings, the information developed, while circumstantial in nature, raised serious questions concerning the national security risks posed by NUMEC's president.

In reviewing DOE files, we found that during the FBI's surveillance activities, the FBI became so concerned about the security risks posed by NUMEC's president that they asked DOE whether it planned to terminate his security clearance or stop the flow of nuclear materials to NUMEC. According to the FBI's liaison with GAO, the FBI recommended that NUMEC's operating license be taken away.

DOE files also show that in early 1969 the FBI briefed President Nixon on the questionable activities of NUMEC's president. The files further show that top level Government concern about the security risks posed by the president of NUMEC continued until 1971. We were told by a former Deputy Director of Security at DOE that in 1971 a former Commissioner of AEC aided the NUMEC official in obtaining employment with Westinghouse Electric Corporation, where he would have no need for access to national security information. The former Deputy Director of Security said he helped the former Commissioner in obtaining such employment for NUMEC's president. The former Commissioner declined to comment to us on this matter. We believe this is particularly important since we were informed by the president of NUMEC that he may attempt to obtain employment in an area which will involve a top secret clearance. If this should occur, the question of his obtaining a security clearance may surface again.

In the FBI briefing on December 14, 1977, we were told by the current FBI agent in charge of the investigation, that no additional surveillance activities or investigations of any kind were undertaken by the FBI concerning NUMEC. In September 1976 until 1976 when ordered to do so by President Ford. A Department of Justice staff attorney assigned to the case later confirmed this. He told us that the FBI's current investigation was the direct result of a request to the then Attorney General by President Ford in April 1976. According to the Justice staff attorney, it was at that time President Ford asked the FBI to investigate the possibility that weapons-grade materials might have been diverted from the NUMEC facility to Israel. GAO was not furnished any documents regarding President Ford's request and thus could not specifically determine its nature and scope.

SECRET

C01162251

At the two FBI briefings . . . were provided with information in the FBI had developed on the background, associations, and business activities of NUMEC's president with Israeli government officials, agents, and citizens. According to the FBI agents giving the briefings, the information developed, while circumstantial in nature, raised serious questions concerning the national security risks posed by NUMEC's president.

In reviewing DOE files, we found that during the FBI's surveillance activities, the FBI became so concerned about the security risks posed by NUMEC's president that they asked DOE whether it planned to terminate his security clearance or stop the flow of nuclear materials to NUMEC. According to the FBI's liaison with GAO, the FBI recommended that NUMEC's operating license be taken away.

DOE files also show that in early 1969 the FBI briefed President Nixon on the questionable activities of NUMEC's president. The files further show that top level Government concern about the security risks posed by the president of NUMEC continued until 1971. We were told by a former Deputy Director of Security at DOE that in 1971 a former Commissioner of AEC aided the NUMEC official in obtaining employment with Westinghouse Electric Corporation, where he would have no need for access to national security information. The former Deputy Director of Security said he helped the former Commissioner in obtaining such employment for NUMEC's president. The former Commissioner declined to comment to us on this matter. We believe this is particularly important since we were informed by the president of NUMEC that he may attempt to obtain employment in an area which will involve a top secret clearance. If this should occur, the question of his obtaining a security clearance may surface again.

In the FBI briefing on December 14, 1977, we were told by the current FBI agent in charge of the investigation, that no additional surveillance activities or investigations of any kind were undertaken by the FBI concerning NUMEC. In September 1976 until 1976 when ordered to do so by President Ford. A Department of Justice staff attorney assigned to the case later confirmed this. He told us that the FBI's current investigation was the direct result of a request to the then Attorney General by President Ford in April 1976. According to the Justice staff attorney, it was at that time President Ford asked the FBI to investigate the possibility that weapons-grade materials might have been diverted from the NUMEC facility to Israel. GAO was not furnished any documents regarding President Ford's request and thus could not specifically determine its nature and scope.

SECRET

C01162251

25X1, E.O.13526

We were told by both the former and current FBI agents involved in the recent investigation that, during all their investigations into NUMEC, it did not obtain any information conclusively showing that a diversion of nuclear material occurred at NUMEC.

As part of its recent investigation, the former agent-in-charge told us the FBI questioned the CIA regarding information it might have developed on the alleged diversion. According to this agent, the CIA initially told the FBI they possessed information linking the unaccounted for NUMEC material to Israel. The CIA later, however, informed the FBI that they did not have such information. The CIA representatives told the FBI that they knew no more than the FBI did about this matter. The CIA officials having current access to the files have advised us that a search of the available data reveals a "semantic" problem concerning the use of the term "evidence." In short, CIA states there is no "hard evidence" of a diversion from NUMEC to Israel.

Without access to the records showing the exact nature of the information exchanged between these two agencies, we were unable to determine what information exchange did occur. However, two former officials of the CIA, a former Deputy Director of Science and Technology—who was one of the five highest ranking officials in the CIA and who reportedly directed the tracking of this in the U.S. on this matter—and another source, who asked not to be identified, told us that the CIA had prepared several internal analyses discussing this particular incident.

The current FBI agent in charge of the investigation, who was never briefed by the CIA, told us that he was unaware of this information.

A newspaper article on January 28, 1978, appeared to further support the existence of such information. The article identified the existence of a special intelligence report, prepared in 1976, by the newspaper. The newspaper reported that the CIA had mistakenly released the top-secret report. One of the conclusions of the report was that Israel had developed nuclear weapons and that the source of the nuclear material for the weapons was obtained partially through clandestine means. The CIA never denied the validity of the newspaper article. Subsequently, we obtained a copy of the report.

25X1, E.O.13526

14
SECRET

C01162251

We were told by both the former and current FBI agents involved in the recent investigation that, during all their investigations into NUMEC, it did not obtain any information conclusively showing that a diversion of nuclear material occurred at NUMEC.

14
SECRET

C01162251

SECRET

25X1, E.O.13526

officials we contacted told us that they did inform the FBI of this information in a May 1977 meeting on the subject. The previous FBI investigator in charge of the investigation attended the May 1977 meeting. The current one did not. The CIA officials we interviewed believed that the May 1977 briefing constituted formal advice to the FBI on what was known by the CIA about the situation concerning Israeli's acquisition of a nuclear weapons capability.

The FBI is currently preparing a report on its most recent investigation. FBI agents involved in the current investigation told us that while there exists circumstantial information which could lead an individual to conclude that a diversion had occurred, there is no substantive proof of a diversion. The report was submitted to the Attorney General on February 16, 1978. However, a staff lawyer in the Internal Security Section at the Department of Justice, informed us on May 25, 1978, that there were still several items the FBI had to cover in its report before the Justice Department would accept it. Currently, the FBI is still investigating the alleged NUMEC incident.

## CENTRAL INTELLIGENCE AGENCY'S INVOLVEMENT WITH NUMEC INCIDENT

On August 29, 1977, we met with the CIA for a briefing on their knowledge of and involvement in the alleged NUMEC incident. Subsequently, we had several follow-up discussions with CIA representatives on the matter. We contacted 11 former and current CIA employees. However, as we got further into our review, the CIA blocked our efforts to continue. While the CIA did provide selected staff members of Chairman Dingell's House Subcommittee on Energy and Power with the opportunity to review at CIA Headquarters some documentation on their knowledge of the NUMEC incident,

the CIA did not cooperate with us in arranging interviews with knowledgeable current and former officials.

SECRET
15

C01162251

SECRET

25X1, E.O.13526

officials we contacted told us that they did inform the FBI of this information in a May 1977 meeting on the subject. The previous FBI investigator in charge of the investigation attended the May 1977 meeting. The current one did not. The CIA officials we interviewed believed that the May 1977 briefing constituted formal advice to the FBI on what was known by the CIA about the situation concerning Israeli's acquisition of a nuclear weapons capability.

The FBI is currently preparing a report on its most recent investigation. FBI agents involved in the current investigation told us that while there exists circumstantial information which could lead an individual to conclude that a diversion had occurred, there is no substantive proof of a diversion. The report was submitted to the Attorney General on February 16, 1978. However, a staff lawyer in the Internal Security Section at the Department of Justice, informed us on May 25, 1978, that there were still several items the FBI had to cover in its report before the Justice Department would accept it. Currently, the FBI is still investigating the alleged NUMEC incident.

CENTRAL INTELLIGENCE AGENCY'S INVOLVEMENT WITH NUMEC INCIDENT

On August 29, 1977, we met with the CIA for a briefing on their knowledge of and involvement in the alleged NUMEC incident. Subsequently, we had several follow-up discussions with CIA representatives on the matter. We contacted 11 former and current CIA employees. However, as we got further into our review, the CIA blocked our efforts to continue. While the CIA did provide selected staff members of Chairman Dingell's House Subcommittee on Energy and Power with the opportunity to review at CIA Headquarters some documentation on their knowledge of the NUMEC incident. With access to any source documents or to their intelligence activities surrounding the Israeli/NUMEC matter. Furthermore, the CIA did not cooperate with us in arranging interviews with knowledgeable current and former officials.

Withheld under statutory authority of the Central Intelligence Agency Act of 1949 (50 U.S.C., section 403g)

SECRET
15

SECRET

C01162251

25X1, E.O.13526

At the August 1977 briefing,

vided the CIA with a memorandum on the information presented
to us at the briefing to assure that our interpretation of
the information was accurate. The CIA official who reviewed
the memorandum suggested certain changes but did not comment
on the accuracy of GAO's stated position regarding the alleged
diversion incident which identified the NUMEC facility as the
"most likely" source of Israel's nuclear weapons material.

A former high ranking CIA official at the briefing
provided us with the following additional information on the
incident. He cited these items as further support for his
belief about the Israel/NUMEC connection.

--The ease with which nuclear materials could have been
    taken from the NUMEC facility.

25X1, E.O.13526

16
SECRET

C01162251

25X1,E.O.13526



The CIA also told us much of the same information that the FBI had provided us. In an interview with a CIA official on September 12, 1977, we were informed that the intelligence information developed on the matter was so strong that everyone in the intelligence community concurred with the CIA's opinions, except one--DOE. However, like the FBI, the CIA emphasized that they had no conclusive evidence tracing the unaccounted for nuclear material from NUMEC to Israel.

One former official stated that the CIA was so confident in the NUMEC information that a former Director briefed President Lyndon Johnson on the incident in 1968 or 1969. The former CIA Director later told us he could not recall such a briefing.

We were told by a CIA official on September 12, 1977, that at least one intelligence estimate was prepared by CIA staff on this incident. However, in commenting on this report CIA officials advised us that the currently available files do not contain an estimate on the NUMEC incident and it is their belief that this official was referring to an overall intelligence estimate on nuclear proliferation. We were also told by the former CIA Deputy Director of Science and Technology on October 18, 1977, and another source formerly employed by the CIA on January 28, 1978, that a series of papers were written

On January 16, 1978, we asked the former CIA Director involved in the matter about these papers and he told us that he could not recall any such documents. However, he qualified this statement by indicating that he did not intend to say that the documents do not exist.

In a meeting with several CIA representatives on November 17, 1977, the CIA appeared to change its views about the alleged diversion.

We asked the CIA to explain its apparent change in views concerning NUMEC. Specifically, we asked them to state, in writing, the CIA's official position on the alleged diversion. In their last submission to us was their formal comments on this report, which still did not adequately address this point.

In several meetings with CIA officials who have current access to the files, it was explained to us that a search of

25X1,E.O.13526

SECRET

C01162251

SECRET

25X1,E.O.13526

the available data reveals a "sensitive" problem concerning the use of the term "evidence." In short, CIA stated there is no "hard evidence" of a diversion from NUMEC to Israel.

We were unable to determine whether the CIA changed its opinion about any NUMEC/Israel link or whether the Chairman inadvertently failed to comment on the inaccuracy of the "most likely" position conveyed to us in the August 1977 briefing. Further, we asked for any reports the CIA might have prepared on the matter. We have never received any. A January 28, 1978, newspaper article, however, alleged the existence of at least one such report.

Moreover, in November 1977 the CIA refused to assist us in contacting former or present CIA employees having knowledge of the incident. At one point we attempted to discuss a particular CIA briefing with a former Chairman of NRC who had participated in the briefing. However, since the discussion would have involved CIA information, the former NRC Chairman wanted prior approval from the CIA. We attempted to obtain the necessary approval from the CIA but were informed that this request could not be honored due to the Director's decision to work solely with Chairman Dingell's subcommittee on this investigation.

18

SECRET

---

C01162251

SECRET

Moreover, in November 1977 the CIA refused to assist us in contacting former or present CIA employees having knowledge of the incident. At one point we attempted to discuss a particular CIA briefing with a former Chairman of NRC who had participated in the briefing. However, since the discussion would have involved CIA information, the former NRC Chairman wanted prior approval from the CIA. We attempted to obtain the necessary approval from the CIA but were informed that this request could not be honored due to the Director's decision to work solely with Chairman Dingell's subcommittee on this investigation.

18

SECRET

Case 1:15-cv-00224-TSC   Document 1   Filed 02/13/15   Page 107 of 147

C01162251

C01162251

CHAPTER 3

WERE THE INVESTIGATIONS BY THE FEDERAL GOVERNMENT

INTO THE ALLEGED INCIDENT ADEQUATE?

If a diversion or theft of nuclear material is suspected
or actually occurs in this country, the Federal Government
must be able to quickly and definitively determine how and
why it happened so that the public can be protected against
the potential hazards of such an occurrence. To do this,
agencies of the Federal Government with capabilities for in-
vestigating and responding to suspected diversion incidents
must work together. This did not happen with NUMEC. Whether
a diversion(s) ever occurred at NUMEC still remains unanswered.
What can be said, however, is that the Federal investigations
of the matter were uncoordinated, limited in scope and time-
liness, and in our opinion less than adequate.

DEPARTMENT OF ENERGY

We believe certain DOE actions prior to and after the
alleged NUMEC diversion(s), raise questions on the adequacy
of DOE's implementation of its regulatory responsibilities
and its investigation of NUMEC. DOE did not take corrective
action even though NUMEC facility prior to the alleged inci-
dent, even though DOE inspections revealed repeated NUMEC
material accountability and physical security deficiencies.
DOE's investigation of NUMEC omitted one potentially signif-
icant avenue of investigation, i.e., that the unaccounted for
material could have been erroneously shipped to another coun-
try. Also recognizing DOE's dual role for promotional and
regulatory responsibilities over nuclear activities, its in-
vestigation of NUMEC cannot be considered truly independent.
Prior to January 1975, DOE was responsible for regulating
nuclear material as well as promoting the use and develop-
ment of nuclear energy in the United States. Consequently,
a discovery that a large amount of weapons-grade material
could have been diverted from a U.S. facility would have been
embarrassing to DOE and detrimental to its promotional respon-
sibilities. Congress recognized these conflicting DOE roles
and split DOE's regulatory aspects from its promotional role
effective January 19, 1975.

From the time NUMEC was licensed in 1957 until the
missing material was identified in April 1965, every accounta-
bility inspection conducted at NUMEC by DOE found significant
weaknesses in NUMEC's accountability over nuclear material.

In view of the problems DOE was experiencing with NUMEC
and investigations which were conducted, the FBI's liaison

19

SECRET

CHAPTER 3

WERE THE INVESTIGATIONS BY THE FEDERAL GOVERNMENT

INTO THE ALLEGED INCIDENT ADEQUATE?

If a diversion or theft of nuclear material is suspected
or actually occurs in this country, the Federal Government
must be able to quickly and definitively determine how and
why it happened so that the public can be protected against
the potential hazards of such an occurrence. To do this,
agencies of the Federal Government with capabilities for in-
vestigating and responding to suspected diversion incidents
must work together. This did not happen with NUMEC. Whether
a diversion(s) ever occurred at NUMEC still remains unanswered.
What can be said, however, is that the Federal investigations
of the matter were uncoordinated, limited in scope and time-
liness, and in our opinion less than adequate.

DEPARTMENT OF ENERGY

We believe certain DOE actions prior to and after the
alleged NUMEC diversion(s), raise questions on the adequacy
of DOE's implementation of its regulatory responsibilities
and its investigation of NUMEC. DOE did not take corrective
action even though NUMEC facility prior to the alleged inci-
dent, even though DOE inspections revealed repeated NUMEC
material accountability and physical security deficiencies.
DOE's investigation of NUMEC omitted one potentially signif-
icant avenue of investigation, i.e., that the unaccounted for
material could have been erroneously shipped to another coun-
try. Also recognizing DOE's dual role for promotional and
regulatory responsibilities over nuclear activities, its in-
vestigation of NUMEC cannot be considered truly independent.
Prior to January 1975, DOE was responsible for regulating
nuclear material as well as promoting the use and develop-
ment of nuclear energy in the United States. Consequently,
a discovery that a large amount of weapons-grade material
could have been diverted from a U.S. facility would have been
embarrassing to DOE and detrimental to its promotional respon-
sibilities. Congress recognized these conflicting DOE roles
and split DOE's regulatory aspects from its promotional role
effective January 19, 1975.

From the time NUMEC was licensed in 1957 until the
missing material was identified in April 1965, every accounta-
bility inspection conducted at NUMEC by DOE found significant
weaknesses in NUMEC's accountability over nuclear material.

In view of the problems DOE was experiencing with NUMEC
and investigations which were conducted, the FBI's liaison

19

SECRET

with GAO and a former Executive Director of the JCAE, told us that the FBI and the JCAE recommended to DOE that NUMEC's license be taken away and that it be prohibited from receiving additional nuclear materials. However, they could not recall when or how these recommendations were communicated to the agency. (We were unable to find any record of these communications.) Further, a letter to DOE on July 26, 1965, a DOE official who played a key role in the investigation of the NUMEC facility, wrote

" * * * if it were within my province to do so I would, to NUMEC until such time as they had straightened out their procedures and had satisfactorily accounted for all enriched uranium entrusted to them to date."

We found no indications that DOE took corrective action against NUMEC based on these recommendations.

DOE's reluctance to take action against the facility in light of continuing material control problems is questionable. In some informal notes we obtained from DOE's files, a former DOE official in charge of DOE's overall investigation of NUMEC, admitted the agency did not know whether the material had been stolen or diverted. Yet the facility was not ordered to cease operations, and it continued to obtain nuclear material on contracts. According to this official, who was a former DOE Assistant General Manager, there was "no good answer" as to why these conditions were allowed to persist over the years of NUMEC's operation.

DOE's handling of physical security inspection reports on the NUMEC facility by top DOE security officials also raises some concern. Two former DOE security inspectors told us on March 11 and April 3, 1978, that during most of the 1960s, including the period of the alleged NUMEC incident, DOE's Division of Security would not issue an "unsatisfactory" security report on a nuclear facility. According to these inspectors the security reports had to be written in such a manner in order to be approved by the security official at DOE, the Director of Security. For example, one security inspection report on the NUMEC facility conducted on February 10 and 11, 1966, noted two "principal" and several "minor" security deficiencies at the facility. The report was then approved for issuance by the Director of Security to visit the NUMEC plant to discuss the problems with facility management. The two former security inspectors told us, however, that the conclusion in the inspection report did not represent the actual findings. The report concluded: "During the course of the inspection several deficiencies were discovered though not sufficient

C01162251

---

with GAO and a former Executive Director of the JCAE, told us that the FBI and the JCAE recommended to DOE that NUMEC's license be taken away and that it be prohibited from receiving additional nuclear materials. However, they could not recall when or how these recommendations were communicated to the agency. (We were unable to find any record of these communications.) Further, a letter to DOE on July 26, 1965, a DOE official who played a key role in the investigation of the NUMEC facility, wrote

" * * * if it were within my province to do so I would, to NUMEC until such time as they had straightened out their procedures and had satisfactorily accounted for all enriched uranium entrusted to them to date."

We found no indications that DOE took corrective action against NUMEC based on these recommendations.

DOE's reluctance to take action against the facility in light of continuing material control problems is questionable. In some informal notes we obtained from DOE's files, a former DOE official in charge of DOE's overall investigation of NUMEC, admitted the agency did not know whether the material had been stolen or diverted. Yet the facility was not ordered to cease operations, and it continued to obtain nuclear material on contracts. According to this official, who was a former DOE Assistant General Manager, there was "no good answer" as to why these conditions were allowed to persist over the years of NUMEC's operation.

DOE's handling of physical security inspection reports on the NUMEC facility by top DOE security officials also raises some concern. Two former DOE security inspectors told us on March 11 and April 3, 1978, that during most of the 1960s, including the period of the alleged NUMEC incident, DOE's Division of Security would not issue an "unsatisfactory" security report on a nuclear facility. According to these inspectors the security reports had to be written in such a manner in order to be approved by the security official at DOE, the Director of Security. For example, one security inspection report on the NUMEC facility conducted on February 10 and 11, 1966, noted two "principal" and several "minor" security deficiencies at the facility. The report was then approved for issuance by the Director of Security to visit the NUMEC plant to discuss the problems with facility management. The two former security inspectors told us, however, that the conclusion in the inspection report did not represent the actual findings. The report concluded: "During the course of the inspection several deficiencies were discovered though not sufficient

C01162251

20

SECRET

C01162251

to seriously detract from the otherwise satisfactory aspects of the security program * * *. However, three former DOE security investigators, including the former Deputy and Assistant Directors of Security, told us that the entire NUMEC security program was inadequate.

We were unable to discuss this matter with the former Director of Security due to his current ill health.

We were told by the former DOE security inspector for the NUMEC facility that during the February 1966 physical security inspection at NUMEC he identified some unusual circumstances regarding the control of nuclear material held by NUMEC. Although this individual was not familiar with the material accounting practices, the circumstances led him to believe that an amount of highly enriched uranium about equal to the amount unaccounted for from the NUMEC facility might have been erroneously shipped to France. This former inspector became so concerned about the matter that he attempted to report it to the former Director of Security upon returning from the inspection. However, according to this individual and his former supervisor, the Director of Security told him to "get out of his office" and not pursue the matter any further. According to both these individuals, the entire matter was suppressed and was never considered by top DOE security officials. According to DOE officials, as it later developed an authorized shipment of highly enriched uranium was sent to France and was identified by DOE inspectors as being in that country.

Since NUMEC was both a DOE contractor and a licensee, the facility's nuclear activities were split between DOE's conflicting regulatory and promotional responsibilities. These conflicting responsibilities may have affected DOE's conclusion about the alleged diversion incident. DOE developed a "theory" and no conclusive information showing that a diversion did or did not occur at the NUMEC plant. Moreover, though DOE had no conclusive information showing that a diversion did or did not occur at the NUMEC plant. Moreover, at a top level staff meeting on February 14, 1966, a former Assistant General Manager of AEC advised the members of the former AEC that:

"* * * it would be theoretically possible to ship material abroad in excess of the amounts indicated in the company's records. And the AEC material accountability system might not reveal a deliberate and systematic attempt to divert material * * *."

Further, 3 days after AEC was advised of the possibility of a diversion, they briefed the FBI and, according to the former agent in charge of the investigation, presented a convincing

SECRET

C01162251

SECRET

case that there was no diversion or theft of material from the NUMEC facility.

## FEDERAL BUREAU OF INVESTIGATION

Our evaluation of the FBI's investigation of NUMEC was blocked by the FBI's denial to provide us with supporting documentation. However, based on our interviews with FBI and Department of Justice officials, we believe that: (1) the FBI's investigations of the incident were untimely; and (2) the scope of the investigation was limited.

From August 1965 to September 1969, the FBI developed a substantial amount of information on the actions and associates of NUMEC's president. According to the FBI investigators, this information was developed in response to requests from DOE and the CIA. However, it was not until April of 1976 that the FBI began to investigate whether there was a diversion of material at the NUMEC plant--about 11 years after DOE's investigation of the incident.

On February 17, 1966, DOE staff met with the FBI to discuss the incident and requested them to investigate the matter. The FBI is required by the Atomic Energy Act of 1954 to investigate all alleged or suspected criminal violations of the act. A diversion of nuclear material is a criminal violation of the act; however, on February 25, 1966, the FBI informed DOE that it would not undertake an investigation of the incident. The question of diversion was not addressed by the Bureau again until 1976. The former agent in charge of the investigation stated that since a long period of time had elapsed since the alleged incident occurred it was very doubtful whether the FBI would be able to develop any evidence that would resolve the incident.

During our review we found that the scope of the FBI's current investigation appeared limited since they had not interviewed at least eight key officials about their knowledge of the NUMEC incident. These included a Chairman of the former AEC during the NUMEC incident[,]

[                                    ] However, it was not until April of 1976 that the FBI began to investigate whether there was a diversion of material at the NUMEC plant--about 11 years after DOE's investigation of the incident.

[                        ] the loan officer at the Mellon Bank who approved the loan to NUMEC; a key DOE staff member responsible for material control investigations at NUMEC; and the chief DOE field investigator for NUMEC. These officials [         ] that the FBI never interviewed them about the NUMEC incident. [       ] DOE's chief field investigator, told us that they could not understand why the FBI had never discussed the matter with them[.]

---

C01162251

SECRET

case that there was no diversion or theft of material from the NUMEC facility.

FEDERAL BUREAU OF INVESTIGATION

Our evaluation of the FBI's investigation of NUMEC was blocked by the FBI's denial to provide us with supporting documentation. However, based on our interviews with FBI and Department of Justice officials, we believe that: (1) the FBI's investigations of the incident were untimely; and (2) the scope of the investigation was limited.

From August 1965 to September 1969, the FBI developed a substantial amount of information on the actions and associates of NUMEC's president. According to the FBI investigators, this information was developed in response to requests from DOE and the CIA. However, it was not until April of 1976 that the FBI began to investigate whether there was a diversion of material at the NUMEC plant--about 11 years after DOE's investigation of the incident.

On February 17, 1966, DOE staff met with the FBI to discuss the incident and requested them to investigate the matter. The FBI is required by the Atomic Energy Act of 1954 to investigate all alleged or suspected criminal violations of the act. A diversion of nuclear material is a criminal violation of the act; however, on February 25, 1966, the FBI informed DOE that it would not undertake an investigation of the incident. The question of diversion was not addressed by the Bureau again until 1976. The former agent in charge of the investigation stated that since a long period of time had elapsed since the alleged incident occurred it was very doubtful whether the FBI would be able to develop any evidence that would resolve the incident.

During our review we found that the scope of the FBI's current investigation appeared limited since they had not interviewed at least eight key officials about their knowledge of the NUMEC incident. These included a Chairman of the former AEC during the NUMEC incident; the former Deputy Director of the CIA responsible for gathering and analyzing data on nuclear activities in Israel during the time of the alleged incident; the loan officer at the Mellon Bank who approved the loan to NUMEC; a key DOE staff member responsible for material control investigations at NUMEC; and the chief DOE field investigator for NUMEC. These officials told us that the FBI never interviewed them about the NUMEC incident. Two individuals, the former Deputy Director of the CIA and DOE's chief field investigator, told us that they could not understand why the FBI had never discussed the matter with them in light of their extensive and direct involvement.

22

SECRET

The image shows two rotated copies of the same page.

SECRET

C01162251

In the FBI briefing we received on October 6, 1977, we learned of another limitation in the scope of the FBI's current investigation. The former agent in charge of the FBI's investigation told us that the FBI did not investigate the source of funds for NUMEC's payment for the missing nuclear material. Although he saw this as an important aspect of the investigation—since NUMEC's financial position did not appear to support such a loan—it was not pursued because the FBI anticipated legal difficulties in getting the appropriate bank records. However, we obtained much of the data simply by requesting it from the responsible bank official over the telephone. Although the information we obtained did not reveal any peculiarities in NUMEC's financial dealings, it did serve to further demonstrate the limited scope of the FBI's investigation of the incident.

The FBI's efforts to effectively investigate the incident have also been impeded by its lack of technical expertise in dealing with nuclear facilities such as NUMEC. This is particularly significant since the Atomic Energy Act requires that the FBI investigate such occurrences. According to the former agent in charge of the investigation at the FBI, the FBI is not competent to do the type of investigation needed to determine the causes of unaccounted for nuclear material without expert assistance. Consequently, he did not think the FBI could ever conduct effective diversion-type investigations without relying heavily on DOE or NRC for technical assistance and guidance.

CENTRAL INTELLIGENCE AGENCY

From interviews with a former CIA official and with former and current officials and staff of DOE and the FBI we concluded that the CIA did not fully cooperate with DOE on the NUMEC matter. Although CIA officials told us that they believe they did fully cooperate with DOE and the FBI, it appears to us that the CIA was reluctant to provide information which could have been helpful to the domestic investigation because of its concern about protecting its "sources and methods" of information.

25X1, E.O.13526

23
SECRET

SECRET

C01162251

In the FBI briefing we received on October 6, 1977, we learned of another limitation in the scope of the FBI's current investigation. The former agent in charge of the FBI's investigation told us that the FBI did not investigate the source of funds for NUMEC's payment for the missing nuclear material. Although he saw this as an important aspect of the investigation—since NUMEC's financial position did not appear to support such a loan—it was not pursued because the FBI anticipated legal difficulties in getting the appropriate bank records. However, we obtained much of the data simply by requesting it from the responsible bank official over the telephone. Although the information we obtained did not reveal any peculiarities in NUMEC's financial dealings, it did serve to further demonstrate the limited scope of the FBI's investigation of the incident.

The FBI's efforts to effectively investigate the incident have also been impeded by its lack of technical expertise in dealing with nuclear facilities such as NUMEC. This is particularly significant since the Atomic Energy Act requires that the FBI investigate such occurrences. According to the former agent in charge of the investigation at the FBI, the FBI is not competent to do the type of investigation needed to determine the causes of unaccounted for nuclear material without expert assistance. Consequently, he did not think the FBI could ever conduct effective diversion-type investigations without relying heavily on DOE or NRC for technical assistance and guidance.

CENTRAL INTELLIGENCE AGENCY

From interviews with a former CIA official and with former and current officials and staff of DOE and the FBI we concluded that the CIA did not fully cooperate with DOE on the NUMEC matter. Although CIA officials told us that they believe they did fully cooperate with DOE and the FBI, it appears to us that the CIA was reluctant to provide information which could have been helpful to the domestic investigation because of its concern about protecting its "sources and methods" of information.

23
SECRET

C01162251

C01162251

SECRET

SECRET
24

C01162251

SECRET

25X1, E.O.13526

According to the CIA, a briefing similar to that provided to the FBI in May 1977 was provided to certain key DOE officials on July 29, 1977. Those present at the meeting are no longer with DOE and have not been interviewed by GAO. However, we interviewed several former officials, including a Chairman of AEC and two other Commissioners at AEC during the time period 1965-1972, who told us that they were not aware that such information existed even though several individuals agreed that it would have been important information to have at that time.

Further, we were told by two former CIA officials, a former Deputy Director of Science and Technology, and an individual who did not wish to be identified, of the existence of internal reports discussing the alleged NUMEC diversion. The Deputy Director was one of the five highest ranking officials in the CIA at the time of the NUMEC incident and reported directly to the Director of the CIA on the matter.

currently handling the NUMEC matter at the CIA told us that they have been unable to identify or find any such documents. Yet the two individuals who told us about the documents said they assisted in preparing them. DOE and FBI representatives we questioned said they were not aware of the existence of the documents. The appearance of the January 26, 1978, newspaper article discussed on pages 14, 17, and 18 of this report, leads us to believe that the CIA was less than forthright in dealing with us and the FBI. The CIA disagrees with this opinion.

25X1, E.O.13526

SECRET
24

C01162251

25X1, E.O.13526

SECRET

## CHAPTER 4

### OBSERVATIONS, CONCLUSIONS, AND RECOMMENDATIONS

#### WHETHER A DIVERSION OCCURRED AT NUMEC REMAINS TO BE ANSWERED

Although large amounts of circumstantial information have been developed by DOE, the FBI, and the CIA on this incident, these agencies did not provide any information, nor did we independently identify any, that would conclusively show that a diversion of material occurred at the NUMEC facility. Consequently, whether or not such an incident occurred is still debatable.

DOE has taken the position that it has no conclusive evidence that a diversion of nuclear material ever occurred at the NUMEC facility, although it cannot deny such a possibility.

DOE supports the theory that the nuclear material unaccounted for from NUMEC was caused by inadequate inventory management. All current and former DOE officials we interviewed, except one, agreed with this theory. On the other hand, many of these same officials also agreed that the facility was sufficiently unable to control its nuclear materials so that a diversion could have been carried out.

FBI agents involved in the investigation believe that there is a substantial amount of information which tends to support the diversion theory. However, it is circumstantial in nature. The FBI is still investigating the matter.

The data which was made available to us by a former CIA official left us with the understanding that NUMEC was the "most likely" source of some of the nuclear material that was diverted to Israel. However, during the course of our work, CIA appeared to change its opinions on the matter and told GAO that it had no data to specifically support such a conclusion.

The newspaper article of January 28, 1978, seemed to confirm this. Current CIA officials told us that the former officials were drawing on memory as they recalled past events. The CIA officials who have current access to data files have advised that the search of the data files reveals a "semantic" problem concerning the use of the term "evidence." In short, CIA states there is no "hard evidence" of a diversion from NUMEC to Israel. At the same time current CIA officials admit

25

SECRET

C01162251

25X1, E.O.13526

SECRET

CHAPTER 4

OBSERVATIONS, CONCLUSIONS, AND RECOMMENDATIONS

WHETHER A DIVERSION OCCURRED AT NUMEC
REMAINS TO BE ANSWERED

Although large amounts of circumstantial information have been developed by DOE, the FBI, and the CIA on this incident, these agencies did not provide any information, nor did we independently identify any, that would conclusively show that a diversion of material occurred at the NUMEC facility. Consequently, whether or not such an incident occurred is still debatable.

DOE has taken the position that it has no conclusive evidence that a diversion of nuclear material ever occurred at the NUMEC facility, although it cannot deny such a possibility.

DOE supports the theory that the nuclear material unaccounted for from NUMEC was caused by inadequate inventory management. All current and former DOE officials we interviewed, except one, agreed with this theory. On the other hand, many of these same officials also agreed that the facility was sufficiently unable to control its nuclear materials so that a diversion could have been carried out.

FBI agents involved in the investigation believe that there is a substantial amount of information which tends to support the diversion theory. However, it is circumstantial in nature. The FBI is still investigating the matter.

25

SECRET

C01162251

NRC, in a February 1978 report related to the NUMEC inci-
dent, concluded that their previous official position of "no
evidence" to support a diversion may need to be reconsidered
in light of the many uncertainties surrounding the incident.

DOE stated that it had no evidence to indicate that a
diversion of nuclear material had occurred. We believe that
the agency could have been much more tentative in its conclu-
sions on the matter, instead of informing the public and Gov-
ernment officials that there was no need for concern about a
possible diversion of weapons-grade material from the NUMEC
facility.

## FEDERAL MECHANISMS TO COORDINATE
## INVESTIGATIONS OF MISSING NUCLEAR
## MATERIAL ARE LACKING

It is essential that the nuclear safeguards systems em-
ployed by the United States be continually monitored and im-
proved as weaknesses in it are identified. Overall, the
safeguards systems in this country have been greatly improved
as a result of the alleged NUMEC incident. Since the alleged
incident occurred AEC and its succeeding agencies have placed
much greater levels of control requirements on private nuclear
facilities like NUMEC. There are many new requirements which
include such measures as bimonthly inventory accounting, armed
guards to prevent unauthorized access to nuclear material and
alarm systems designed to detect unauthorized movement of nu-
clear material. Nevertheless, two recent GAO reports pointed
out significant shortcomings in the ability of Government and
commercial nuclear facilities to adequately monitor and control
nuclear materials with current accountability systems. These
reports pointed out that due to limitations in the state-of-
the-art of measurement instrumentation, diversions of nuclear
material from a U.S. facility can still occur and would prob-
ably not be discovered in a timely manner.

26
SECRET

---

C01162251

available data, when coupled with past recollections of events,
could lead former officials to speak in terms of "linking" the
undocumented material from NUMEC to nuclear developments in
Israel.

NRC, in a February 1978 report related to the NUMEC inci-
dent, concluded that their previous official position of "no
evidence" to support a diversion may need to be reconsidered
in light of the many uncertainties surrounding the incident.

DOE stated that it had no evidence to indicate that a
diversion of nuclear material had occurred. We believe that
the agency could have been much more tentative in its conclu-
sions on the matter, instead of informing the public and Gov-
ernment officials that there was no need for concern about a
possible diversion of weapons-grade material from the NUMEC
facility.

Moreover, we believe that the FBI and CIA may have al-
ready collected information which, if added to data held by
DOE, could provide a more definitive answer to the question
of whether diversion did occur. Until all information held
by these organizations can be consolidated and reviewed in its
entirety, a complete evaluation providing authoritative answers
to the questions surrounding the NUMEC diversion cannot be ob-
tained.

## FEDERAL MECHANISMS TO COORDINATE
## INVESTIGATIONS OF MISSING NUCLEAR
## MATERIAL ARE LACKING

It is essential that the nuclear safeguards systems em-
ployed by the United States be continually monitored and im-
proved as weaknesses in it are identified. Overall, the
safeguards systems in this country have been greatly improved
as a result of the alleged NUMEC incident. Since the alleged
incident occurred AEC and its succeeding agencies have placed
much greater levels of control requirements on private nuclear
facilities like NUMEC. There are many new requirements which
include such measures as bimonthly inventory accounting, armed
guards to prevent unauthorized access to nuclear material and
alarm systems designed to detect unauthorized movement of nu-
clear material. Nevertheless, two recent GAO reports pointed
out significant shortcomings in the ability of Government and
commercial nuclear facilities to adequately monitor and control
nuclear materials with current accountability systems. These
reports pointed out that due to limitations in the state-of-
the-art of measurement instrumentation, diversions of nuclear
material from a U.S. facility can still occur and would prob-
ably not be discovered in a timely manner.

26
SECRET

C01162251



The WNMC incident and its associated 13-year investigation highlight this country's current inability to effectively deal with possible diversions of nuclear material. The combined capabilities of DOE, FBI, and CIA were never directed at all the factors involved in the alleged diversion. The institutional barriers existing among these agencies may have prevented it. Each agency did "its own thing," to the detriment of a unified, comprehensive investigation. A formal coordinated interagency plan agreed upon plan is needed to focus the combined capabilities of these agencies in a more timely and effective manner. The agreed upon plan should focus on (1) an adequate detection and investigative system and (2) a reporting system to the appropriate congressional committees and to the President. As a result, if a similar incident were to occur today, this country may not be assured of any better investigation. The United States needs to improve its efforts for effectively responding to and investigating incidents of missing or unaccounted for weapons-grade nuclear materials. In view of, increasing terrorist activities throughout the world, the ability to respond and investigate such incidents should be of concern to national security and the public health and safety. We believe a timely concerted effort on the part of these three agencies would have greatly aided and possibly solved the NUMEC diversion questions, if they desired to do so.

While incidents of unaccounted for material have been experienced in the past, there has not been another incident involving public allegations such as those at NUMEC. We believe this can possibly be attributed to the increased emphasis the Government has placed on protective measures against diversion or thefts but it may also be due to a little good luck in that people may have not tried to do it.

RECOMMENDATIONS TO THE HEADS OF AGENCIES

GAO recommends that the heads of DOE, NRC, the Department of Justice, and the CIA, as part of their responsibilities for the national security of the country establish a plan for coordinated interagency action which focuses on a nuclear safeguards system that adequately detects, investigates, and reports to the Congress and the President on thefts or diversions of nuclear materials. The plan which should be submitted to the Congress within 90 days or less of the issuance of this report, should include

--a formal means for a timely determination of whether a loss has occurred;

--a clear and direct channel of communications between the agencies;

27

SECRET

C01162251

The WNMC incident and its associated 13-year investigation highlight this country's current inability to effectively deal with possible diversions of nuclear material. The combined capabilities of DOE, FBI, and CIA were never directed at all the factors involved in the alleged diversion. The institutional barriers existing among these agencies may have prevented it. Each agency did "its own thing," to the detriment of a unified, comprehensive investigation. A formal coordinated interagency plan agreed upon plan is needed to focus the combined capabilities of these agencies in a more timely and effective manner. The agreed upon plan should focus on (1) an adequate detection and investigative system and (2) a reporting system to the appropriate congressional committees and to the President. As a result, if a similar incident were to occur today, this country may not be assured of any better investigation. The United States needs to improve its efforts for effectively responding to and investigating incidents of missing or unaccounted for weapons-grade nuclear materials. In view of, increasing terrorist activities throughout the world, the ability to respond and investigate such incidents should be of concern to national security and the public health and safety. We believe a timely concerted effort on the part of these three agencies would have greatly aided and possibly solved the NUMEC diversion questions, if they desired to do so.

While incidents of unaccounted for material have been experienced in the past, there has not been another incident involving public allegations such as those at NUMEC. We believe this can possibly be attributed to the increased emphasis the Government has placed on protective measures against diversion or thefts but it may also be due to a little good luck in that people may have not tried to do it.

RECOMMENDATIONS TO THE HEADS OF AGENCIES

GAO recommends that the heads of DOE, NRC, the Department of Justice, and the CIA, as part of their responsibilities for the national security of the country establish a plan for coordinated interagency action which focuses on a nuclear safeguards system that adequately detects, investigates, and reports to the Congress and the President on thefts or diversions of nuclear materials. The plan which should be submitted to the Congress within 90 days or less of the issuance of this report, should include

--a formal means for a timely determination of whether a loss has occurred;

--a clear and direct channel of communications between the agencies;

27

SECRET

C01162251

-- a formal means for rapidly focusing the abilities of these agencies on the resolution of a diversion incident; and

-- a means for allowing any incident involving the theft or diversion of nuclear material to be definitely resolved to the satisfaction of the Congress and the President.

We also recommend that the Attorney General, working with the FBI, take the lead in establishing the interagency plan since the FBI, under the Atomic Energy Act of 1954, is responsible for investigating incidents involving the diversion or theft of nuclear materials.

RECOMMENDATION TO THE CONGRESS

The committees of Congress having jurisdiction for domestic nuclear safeguards should

-- review the nuclear safeguards plan to be submitted by the Executive Branch to assure that an adequate system is developed which detects and investigates thefts or diversions of nuclear materials.

-- request that the FBI and DOE's Office of Inspector General complete their investigations of the NUMEC incident as soon as possible and submit their reports to the committees.

These reports should be reviewed to determine the adequacy of the investigations and their implications for developing a more effective future system.

The committees should note that with the passage of time it is difficult to conclusively determine what specifically happened at NUMEC. However, the important point to remember is that we should use this lesson and make certain that the Nation develops an adequate detection and follow-up system to deter future nuclear thefts or diversion.

AGENCY COMMENTS

DOE's comments on the report are contained in a letter dated July 25, 1978. (See appendix II.) DOE agreed with the thrust of the report. However, it disagreed with our recommendation concerning the need to enter into a formal interagency agreement with NRC, the FBI, and the CIA for more timely and effective action in investigating incidents of suspected or real diversions of nuclear materials. DOE states in its letter that a comprehensive plan and a memorandum of

28
SECRET

C01162251

-- a formal means for rapidly focusing the abilities of these agencies on the resolution of a diversion incident; and

-- a means for allowing any incident involving the theft or diversion of nuclear material to be definitely resolved to the satisfaction of the Congress and the President.

We also recommend that the Attorney General, working with the FBI, take the lead in establishing the interagency plan since the FBI, under the Atomic Energy Act of 1954, is responsible for investigating incidents involving the diversion or theft of nuclear materials.

RECOMMENDATION TO THE CONGRESS

The committees of Congress having jurisdiction for domestic nuclear safeguards should

-- review the nuclear safeguards plan to be submitted by the Executive Branch to assure that an adequate system is developed which detects and investigates thefts or diversions of nuclear materials.

-- request that the FBI and DOE's Office of Inspector General complete their investigations of the NUMEC incident as soon as possible and submit their reports to the committees.

These reports should be reviewed to determine the adequacy of the investigations and their implications for developing a more effective future system.

The committees should note that with the passage of time it is difficult to conclusively determine what specifically happened at NUMEC. However, the important point to remember is that we should use this lesson and make certain that the Nation develops an adequate detection and follow-up system to deter future nuclear thefts or diversion.

AGENCY COMMENTS

DOE's comments on the report are contained in a letter dated July 25, 1978. (See appendix II.) DOE agreed with the thrust of the report. However, it disagreed with our recommendation concerning the need to enter into a formal interagency agreement with NRC, the FBI, and the CIA for more timely and effective action in investigating incidents of suspected or real diversions of nuclear materials. DOE states in its letter that a comprehensive plan and a memorandum of

28
SECRET



understanding with the FBI already existed for joint responses
to nuclear threat situations. Further, DOE stated that it has
open channels of communication to other agencies, including
the CIA, for the exchange of information pertinent to nuclear
threat situations.

These factors were known to us and are commendable. The
current memorandum of understanding between DOE and the FBI
is the beginning of an effective response plan to incidents
of nuclear diversion, but it is inadequate since it does not
include CIA participation and cooperation. Without a formal
interagency agreement placing positive reporting and investi-
gative responsibilities on DOE, NRC, FBI, and the CIA along
the lines recommended by GAO, we believe the possibility
exists for a repetition of the 13-year NUMEC investigation.

The comments received from the CIA are contained in a
letter dated September 1, 1978. (See appendix III.) The
letter takes no issue with the facts or recommendations in-
cluded in the report. It does, however, point out some CIA
concerns about certain information in the report.

We believe that the CIA's concerns have been adequately
addressed in the report. However, we did not specifically
address the CIA's concerns regarding its degree of coopera-
tion with DOE and the FBI on the alleged NUMEC incident.

In its letter the CIA disagreed with the statement in
the report indicating that they failed to cooperate with DOE
and the FBI. The CIA based the disagreement on the fact that
its officials briefed a large number of officials in the exec-
utive and legislative branches of Government on the NUMEC mat-
ter in 1976 and 1977.

We were aware that such briefings were provided. How-
ever, we believe that since the briefings were provided 4 to
6 years after some of the key information was developed their
utility in helping to resolve the NUMEC matter was greatly
diminished.

[25X1,E.O.13526]

The Department of Justice and the FBI did not furnish
formal written comments. We provided them more than 3 months
to do so, a time period longer than that provided DOE, CIA,
and NRC. While we did not have the benefit of official

29
SECRET

C01162251

understanding with the FBI already existed for joint responses
to nuclear threat situations. Further, DOE stated that it has
open channels of communication to other agencies, including
the CIA, for the exchange of information pertinent to nuclear
threat situations.

These factors were known to us and are commendable. The
current memorandum of understanding between DOE and the FBI
is the beginning of an effective response plan to incidents
of nuclear diversion, but it is inadequate since it does not
include CIA participation and cooperation. Without a formal
interagency agreement placing positive reporting and investi-
gative responsibilities on DOE, NRC, FBI, and the CIA along
the lines recommended by GAO, we believe the possibility
exists for a repetition of the 13-year NUMEC investigation.

The comments received from the CIA are contained in a
letter dated September 1, 1978. (See appendix III.) The
letter takes no issue with the facts or recommendations in-
cluded in the report. It does, however, point out some CIA
concerns about certain information in the report.

We believe that the CIA's concerns have been adequately
addressed in the report. However, we did not specifically
address the CIA's concerns regarding its degree of coopera-
tion with DOE and the FBI on the alleged NUMEC incident.

In its letter the CIA disagreed with the statement in
the report indicating that they failed to cooperate with DOE
and the FBI. The CIA based the disagreement on the fact that
its officials briefed a large number of officials in the exec-
utive and legislative branches of Government on the NUMEC mat-
ter in 1976 and 1977.

We were aware that such briefings were provided. How-
ever, we believe that since the briefings were provided 4 to
6 years after some of the key information was developed their
utility in helping to resolve the NUMEC matter was greatly
diminished.

[25X1,E.O.13526]

This information was not passed on to DOE or the FBI accord-
ing to the officials we contacted in those agencies. However,
we believe it must be pointed out that the current officials
we interviewed said that such documents were not known to
exist within the CIA.

The Department of Justice and the FBI did not furnish
formal written comments. We provided them more than 3 months
to do so, a time period longer than that provided DOE, CIA,
and NRC. While we did not have the benefit of official

29
SECRET

C01162251

C01162251

SECRET

Written comments from the Department of Justice and the FBI in preparing the final report, we did consider the views and comments of the FBI staff familiar with the alleged NUMEC incident.

NRC had no comment on the content of the report. However, the Commission did state that the recommendations to the Heads of Agencies appears reasonable. (See appendix IV.)

30
SECRET

---

C01162251

SECRET

Written comments from the Department of Justice and the FBI in preparing the final report, we did consider the views and comments of the FBI staff familiar with the alleged NUMEC incident.

NRC had no comment on the content of the report. However, the Commission did state that the recommendations to the Heads of Agencies appears reasonable. (See appendix IV.)

30
SECRET

C01162251

SECRET

## CHAPTER 5

## SCOPE OF REVIEW

We obtained the information contained in this report by reviewing documents, reports, correspondence, and other records of the former AEC and ERDA, and DOE and NRC. We also interviewed officials at

--DOE headquarters, Washington, D.C., and Germantown, Maryland;

--CIA headquarters, Langley, Virginia;

--FBI headquarters, Washington, D.C.;

--NRC headquarters, Bethesda, Maryland; and

--many other locations across the country.

Because we were unable to obtain source documents from some of the organizations involved in the matter, we conducted extensive interviews with former and current Government agency employees about their knowledge of the incident. We also interviewed people outside of the Government having an involvement with the NUMEC operation. Specifically, we contacted 42 former and current employees of DOE and NRC. We contacted 12 former and current officials of the Department of Justice and the FBI, 11 from the CIA, and 20 other individuals, including 7 people that formerly worked at NUMEC. Our interviews were with those most knowledgeable of the incident at all levels of these organizations, including the former Chairman of AEC, two former Attorneys General of the United States, the president of NUMEC, former and current presidential aides, and FBI/CIA/DOE investigators. (See appendix I for a summary listing of individuals contacted during our review.)

We believe we conducted the most thorough and complete investigation possible under the severe limitations imposed on us by several Federal agencies.

C01162251

SECRET

## CHAPTER 5

## SCOPE OF REVIEW

We obtained the information contained in this report by reviewing documents, reports, correspondence, and other records of the former AEC and ERDA, and DOE and NRC. We also interviewed officials at

--DOE headquarters, Washington, D.C., and Germantown, Maryland;

--CIA headquarters, Langley, Virginia;

--FBI headquarters, Washington, D.C.;

--NRC headquarters, Bethesda, Maryland; and

--many other locations across the country.

Because we were unable to obtain source documents from some of the organizations involved in the matter, we conducted extensive interviews with former and current Government agency employees about their knowledge of the incident. We also interviewed people outside of the Government having an involvement with the NUMEC operation. Specifically, we contacted 42 former and current employees of DOE and NRC. We contacted 12 former and current officials of the Department of Justice and the FBI, 11 from the CIA, and 20 other individuals, including 7 people that formerly worked at NUMEC. Our interviews were with those most knowledgeable of the incident at all levels of these organizations, including the former Chairman of AEC, two former Attorneys General of the United States, the president of NUMEC, former and current presidential aides, and FBI/CIA/DOE investigators. (See appendix I for a summary listing of individuals contacted during our review.)

We believe we conducted the most thorough and complete investigation possible under the severe limitations imposed on us by several Federal agencies.

31
SECRET

C01162251

APPENDIX I

**SECRET**

## SUMMARY LIST OF INDIVIDUALS
### CONTACTED IN PREPARING REPORT

**AEC/ERDA/DOE**

  1 former Chairman, AEC
  2 former Commissioners, AEC
 14 former staff members, AEC/ERDA
 13 current staff members, DOE

**CIA**

  Current Director
  General Counsel
  1 former Director
  2 former Deputy Directors
  6 current staff members

**NRC**

  1 former Chairman
  5 former staff members
  6 current staff members

**DOJ**

  Current Attorney General
  2 former Attorneys General
  3 staff attorneys

**FBI**

  3 former agents
  3 current agents

**NUMEC**

  Former President of company
  Former Vice President of company
  Former Treasurer of company
  Former Secretary of company
  3 former employees

**JCAE**

  2 former executive staff directors

**SECRET**

C01162251

APPENDIX I

**SECRET**

## SUMMARY LIST OF INDIVIDUALS
### CONTACTED IN PREPARING REPORT

**AEC/ERDA/DOE**

  1 former Chairman, AEC
  2 former Commissioners, AEC
 14 former staff members, AEC/ERDA
 13 current staff members, DOE

**CIA**

  Current Director
  General Counsel
  1 former Director
  2 former Deputy Directors
  6 current staff members

**NRC**

  1 former Chairman
  5 former staff members
  6 current staff members

**DOJ**

  Current Attorney General
  2 former Attorneys General
  3 staff attorneys

**FBI**

  3 former agents
  3 current agents

**NUMEC**

  Former President of company
  Former Vice President of company
  Former Treasurer of company
  Former Secretary of company
  3 former employees

**JCAE**

  2 former executive staff directors

**SECRET**

C01162251  APPENDIX I

SECRET

APPENDIX I

## Senate Select Intelligence Committee

1 current staff member

### Others

6 former and current Presidential aides
2 staff members Pennsylvania Department of Revenue and Taxation
1 staff member U.S. Securities and Exchange Commission
1 official of Mellon Bank, Pittsburgh, Pennsylvania

33
SECRET

C01162251  APPENDIX I

SECRET

APPENDIX I

Senate Select Intelligence Committee

1 current staff member

Others

6 former and current Presidential aides
2 staff members Pennsylvania Department of Revenue and Taxation
1 staff member U.S. Securities and Exchange Commission
1 official of Mellon Bank, Pittsburgh, Pennsylvania

33
SECRET

C01162251

SECRET

APPENDIX II

APP. II :



Department of Energy
Washington, D.C. 20545

July 25, 1978

Mr. Monte Canfield, Jr., Director
Energy and Minerals Division
U.S. General Accounting Office
Washington, D.C. 20548

Dear Mr. Canfield:

Thank you for the opportunity to review and comment on the GAO draft report entitled "Nuclear Diversion in the U.S. - 13 Years of Contradiction and Confusion."

In our July 21, 1978 meeting with Mr. J. Howard and other members of your staff, we discussed our comments and concerns with the draft report as written. As the result of our meeting, we understand that certain changes are to be made which will point out that DOE has made significant improvements in strengthening past safeguard policies and practices since 1965. We also understand that the report will be clarified in other respects consistent with our comments furnished under separate cover. However, we are concerned that the readers of the report might obtain its recommendation might obtain an incorrect impression of DOE's ability to respond to threats or incidents of suspected or real theft or diversion of nuclear material (SNM).

DOE responds in a very timely and effective manner to terrorism threats and incidents of suspected or real diversion or thefts of nuclear materials in the U.S. We have a comprehensive plan and a memorandum of understanding with the FBI for joint responses to nuclear threat situations. We also have clear and open channels to other agencies such as the CIA and NRC for the exchange of information pertinent to potential nuclear theft, alleged black market incidents involving SNM, etc. Further, we have an arrangement with the FBI to provide formal in-service training for agents in the technical and scientific sophistications relevant to nuclear investigations. NRC has fully participated in this program. Also, we have briefed Congress on some detail on various aspects of our emergency preparedness and response program. Information on our emergency preparedness and response program, including our formal policies and procedures, continues to be available for review by your representatives.



34

SECRET

C01162251

APPENDIX II

APP. II :

Department of Energy
Washington, D.C. 20545

July 25, 1978

Mr. Monte Canfield, Jr., Director
Energy and Minerals Division
U.S. General Accounting Office
Washington, D.C. 20548

Dear Mr. Canfield:

Thank you for the opportunity to review and comment on the GAO draft report entitled "Nuclear Diversion in the U.S. - 13 Years of Contradiction and Confusion."

In our July 21, 1978 meeting with Mr. J. Howard and other members of your staff, we discussed our comments and concerns with the draft report as written. As the result of our meeting, we understand that certain changes are to be made which will point out that DOE has made significant improvements in strengthening past safeguard policies and practices since 1965. We also understand that the report will be clarified in other respects consistent with our comments furnished under separate cover. However, we are concerned that the readers of the report might obtain its recommendation might obtain an incorrect impression of DOE's ability to respond to threats or incidents of suspected or real theft or diversion of nuclear material (SNM).

DOE responds in a very timely and effective manner to terrorism threats and incidents of suspected or real diversion or thefts of nuclear materials in the U.S. We have a comprehensive plan and a memorandum of understanding with the FBI for joint responses to nuclear threat situations. We also have clear and open channels to other agencies such as the CIA and NRC for the exchange of information pertinent to potential nuclear theft, alleged black market incidents involving SNM, etc. Further, we have an arrangement with the FBI to provide formal in-service training for agents in the technical and scientific sophistications relevant to nuclear investigations. NRC has fully participated in this program. Also, we have briefed Congress on some detail on various aspects of our emergency preparedness and response program. Information on our emergency preparedness and response program, including our formal policies and procedures, continues to be available for review by your representatives.

34

SECRET

C01162251

SECRET

APPENDIX II

Mr. Monte Canfield, Jr.

July 25, 1978

The thrust of the recommendations concerning investigation of threats was clarified during our discussion to apply to after-the-fact resolution of reasons for or causes of threat indications. It is proposed that these recommendations be restated to make clear that they are directed to agencies other than DOE and not to DOE or its ability to investigate and respond to threats or diversions of SNM in a timely and effective manner.

Sincerely,

Fred L. Hiser, Director
Division of GAO Liaison
Office of the Controller

35

SECRET

C01162251

APPENDIX II

SECRET

APPENDIX II

Mr. Monte Canfield, Jr.

July 25, 1978

The thrust of the recommendations concerning investigation of threats was clarified during our discussion to apply to after-the-fact resolution of reasons for or causes of threat indications. It is proposed that these recommendations be restated to make clear that they are directed to agencies other than DOE and not to DOE or its ability to investigate and respond to threats or diversions of SNM in a timely and effective manner.

Sincerely,

Fred L. Hiser, Director
Division of GAO Liaison
Office of the Controller

35

SECRET

APPENDIX III

1 September 1978

The Honorable Elmer Staats
Comptroller General of the United States
Washington, D.C.

Dear Elmer,

In the period August 1977 to August 1978 CIA was in sustained contact with the General Accounting Office (GAO) concerning its current investigation of nuclear materials unaccounted for from the facilities of the Nuclear Materials and Equipment Corporation (NUMEC) of Apollo, Pennsylvania. We believe that this dialogue has contributed to GAO's understanding of some of the key issues that are touched on in the GAO report titled, "Nuclear Diversion in the United States? Thirteen Years of Contradiction and Confusion." One needs to note, however, that the issues that have been of primary interest to GAO in its present investigation find their origins in a complex situation that first came to the attention of the United States Government in 1965. As a result, while it is agreed that the nuclear material that has been unaccounted for since 1965 is uranium-235, it is less clear, despite lengthy investigations and inspections conducted at different times over the past thirteen years by GAO, the FBI and DOE, as to what actually happened to this uranium. In view of these circumstances, CIA officers have spent a substantial number of hours during several different meetings in recent weeks in reviewing with GAO personnel a number of factual errors and misunderstandings in the earlier versions of the draft report which were eventually eliminated. We find, however, that the tone of the GAO report suggests a less than forthright approach to the NUMEC issue by CIA. Insofar as this agency's role in this matter is concerned, which is all that we can address, the report creates an unfortunate and inaccurate impression which in our view cannot be substantiated by the facts as we have been able to reconstruct them. This judgment leads us, therefore, to comment in the following paragraphs on our reactions to the GAO report before it is made final.

The circumstances surrounding the identification of nuclear materials unaccounted for, when combined with media speculations on what may have happened to this material, have generated a number of allegations. It is important to note, therefore, that CIA's knowledge of those events which could in any way impact on these



36

SECRET

WARNING NOTICE
SENSITIVE INTELLIGENCE SOURCES
AND METHODS INVOLVED

APPENDIX III

1 September 1978

The Honorable Elmer Staats
Comptroller General of the United States
Washington, D.C.

Dear Elmer,

In the period August 1977 to August 1978 CIA was in sustained contact with the General Accounting Office (GAO) concerning its current investigation of nuclear materials unaccounted for from the facilities of the Nuclear Materials and Equipment Corporation (NUMEC) of Apollo, Pennsylvania. We believe that this dialogue has contributed to GAO's understanding of some of the key issues that are touched on in the GAO report titled, "Nuclear Diversion in the United States? Thirteen Years of Contradiction and Confusion." One needs to note, however, that the issues that have been of primary interest to GAO in its present investigation find their origins in a complex situation that first came to the attention of the United States Government in 1965. As a result, while it is agreed that the nuclear material that has been unaccounted for since 1965 is uranium-235, it is less clear, despite lengthy investigations and inspections conducted at different times over the past thirteen years by GAO, the FBI and DOE, as to what actually happened to this uranium. In view of these circumstances, CIA officers have spent a substantial number of hours during several different meetings in recent weeks in reviewing with GAO personnel a number of factual errors and misunderstandings in the earlier versions of the draft report which were eventually eliminated. We find, however, that the tone of the GAO report suggests a less than forthright approach to the NUMEC issue by CIA. Insofar as this agency's role in this matter is concerned, which is all that we can address, the report creates an unfortunate and inaccurate impression which in our view cannot be substantiated by the facts as we have been able to reconstruct them. This judgment leads us, therefore, to comment in the following paragraphs on our reactions to the GAO report before it is made final.

The circumstances surrounding the identification of nuclear materials unaccounted for, when combined with media speculations on what may have happened to this material, have generated a number of allegations. It is important to note, therefore, that CIA's knowledge of those events which could in any way impact on these

36

SECRET

WARNING NOTICE
SENSITIVE INTELLIGENCE SOURCES
AND METHODS INVOLVED

C01162251

C01162251

25X1, E.O.13526

## APPENDIX III

allegations stems from this agency's pursuit of foreign intelligence and counterintelligence objectives which deal with the issues of worldwide nuclear proliferation. In short, CIA's interest in intelligence and counterintelligence matters enables it to comment on events in overseas areas to include the making of estimates about the growing capabilities of foreign countries in the nuclear arena. This situation has been explained to the GAO investigators on several different occasions. The GAO report implies, however, that there was a CIA estimate on the alleged NUMEC diversion which was never admitted to by this agency. The GAO cites a newspaper article to buttress this point.

This brief passage was contained in an overall estimate on nuclear proliferation worldwide. Despite the availability of this background information, the GAO report opts to leave this issue factually unclear.

In a policy sense the key allegations that continue to circulate relative to the material unaccounted for are:

a. The material was illegally diverted to Israel by NUMEC's management for use in nuclear weapons.

b. The material was diverted to Israel by NUMEC's management with the assistance of the CIA.

c. The material was diverted to Israel with the acquiescence of the United States Government.

d. There has been a cover-up of the NUMEC incident by the United States Government involving a President of the United States.

CIA has no 'hard intelligence' concerning the allegations outlined in subparagraph a. above. It was CIA, however, which requested an FBI investigation as early as 1966.

Despite this historical record, it is implied in the GAO report that CIA failed to cooperate with United States officials who were concerned with the NUMEC case. We believe the facts of the matter argue otherwise. Of particular note in this regard is the reality that since the NUMEC case was reopened in 1976 by Presidential direction, a large number of officials in the executive and legislative branches have been briefed on NUMEC-related developments by CIA.

37

SECRET

C01162251

25X1, E.O.13526

APPENDIX III

allegations stems from this agency's pursuit of foreign intelligence and counterintelligence objectives which deal with the issues of worldwide nuclear proliferation. In short, CIA's interest in intelligence and counterintelligence matters enables it to comment on events in overseas areas to include the making of estimates about the growing capabilities of foreign countries in the nuclear arena. This situation has been explained to the GAO investigators on several different occasions.

In a policy sense the key allegations that continue to circulate relative to the material unaccounted for are:

a. The material was illegally diverted to Israel by NUMEC's management for use in nuclear weapons.

b. The material was diverted to Israel by NUMEC's management with the assistance of the CIA.

c. The material was diverted to Israel with the acquiescence of the United States Government.

d. There has been a cover-up of the NUMEC incident by the United States Government involving a President of the United States.

Despite this historical record, it is implied in the GAO report that CIA failed to cooperate with United States officials who were concerned with the NUMEC case. We believe the facts of the matter argue otherwise. Of particular note in this regard is the reality that since the NUMEC case was reopened in 1976 by Presidential direction, a large number of officials in the executive and legislative branches have been briefed on NUMEC-related developments by CIA.

37

SECRET

C01162251

SECRET

APPENDIX III



available on Israeli nuclear developments that had been the case in 1968, the new information did not change the thrust of their earlier conclusions concerning the previous allegations of a diversion.

GAO has also been advised, repeatedly, that CIA has no information that would substantiate the allegations outlined in subparagraph, b, c and d.

Also of concern to us is the GAO allegation that CIA changed its position on the alleged diversion of nuclear materials. This situation resulted from GAO participation in an August 1977 meeting at which they were given an oral briefing on Israeli nuclear developments and how these might impact on GAO's NUMEC investigation. The participants at the briefing were retired and active duty CIA officers. The retired employee spoke from memory on past events without the benefit of access to file data. The current employees talked primarily from data that had been retrieved from the files, since the principal briefer had not been a firsthand participant in monitoring Israeli nuclear developments in the 1965 to 1975 period. The GAO report tends to comingle the results of what was said at that meeting by both the retired employee and by the current employees into one official CIA position. This, in our view, is not a proper investigative technique, for it creates confusion where there should be none. In short, the retired official talked from memory and in so doing surfaced data that was not recorded either in our current files or in our institutional memory. This new material was not challenged at the time it was presented, but subsequent checks revealed that some of it could not be confirmed by documentary data. This does not mean the information as stated was not true. It simply reflects a situation in which file data on this topic has not proven to be less than adequate. In addition, the retired employee mentioned one or two items that subsequent checks revealed were garbled. Although this entire matter has been explained to GAO investigators, and we have made the point that the key issue in this dialogue hinges on the semantic problem concerning the use of the term "evidence," the reader of the GAO report is left with the impression that GAO does not fully accept this explanation. This in turn raises a question of contradictions when in fact there is none.

We are of the opinion that that part of the "confusion and contradiction" recorded in the GAO report reflects the results of investigators talking to employees of other agencies whomCIA did not brief on its knowledge of Israeli nuclear developments. If the employee contacted by GAO did not have access to this organization's files or did not recall past events involving CIA action, the GAO report makes it appear that CIA was either remiss in not briefing the employee or is not recounting past events accurately. This is a distortion that needs to be corrected, for when

SECRET

C01162251

SECRET

APPENDIX III

25X1, E.O.13526

CIA briefed an individual FBI or DOE employee, we were passing information to the institution that was involved and not the individual. If, in subsequent periods, the institution's current employees cannot retrieve this data or they do not have access to it within their organization, this factor should in our view not be stated or implied as a shortfall in CIA procedures or openness in dealing with other agencies.

The GAO report accurately states that its officers were denied access to documents. It should be stated in the report with equal vigor that congressional staffers directly engaged in the NUMEC case did subsequently review relevant CIA files and others, including GAO, were verbally briefed on CIA's knowledge of pertinent events.

The GAO report makes a number of recommendations. We cannot foresee how these will be acted on by those who have the responsibility to consider these key points. CIA remains fully aware, however, of the need to cooperate with those in the United States who have the legal mandate to investigate nuclear material unaccounted for. We will fulfill this responsibility while simultaneously meeting our obligations to protect sources and methods.

As a final point, let me say that my staff is looking at the question of what portion of the GAO report can be declassified. We will be in touch with your associates on this matter in a prompt manner.

Yours,

STANSFIELD TURNER

39

SECRET

C01162251

SECRET

APPENDIX III

25X1, E.O.13526

The GAO report accurately states that its officers were denied access to documents. It should be stated in the report with equal vigor that congressional staffers directly engaged in the NUMEC case did subsequently review relevant CIA files and others, including GAO, were verbally briefed on CIA's knowledge of pertinent events.

The GAO report makes a number of recommendations. We cannot foresee how these will be acted on by those who have the responsibility to consider these key points. CIA remains fully aware, however, of the need to cooperate with those in the United States who have the legal mandate to investigate nuclear material unaccounted for. We will fulfill this responsibility while simultaneously meeting our obligations to protect sources and methods.

As a final point, let me say that my staff is looking at the question of what portion of the GAO report can be declassified. We will be in touch with your associates on this matter in a prompt manner.

Yours,

STANSFIELD TURNER

39

SECRET

C01162251

APPENDIX IV

SECRET

UNITED STATES
NUCLEAR REGULATORY COMMISSION
WASHINGTON D C 20555

JUL 13 1976

Mr. Monte Canfield, Jr., Director
Energy and Minerals Division
U. S. General Accounting Office
Washington, DC 20548

Dear Mr. Canfield:

SUBJECT: GAO DRAFT REPORT, "NUCLEAR DIVERSION IN THE US? 13 YEARS
OF CONTRADICTION AND CONFUSION" (SECRET/NSI)

The Nuclear Regulatory Commission has no comments on the content
of the report. The recommendations to Heads of Agencies appears
reasonable.

Sincerely,

Lee V. Gossick
Executive Director
for Operations

(30513)

40

SECRET

APPENDIX IV

SECRET

UNITED STATES
NUCLEAR REGULATORY COMMISSION
WASHINGTON D C 20555

JUL 13 1976

Mr. Monte Canfield, Jr., Director
Energy and Minerals Division
U. S. General Accounting Office
Washington, DC 20548

Dear Mr. Canfield:

SUBJECT: GAO DRAFT REPORT, "NUCLEAR DIVERSION IN THE US? 13 YEARS
OF CONTRADICTION AND CONFUSION" (SECRET/NSI)

The Nuclear Regulatory Commission has no comments on the content
of the report. The recommendations to Heads of Agencies appears
reasonable.

Sincerely,

Lee V. Gossick
Executive Director
for Operations

(30513)

40

SECRET

C01162251

APPENDIX V

UNITED STATES DEPARTMENT OF JUSTICE
Washington, D.C. 20530

February 8, 1978

B-16491

Honorable Elmer B. Staats
Comptroller General of the
United States
Washington, D. C.   20548

Dear Mr. Staats:

   This is in response to your letter to me, dated
December 16, 1977, requesting access to records, reports
and files in the possession of this Department which relate
to the Nuclear Materials and Equipment Corporation (NUMEC)
of Apollo, Pennsylvania. Your inquiry into this matter was
at the request of Chairman Dingell of the House Subcommittee
on Energy and Power. You also requested to be informed of
the scope of our investigation and the estimated date of its
completion.

   As you may know, in response to a similar request from
Chairman Dingell, the Deputy Attorney General informed him,
by letter dated September 8, 1977, that Department policy
has been to provide oral briefings by the FBI to Congressional
committees which have inquired about this matter.  Such a
briefing was offered to Chairman Dingell.

   The recent meeting of FBI representatives with Mr.
Canfield, Director of the GAO Energy and Minerals Division
and members of his staff, to which you refer in your letter,
was in fact a briefing by the FBI as a result of the Acting
Comptroller General's letter to me of August 30, 1977.

41

C01162251

APPENDIX V

UNITED STATES DEPARTMENT OF JUSTICE
Washington, D.C. 20530

February 8, 1978

B-16491

Honorable Elmer B. Staats
Comptroller General of the
United States
Washington, D. C.   20548

Dear Mr. Staats:

   This is in response to your letter to me, dated
December 16, 1977, requesting access to records, reports
and files in the possession of this Department which relate
to the Nuclear Materials and Equipment Corporation (NUMEC)
of Apollo, Pennsylvania. Your inquiry into this matter was
at the request of Chairman Dingell of the House Subcommittee
on Energy and Power. You also requested to be informed of
the scope of our investigation and the estimated date of its
completion.

   As you may know, in response to a similar request from
Chairman Dingell, the Deputy Attorney General informed him,
by letter dated September 8, 1977, that Department policy
has been to provide oral briefings by the FBI to Congressional
committees which have inquired about this matter.  Such a
briefing was offered to Chairman Dingell.

   The recent meeting of FBI representatives with Mr.
Canfield, Director of the GAO Energy and Minerals Division
and members of his staff, to which you refer in your letter,
was in fact a briefing by the FBI as a result of the Acting
Comptroller General's letter to me of August 30, 1977.

41

C01162251

APPENDIX V

APPENDIX V

- 2 -

In view of the fact that our investigation into this matter is continuing, I am not able to accede to your request at this time. Consideration will, of course, be given to your request upon the conclusion of our investigation.

I am unable to estimate when the investigation will be concluded. You may be assured, however, that it is being carried out as expeditiously as possible.

Yours sincerely,

Griffin B. Bell
Attorney General

42

C01162251

APPENDIX V

APPENDIX V

- 2 -

In view of the fact that our investigation into this matter is continuing, I am not able to accede to your request at this time. Consideration will, of course, be given to your request upon the conclusion of our investigation.

I am unable to estimate when the investigation will be concluded. You may be assured, however, that it is being carried out as expeditiously as possible.

Yours sincerely,

Griffin B. Bell
Attorney General

42

SECRET
UNCLASSIFIED

UNCLASSIFIED
SECRET

C0116225l



SECRET

SECRET

C0116225l

# Exhibit 12

NLF MR Case No _____ 13-031

Document No _____ #1

SECRET

CENTRAL INTELLIGENCE AGENCY

WASHINGTON, D. C. 20505

OFFICE OF THE DIRECTOR

2  APR 1968

DECLASSIFIED UNDER AUTHORITY OF THE
INTERAGENCY SECURITY CLASSIFICATION APPEALS PANEL,
E.O. 13526, SECTION 5.3(b)(3)

ISCAP APPEAL NO. 2013-062, document no. 1
DECLASSIFICATION DATE: March 18, 2014

The Honorable Ramsey Clark
The Attorney General
Washington, D. C.

Dear Ramsey,

You are well aware of the great concern which exists at the
highest levels of this Government with regard to the proliferation
of nuclear weapons.  With the expanding use of nuclear energy for
power and the greater civilian involvement with nuclear material
there is a real danger that clandestine traffic in these materials
might occur.

In this connection I would like to bring the following matter
to your attention.  The Nuclear Materials and Equipment Corpo-
ration of Apollo, Pennsylvania, is one of the principal processors
of nuclear materials such as plutonium and U 235 which if diverted
could be used for weapons.  Although NUMEC made periodic physi-
cal inventories and the United States Atomic Energy Commission
performed a number of accountability surveys, a significant
quantity of enriched U 235, possibly representing a cumulative loss
over a period of years, could not be accounted for in the spring of
1965.  These losses came to light in the closing out of a large
contract.  Because of the condition of NUMEC's records and the
nature of the operation, the specific disposition of this material
could not be identified.  At that time the AEC reported that al-
though it could not be stated with certainty that a diversion of this
material had not taken place, no evidence had been found to support
the possibility of diversion and that other information did exist to
reduce such a possibility.

25X1, E.O.13526

SECRET

Photocopy
from
Gerald R. Ford Library

SECRET

25X1, E.O.13526

It is critical for us to establish whether or not the Israelis now have the capability of fabricating nuclear weapons which might be employed in the Near East. Furthermore, introduction by Israel of such weapons into their arsenal would undoubtedly affect the Non-Proliferation Treaty which has been placed before the United Nations by the United States and the USSR.

Given the aforementioned circumstances, I urge that the Federal Bureau of Investigation be called upon to initiate a discreet intelligence investigation of an all source nature of Dr. Shapiro in order to establish the nature and extent of his relationship with the Government of Israel.

Sincerely,

Richard Helms

2

SECRET

Photocopy
from
Gerald R. Ford Library

# Exhibit 13

OCT.10.2012   2:25PM                                      NO.449   P.1

~~TOP SECRET~~/SENSITIVE - XGDS

4

MEMORANDUM

NATIONAL SECURITY COUNCIL

July 28, 1977


MEMORANDUM FOR:      JESSICA TUCHMAN

FROM:                JOHN MARCUM

SUBJECT:             Israel and MUF


Ted Schackley called today on a secure line and provided the following
responses to our inquiries of yesterday:



25X1, E.O.13526

DECLASSIFIED UNDER AUTHORITY OF THE
INTERAGENCY SECURITY CLASSIFICATION APPEALS PANEL.
E.O. 13526, SECTION 5.3(b)(3)

ISCAP APPEAL NO. 2012-167, document no. 3
DECLASSIFICATION DATE: March 18, 2014

~~TOP SECRET~~/SENSITIVE - XGDS

OCT.10.2012   2:25PM                                               NO.449   P.2

~~TOP SECRET~~/SENSITIVE - XGDS                                              2

25X1, E.O.13526

~~TOP SECRET~~/SENSITIVE - XGDS

OCT.18.2012 2:25PM                                                    NO.449   P.3

~~TOP SECRET~~/SENSITIVE - XGDS

3

I also asked Schackley to get us a rundown on the political aspects --
e.g., when were the President and Congressional officials briefed on
the Israeli weapons program, on the NUMEC connection, and what
were their reactions.    In December, Carter was briefed on the
NUMEC problem as President-elect by Bush in Georgia.  I have also
heard sketchy accounts of briefings for Johnson and Nixon, but it
would be useful to get these details in hand in case there is a
Congressional inquiry later.

We should discuss next steps on this issue and the MUF release.  At
this point, despite the FBI clean bill of health, I do not think the
President has plausible deniability.  The CIA case is persuasive,
though not conclusive,

25X6, E.O.13526

# Exhibit 14

*file*



# Office of the Attorney General
## Washington, B. C.

April 25, 1979

MEMORANDUM TO: Attorney General

FROM: Frederick D. Baron 

RE: NUMEC Investigation

On March 22, 1979, an article in the New York Times referred to the fact that the FBI and CIA had refused access to GAO to examine classified material from their files pertinent to the NUMEC investigation of allegations of diversion of nuclear material from a plant in Apollo, Pennsylvania.

Jack Keeney in the Criminal Division indicated, by way of background, that you wrote the Comptroller General on February 9, 1978, refusing GAO access to the Department's files because the NUMEC investigation was still continuing. The Internal Security Section has now completed a detailed review of thousands of CIA documents and is preparing a report. On the basis of this document review, some further investigation by the FBI will be necessary. Termination of the investigation will depend in large measure on the results of the Bureau's investigation.

Jack Keeney believes that upon completion of the review, we should give serious consideration to making the materials available to an appropriate committee of Congress.

cc: John C. Keeney

Jack Davitt

Noted
GBB
4/30/79

*Rle-~~First~~ NUMEC*

UNITED STATES GOVERNMENT

APR 17 1979

John C. Keeney
Deputy Assistant Attorney General
Criminal Division

SUBJECT: NUMEC Investigation

TO: The Attorney General

# memorandum

JCK:JHD:TEM:njs
146-41-15-3112

By a memorandum dated April 2, 1979, Frederick **D.**
Baron requested that I summarize the background of our
refusal to allow the GAO to examine classified material
from our files on the NUMEC matter, as was reported in
an article in the March 22, 1979 edition of The New York
Times.

As the article indicates, the Comptroller General,
in a letter to Chairman Dingell of the House Subcommittee
on Energy and Power, discussed the refusal of the FBI and
the CIA last year to allow the GAO to examine classified
material concerning the NUMEC matter. The article did
not indicate that the Department, other than the FBI, had
refused access to GAO.

In this regard, however, by letter to the Comptroller
General, dated February 9, 1978, a copy of which is
attached hereto, you declined to permit the GAO to have
access to the Department's files because the NUMEC investi-
gation was continuing.

In answer to Mr. Baron's question, the Internal
Security Section's task force has completed its detailed
review of the thousands of CIA documents, and its report
on that aspect of the matter is being prepared. In
addition, it is reviewing the FBI's investigation and is
preparing directions to the FBI on additional matters that
must be covered. Unfortunately, it is not possible to
make any intelligent prediction as to when the NUMEC
investigation will be concluded by the Internal Security
Section. The reason is that it has been our past
experience that new vistas have opened up just when it
has been concluded that the investigation could be termi-
nated. For example, we only learned as a result of a
letter to you from Senator Baker last year (copy attached)
that the CIA had a substantial number of documents of rele-
vance to this case. Our review of these documents generated,
in part, the need of further specific investigation by
the FBI which, as I have indicated, we intend to seek.



**Buy U.S. Savings Bonds Regularly on the Payroll Savings Plan**

☆ U.S. Government Printing Office: 1977—241-530/3474

OPTIONAL FORM NO. 10
(REV. 7-76)
GSA FPMR (41 CFR) 101-11.6

2

Thus, the termination of the investigation will depend,
in large measure, on the results of the Bureau's investi-
gation.

Finally, in response to the question of making
documents available to GAO once the NUMEC investigation is
closed, I believe that upon completion of our review, we
should give serious consideration to making the materials
available to an appropriate committee of Congress.

# Exhibit 15

OCT.12.2212   2:26PM

MEMORANDUM

~~TOP SECRET~~

No. 449   P.4

THE WHITE HOUSE
WASHINGTON

~~TOP SECRET~~/SENSITIVE

5367

MEMORANDUM FOR:        THE PRESIDENT

FROM:                  ZBIGNIEW BRZEZINSKI

SUBJECT:               Nuclear MUF

A review, as directed by you on our Weekly Report.
ERDA's long-planned release of U.S. MUF (Material Unaccounted
For) data will take place on Thursday (August 4). As I mentioned to
you in a recent Weekly Alert, the public release will undoubtedly
focus intense press and Congressional attention on the missing
material from the NUMEC plant in Apollo, Pennsylvania.

At your direction I have been thoroughly briefed by ERDA, FBI and
CIA. The essential conclusions are these:

-- In the 1950s and '60s, the AEC did not require its licensees to
   make annual physical inventories of their special nuclear
   material. This lead to the practice of a plant's borrowing on a
   subsequent contract in order to cover operational losses (the
   major contributor to MUF) in a current contract. The NUMEC
   plant was particularly bad in this respect. No inventory was
   performed between 1957 and 1965. In mid 1965, the lack of an
   immediate subsequent contract forced NUMEC to do a material
   accounting which revealed that 170 kg of highly enriched uranium
   [        ] was missing.

-- Upon receiving this accounting, the AEC immediately began a long
   series of investigations which continued through 1969, and which
   ultimately concluded that all but 56 kg of the missing material could
   be physically accounted for. ERDA believes now (but has no
   evidence) that even this remaining 56 kg can be accounted for by
   operational losses, but this will be a very hotly contested conclusion.
   The ERDA report also reaches a very carefully guarded conclusion
   that no evidence of theft of significant amounts of material has been
   found. The key paragraph is attached at Tab A.

-- The FBI has undertaken two lengthy investigations of this case.
   The first, beginning in 1965, looked at the question of Shapiro's
   (the President of NUMEC) relationship to the Israeli Government.

~~TOP SECRET~~/SENSITIVE/XGDS

~~TOP SECRET~~

DECLASSIFIED UNDER AUTHORITY OF THE
INTERAGENCY SECURITY CLASSIFICATION APPEALS PANEL,
E.O. 13526, SECTION 5.3(b)(3)
ISCAP APPEAL NO. 2012-167, document no. 4
DECLASSIFICATION DATE: March 18, 2014

Withheld under statutory authority of the
Atomic Energy Act of 1954, as amended
and regulations issued under the Act

It concluded that Shapiro did indeed have frequent contacts with
Israeli officials here, particularly the Science Attache who was
thought to be an intelligence officer. They also discovered that
Shapiro got VIP treatment on trips to Israel for which there
was no obvious explanation. This is the essential sum of their
findings. When these results were transmitted to Helms, then
head of the CIA (at whose request the investigation had been
undertaken), he responded with a series of letters to Hoover
urging that the FBI take additional steps, including wiretapping
and surveillance of Shapiro. Hoover refused.

-- The AEC, at the direction of Attorney General Mitchell, undertook
its own investigation leading up to a full commission interview of
Shapiro in 1969. Strangely, all that Shapiro was asked in that
interview was whether he had ever divulged any classified information
and not whether he had participated in a diversion of material. The
AEC investigation was discontinued in September 1969.

--

> 25X1, E.O.13526

Not surprisingly, Baker went to
President Ford who then ordered the Attorney General to undertake
an immediate investigation. This time the FBI mandate covered
two questions: was there a diversion, and was there a coverup of a
diversion. An intensive study, involving hundreds of interviews,
a full-time team of 6 senior agents, and millions of dollars was
undertaken. It was concluded one week ago. The investigation
was unable to uncover any evidence of a theft although the
interviews included many current and former NUMEC employees.

--

> 25X1 and 6, E.O.13526

--

OCT.18.2012   2:27PM     ~~TOP SECRET~~     NO.449   P.6

> [ 25X1 and 6. E.O.13526 ]

The conclusion from all this is that while a diversion might have occurred,
there is no evidence -- despite an intensive search for some -- to prove
that one did.  For every piece of evidence that implies one conclusion, there
is another piece that argues the opposite.  One is pretty much left with
making a personal judgment -- based on instinct -- as to whether the
diversion did or did not occur.  So far as we know however, (and we have made
serious effort to discover it) there is nothing to indicate active CIA participation
in the alleged theft.

There is a tremendous amount of interest in this issue in Congress, both
because of the existing intelligence aspect and because of the implications
for U.S. safeguards standards (i.e., that such a thing could have happened
over a period of years without being detected).

We face tough sledding in the next few weeks (particularly in view of Cy's
Mid-East trip) in trying to keep attention focused on ERDA's technical
arguments and, if necessary, on the FBI investigations, and away from
the CIA's information.  We run an obvious risk in releasing this information
since it is quite possible that Congressional investigations and press probings
could lead to leaks of the sensitive material.  However, with all the public
expectation of the ERDA release, and the rumors already floating around,
the political costs involved in withholding the release would be unacceptable.

~~TOP SECRET~~

# AEC LICENSEES

AEC LICENSEES, PRIOR TO 1968, WERE REQUIRED TO MAINTAIN ACCOUNTING RECORDS, INVENTORIES, REPORT LOSSES OTHER THAN NORMAL OPERATING LOSSES, AND AFFORD THE AEC ACCESS TO THEIR FACILITIES FOR INSPECTION. THEY WERE ALSO REQUIRED TO ADEQUATELY CONTROL ACCESS TO SNM AND SECURE FISSILE MATERIAL STORAGE AREAS AGAINST UNAUTHORIZED REMOVAL OF SNM. AT THOSE LICENSEES WHICH POSSESSED SIGNIFICANT QUANTITIES OF STRATEGIC SPECIAL NUCLEAR MATERIAL, AEC CARRIED OUT SEPARATELY AND PERIODICALLY ACCOUNTING SYSTEM AND PHYSICAL PROTECTION SURVEYS. IT IS NOT EVIDENT FROM THE RECORDS STILL AVAILABLE THAT THERE WAS (NORMALLY) A SIMULTANEOUS AUDIT OF ACCOUNTABILITY RECORDS AGAINST A COMPLETE PHYSICAL INVENTORY. NO DIRECT EVIDENCE OF ANY THEFT ATTEMPT WAS REPORTED FROM THESE SURVEYS. THERE HAS ALSO NEVER BEEN ANY DIRECT EVIDENCE OF A BLACK MARKET IN SNM.

DECLASSIFIED UNDER AUTHORITY OF THE
INTERAGENCY SECURITY CLASSIFICATION APPEALS PANEL.
E.O. 13526, SECTION 5.3(b)(3)
ISCAP APPEAL NO. 2012-107, document no. 5
DECLASSIFICATION DATE: March 18, 2014